UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LISA GUFFEY & CHRISTINE SMITH,

Plaintiffs,

v.

JAMES C. DUFF, in his official capacity,

Defendant.

No. 18-cv-_____

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
## FOR A PRELIMINARY INJUNCTION

Plaintiffs Lisa Guffey and Christine Smith ask this Court to preliminarily enjoin the Director of the agency that employs them, the Administrative Office of the United States Courts (AOUSC), from enforcing a new Code of Conduct that forbids them from speaking publicly about, attending events for, giving money to, or associating for the purpose of supporting partisan candidates in elections for public office, from members of a town council to President of the United States. The new Code's unprecedented restrictions on the First Amendment rights of hundreds of government employees are far out of proportion to any concrete effect their political activity could have on the government's operations and cannot be justified by the three vague interests that the AOUSC has asserted. The Code has imposed more severe limitations on political participation by a judicial-branch IT specialist, facilities manager, or human resources specialist than Congress has imposed on employees of the Federal Election Commission — the very agency responsible for enforcing the nation's election laws. While the Code's restrictions are in place, Plaintiffs and hundreds of their colleagues will be denied some of their most fundamental rights in our

democratic system. For these reasons and those elaborated below, a preliminary injunction should issue.

## BACKGROUND

Created in 1939, the AOUSC provides "legislative, legal, financial, technology, management, administrative, and program support services to federal courts." U.S. Courts, Judicial Administration, *at* http://www.uscourts.gov/about-federal-courts/judicial-administration. In service of this mission, AOUSC employees carry out a variety of tasks in support of the federal judiciary but do not themselves decide individual cases or participate in the decisional process (in contrast to, for instance, a judge's law clerks).

Plaintiff Lisa Guffey's job is to regularly assess whether federal defender offices and court panel attorney programs are properly resourced, operating effectively, and complying with relevant administrative policies and procedures. Decl. of Lisa Guffey ("Guffey Decl.") ¶ 2. Plaintiff Christine Smith's job is to address the IT needs of the federal public defender and community defender offices and to make recommendations concerning defender IT and cybersecurity policy. Decl. of Christine Smith ("Smith Decl.") ¶ 2. Neither Ms. Guffey nor Ms. Smith has any influence regarding the outcome of any individual case pending before an Article III judge; indeed, they do not come into contact with judges more than a handful of times a year, much less are they in a position to implement any sort of partisan agenda of their own. *See* Guffey Decl. ¶¶ 3-4; Smith Decl. ¶ 3.

Other employees of the AOUSC are similarly removed from the process of deciding cases. Outside of its "executive offices," the AOUSC consists of three departments, Technology Services, Administrative Services, and Program Services. The first two of these plainly have no responsibilities that pertain to judicial decisionmaking; instead, they are responsible for the basic,

day-to-day operations of the judicial branch, as a list of the name of the Technology and Administrative Services subcomponents makes clear: Technology Solutions, IT Security, Systems Deployment and Support, Cloud Technology and Hosting, Infrastructure Management, AOUSC Technology, Human Resources, Finance and Procurement, Facilities and Security, and Administrative Systems. Guffey Decl. ¶¶ 6-9.

Although the divisions within Program Services have some responsibility for overseeing and supporting substantive functions performed by judicial branch employees like federal public defenders and probation officers, Program Services employees such as Plaintiffs Guffey and Smith, like their counterparts in Technology Services and Administrative Services, are not involved in and have no influence over the process of deciding cases, and they do not perform functions that could provide them with any opportunity to inject their political views into their work. Specifically, the Judicial Services Office supports the needs of judges and their staff (such as by coordinating travel), and it conducts assessments of the judiciary's workload and staffing needs. Guffey Decl. ¶ 10. The Court Services Office manages services related to court administration and case management, including providing day-to-day operational support for the federal courts. *Id.* The Defender Services Office provides leadership, direction, administration, management, oversight, and support for the federal system of providing legal representation and other defense services under the Criminal Justice Act, including by providing training and advice to appointed counsel and by developing policies and procedures regarding appointed counsel. *Id.* The Probation and Pretrial Services Office manages, oversees, and supports the judiciary's probation and pretrial services program, including training, operational support, and development of policies and procedures. *Id.* The Judiciary Data and Analysis Office provides data analysis and reporting, ensures the judiciary's compliance with data governance standards, and provides

technical support. *Id.* The Case Management Systems Office oversees, supervises, and coordinates case management systems, facilitates the effective use of information technology by the judiciary, and manages the transition to the "Next Generation CM/ECF" system for legal filings. *Id.*

Finally, apart from the Offices of the Director and Deputy Director, the AOUSC also has several "executive" offices and these, too, are far removed from the process of deciding cases or any other function susceptible to skewed performance on account of political bias: the Office of Audit administers financial audits of the judiciary, the Office of the General Counsel provides legal counsel to employees of the judicial branch; the Judicial Conference Secretariat provides support for the Judicial Conference, the Office of Public Affairs conducts public-relations activities, the Office of Legislative Affairs is the judiciary's legislative liaison, the Office of Fair Employment Practices protects against discrimination and promotes diversity at the AOUSC, and the Office of AOUSC Human Resources provides human resources service to AOUSC employees. Guffey Decl. ¶ 11.

Prior to March 1, 2018, AOUSC employees (other than a handful of high-level "designated employees") were permitted to engaged in a wide variety of off-duty political activities with regard to both partisan and non-partisan offices, including expressing views on political candidates publicly, displaying political signs and badges, contributing to parties and partisan candidates for office, joining a political party, and attending political fundraisers. With respect to state and local (but not federal) elective offices, AOUSC employees (other than the "designated employees") were also permitted to endorse or oppose partisan candidates for office, drive voters to polls on behalf of parties or partisan candidates, and organize fundraisers. AO Code of Conduct § 260(a)(2), (b)(1), (c)(1), (c)(8), (c)(10), (e)(1), (e)(2) & (f) (Oct. 5, 2016 version) (attached to Guffey Decl. as Exhibit D).

The new Code of Conduct, effective March 1, 2018, added prohibitions on "partisan political activity," AO Code of Conduct § 260 Canon 5(a)(1) (included within the memorandum attached to Guffey Decl. as Exhibit A), and on "mak[ing] speeches for or publicly endors[ing] or oppos[ing] a partisan political organization or candidate," *id.* Canon 5(a)(3). Under this Code and the July 2017 interpretive guidance issued by Defendant AOUSC Director James C. Duff defining the term "partisan political activity," the following political activities are forbidden for all AOUSC employees, even when an AOUSC employee is not at work, not using government facilities for her speech, and not identifying herself as an AOUSC employee:

(1) expressing opinions publicly, including on social media or via articles or letters to the editor, regarding a political party or partisan candidate for office;

(2) wearing or displaying partisan political badges, signs, or buttons;

(3) driving voters to polls on behalf of a political party or partisan candidate for office;

(4) contributing funds to a political party, political action committee, or partisan candidate for office;

(5) attending partisan fundraisers;

(6) being a member of a partisan political organization (other than registering as a member of a party for voting purposes);

(7) attending events for a partisan candidate for office;

(8) organizing events for a partisan candidate for office; and

(9) attending party conventions, rallies, or meetings.

*See* "Examples of Permissible and Impermissible Political Activities," App. to Memo. of James C. Duff, Dir. of the Admin. Office of the U.S. Courts, to All Administrative Office Employees 1-3,

July 10, 2017 (attached to Guffey Decl. as Exhibit A). Plaintiffs will refer to these nine prohibitions as the "Identified Restrictions."[1]

In his memorandum announcing the new Code and its restrictions, Defendant Duff identified two justifications for the new rules: (1) sending the message to the courts conveying "the unity of purpose between the AO and the courts" and demonstrating "that the AO is very much an integral part of the Judicial Branch and not an independent, isolated agency"; and (2) "to align ourselves more consistently with the Court Code," i.e., the Code of Conduct that applies to judges. *Id.* at 1-2.

In response to a March 2018 letter on behalf of Plaintiffs expressing concern about the new Code and asking that the Identified Restrictions be rescinded, Director Duff opined that the Code was "necessary to maintain the public's confidence in the Judiciary's work" — an interest that he believed "extended beyond" the interest in "prevent[ing] the appearance of corruption in the Legislative and Executive Branches." Letter of James C. Duff to Scott Michelman 1-2, Mar. 30, 2018 (attached to Guffey Decl. as Exhibit B).

The Identified Restrictions will significantly curtail — in fact, throttle — political activity that Plaintiffs would otherwise engage in. Both Plaintiffs have been politically active in the past and desire to continue their political activities in numerous ways forbidden under the new Code. In the past, Plaintiff Guffey has donated money to a national party committee and to individual party candidates, posted yard signs for local candidates for office, attended fundraising events for local candidates, and expressed opinions about political candidates on social media. Guffey Decl. ¶¶ 12-13. Plaintiff Smith has expressed her opinions publicly about candidates and parties

---

[1] Additional restrictions, not at issue here, apply to "designated employees," defined as the Director, the Deputy Director, and the AO Executive Management Group. *See* AO Code of Conduct § 260 Canon 5(b)(1).

(including via social media like Facebook), displayed political bumper stickers and buttons about candidates and parties, drove voters to polls on behalf of a political party, contributed funds to candidates and to a political party, attended and organized fundraising events for candidates, and joined a political party. Smith Decl. ¶ 6. In particular, Plaintiff Smith volunteered as the Volunteer Coordinator for a partisan city council race in Toledo, Ohio, in 2006; in that role, Ms. Smith coordinated the activities of more than 100 volunteers, canvassed neighborhoods, put up posters, made calls, worked at polling places, and attended and organized fundraising events for her candidate. Smith Decl. ¶ 7.

Plaintiffs Guffey and Smith desire to engage in all these activities and more — although not during work hours, using work resources, or while identifying themselves with the AOUSC in any way — with respect to future elections, including the 2018 Maryland gubernatorial election (Ms. Guffey), the 2018 Virginia Senate race (Ms. Smith), the 2021 Virginia gubernatorial election (Ms. Smith), and the 2020 U.S. Presidential election (both). Guffey Decl. ¶¶ 14; Smith Decl. ¶¶ 8-10. In fact, the AOUSC Code of Conduct has already deterred and is continuing to deter both Plaintiffs from political activity in which they would otherwise be engaging. For instance, Plaintiff Guffey was invited to a March 3 reception for a Maryland gubernatorial candidate; she did not attend because of the Code. Guffey Decl. ¶ 15. Plaintiff Guffey would be donating money to a national party committee and a PAC if not for the Code. Guffey Decl. ¶ 14.  Plaintiff Smith has already refrained from publicly wearing clothing expressing support for a partisan candidate, donating to her own U.S. Senator — a partisan candidate who is running for reelection this year — and commenting on Facebook about particular partisan candidates whom she would like to criticize publicly because they advance policies or hold positions that she strongly disagrees with. Smith Decl. ¶ 11. Plaintiffs Guffey and Smith specifically state that in the future, they would, if

permitted, engage in conduct prohibited by the Identified Restrictions with regard to partisan elections. Guffey Decl. ¶ 14; Smith Decl. ¶¶ 10-11.

Since the Code became effective on March 1, 2018, AOUSC officials have made clear that its provisions are not merely hortatory. Seeking to understand the scope of the restrictions imposed on them, both Plaintiffs wrote attorneys in the AOUSC's Office of the General Counsel to ask if they would be subject to discipline if they engaged in specific partisan political activities forbidden by the Code. Both Plaintiffs received responses on March 8 from AOUSC Assistant General Counsel Robert Deyling stating that violating the Code would expose an employee to disciplinary action. Guffey Decl. ¶¶ 15-17; Smith Decl. ¶¶ 12-14.

Neither Director Duff nor any other AOUSC official has identified any manner in which the political activities restricted by the Code would, if allowed, affect the actual operations (including the public's perception) of the AOUSC.

## APPLICABLE LEGAL STANDARD

Preliminary relief is warranted where the party seeking relief makes a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of equities in its favor, and accord with the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016). "In First Amendment cases, the likelihood of success will often be the determinative factor in the preliminary injunction analysis." *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (internal quotation marks omitted). For that reason, where there is likely success on the merits, the court will "view more favorably [Plaintiff]'s arguments regarding irreparable injury, the balance of the equities, and the public interest." *Id.*

Courts in this Circuit have traditionally applied these factors on a "sliding scale," under which a stronger showing on some factors can compensate for a weaker showing on others. *See, e.g., Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317–18 (D.C. Cir. 1998). Regardless, Plaintiffs make the necessary showing here, as all four factors point strongly in their favor.

## ARGUMENT

This Court has inherent equitable power to enjoin federal officials from violating the law. *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015). For the following reasons, that power should be exercised here.

### I.   Plaintiffs Have a Clear Likelihood of Success on the Merits Because Director Duff Is Violating Their First Amendment Rights.

The First Amendment commands the government to "make no law . . . abridging the freedom of speech." Although the government has more latitude to regulate the speech of its employees than of the public at large, the Supreme Court has for fifty years rejected the premise that public employees may by virtue of their employment "constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

Further, when the government imposes an *ex ante* restriction on employee speech (as distinguished from disciplining an employee for her speech after it occurs), its rule has "widespread impact" that "gives rise to far more serious concerns than could any single supervisory decision," because "such a ban chills potential speech before it happens." *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454, 468 (1995) *("NTEU")*. Accordingly, to justify *ex ante* restrictions on public employees' expression, "[t]he Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary

impact on the actual operation' of the Government," which may include the appearance of impropriety. *Id.* at 468, 473 (citation and internal quotation marks omitted). Under this balancing test, the nine Identified Restrictions cannot constitutionally be applied to AOUSC employees.

The political activities restricted by the new Code are at the heart of what the First Amendment protects. "There is no right more basic in our democracy than the right to participate in electing our political leaders. Citizens can exercise that right in a variety of ways: They can run for office themselves, vote, urge others to vote for a particular candidate, volunteer to work on a campaign, and contribute to a candidate's campaign." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1440-41 (2014) (plurality opinion). The nine Identified Restrictions do not involve Plaintiffs' right to vote or run for office (the former is not restricted; the latter is not a right Ms. Smith or Ms. Guffey wishes to exercise at this time), but the other political activities that the Court has identified as "basic" — urging others to vote, working on a campaign, and contributing to a campaign — are severely restricted under the AOUSC's Code of Conduct, even though "speech about the qualifications of candidates for public office," is "at the core of our First Amendment freedoms." *Republican Party of Minn. v. White*, 536 U.S. 765, 774 (2002) (citation and internal quotation marks omitted). "Indeed, the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (citation and internal quotation marks omitted). "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Williams v. Rhodes*, 393 U.S. 23, 31 (1968) (citation and internal quotation marks omitted).

The Identified Restrictions also prohibit a broad range of associational activities — including attending and organizing events and being a member of a partisan political organization

— that have long been recognized as fundamental First Amendment freedoms. *See Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214 (1986) ("The freedom of association protected by the First and Fourteenth Amendments includes partisan political organization. The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom." (citation and internal quotation marks omitted)).

The AOUSC's reasons for imposing these restrictions — the hortatory purpose to "communicate with the courts about the unity of purpose between the AO and the courts," the desire to "align" the AO Code with rules applicable to judges, and Director Duff's speculative concern about public perception — do not come close to demonstrating a "necessary impact on the actual operation of the Government" that "outweigh[s]" the core First Amendment freedoms of the hundreds of employees whose political participation are sharply curtailed by the Code. *NTEU*, 513 U.S. at 468. Indeed, the AOUSC's justifications do not suggest that the political activities prohibited by the Identified Restrictions have any impact on the operation of the government in any form or fashion. The Identified Restrictions, at most, are attempts to build agency morale (the communicative rationale), to promote administrative convenience (the alignment rationale), and to guard against some nebulous and speculative fear about the public's views regarding the judiciary's integrity (the perception rationale). Putting aside the fact that these restrictions will actually harm employees' morale and burden the agency with intrusive enforcement responsibilities, such vague and speculative interests cannot justify the significant restrictions the AOUSC is now imposing on its employees' First Amendment rights.

Unless the AOUSC can demonstrate how an AOUSC employee's off-duty public expression of her political views, donation of resources and time, membership in a political party, and participation in partisan events, all on her own time, necessarily affect the performance of her

duties or the efficiency or public perception of the agency, these restrictions are not justified and cannot be imposed consistent with the First Amendment. As the Court explained in *NTEU*, "a 'reasonable' burden on expression requires a justification far stronger than mere speculation about serious harms." *Id.* at 475. There, in striking down a ban on federal employees' receipt of honoraria for speeches and articles, the Court described the government's burden in these terms: "when the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* at 475 (citation, internal quotation marks, and source's alteration marks omitted); *accord Sanjour v. EPA*, 56 F.3d 85, 91 (D.C. Cir. 1995) (en banc) (applying *NTEU* test in striking down prohibition on EPA employees' receipt of travel expense reimbursements from private sources); *Lodge No. 5 of the Fraternal Order of Police v. City of Phila.*, 763 F.3d 358, 368-69, 384-85 (3d Cir. 2014) ("*Fraternal Order*") (applying *NTEU* test in striking down prohibition on police officers' contributions to their union's political action committee). The government's speculation in *NTEU* itself was insufficient to meet that standard:

> Congress reasonably could assume that payments of honoraria to judges or high-ranking officials in the Executive Branch might generate [the] appearance of improper influence. Congress could not, however, reasonably extend that assumption to all federal employees below grade GS-16, an immense class of workers with negligible power to confer favors on those who might pay to hear them speak or to read their articles.

*NTEU*, 513 U.S. at 473; *see also Sanjour*, 56 F.3d at 98 ("[T]he government's failure to demonstrate that the challenged regulatory scheme addresses genuine harms also contributes to our reluctance to weigh its interest heavily in the *Pickering* balance.").

Likewise, here, the AOUSC cannot reasonably extend the assumptions underlying the Code of Conduct for judges to a "class of workers with negligible power to confer favors." *NTEU*, 513 U.S. at 473. No reasonable member of the public who is aware of the work of AOUSC employees would think that the types of functions they perform are realistically at any risk of being affected by political bias. For instance, there is no "Democratic" or "Republican" way to coordinate judges' travel or to manage the judicial branch's facilities and security. Although some AOUSC employees perform tasks that have a policy component, they are not tasks that could realistically be skewed by an employee's choice of partisan political candidate: it is difficult to imagine how an AOUSC employee could provide training for probation officers in a manner that provides an electoral advantage for Donald Trump, or assess the judiciary's workload in a manner that would facilitate a Hillary Clinton victory. At most, employees might have their own views about policy relevant to their job functions, but the Code does not prevent employees from having such personal policy views nor from expressing them publicly. Instead of indulging in the type of farfetched hypothetical and cynical attitude toward AOUSC employees necessary to concoct a scenario in which political bias somehow creeps into the work of the AOUSC or undermines the public's perception of the judicial branch, Director Duff should instead follow the Supreme Court's lead in *NTEU* in crediting "the powerful and realistic presumption that the federal work force consists of dedicated and honorable civil servants." *Id.* at 476.

Perhaps the most factually on-point precedent is one that long predates *NTEU* but nonetheless applies similar reasoning to a ban like the one the AOUSC has imposed. In *Hobbs v. Thompson*, 448 F.2d 456 (5th Cir. 1971), the court considered an effort by the city of Macon, Georgia, to bar its firefighters from engaging in political speech in support of a candidate (including displaying candidate bumper stickers), soliciting votes, or contributing money to a

candidate. *Id*. at 457-58. The court found the unconstitutionality of these restrictions "patently obvious," as they "proscribe[d] a great deal of political activity which is unrelated to the effective workings of the fire department." *Id*. at 471. Anticipating the approach of *NTEU*, the court focused on the mismatch between the broad sweep of the regulations and the vague interests the city had asserted to justify them:

> Under the Macon regulatory scheme firemen are effectively rendered political eunuchs. The very fact that the scheme has been construed to forbid political bumper stickers — a particularly innocuous form of political activity — points out clearly the broadside nature of the Macon prohibitory regulations. We might ask whether a fireman's bumper stickers are so politically inflammatory that they would inhibit his firefighting ferocity or does the proscription of bumper stickers prevent extortion of political contributions? We think not. Macon has simply not aimed precisely at particular, specific evils which might justify political regulation. Bland assurances that the Macon scheme contributes to the "reasonable neutrality" of public employees or constitutes a "worthy aim" do nothing to overcome the fatal overbreadth of the charter and ordinance provisions in question.

*Id.* Like the restrictions at issue in *Hobbs*, the AOUSC Code prohibits speech — right down to the bumper stickers and their 21st-century equivalent, the social media post — about partisan political candidates, along with a host of other expressive and associative activities including contributing money to such candidates. And as in *Hobbs*, the AOUSC relies on bromides (here, about "unity" and "alignment") rather than evidence of a problem in need of solving. More recently, other courts have reiterated that the *NTEU* balancing test is not met in the absence of a concrete showing of harm. *See Castle v. Colonial Sch. Dist.*, 933 F. Supp. 458, 461-62, 465 (E.D. Pa. 1996) (striking down school district policy that prohibited off-duty school employees from engaging in political activity at polling places that happened to be located on school grounds); *Goodman v. City of Kansas City*, 906 F. Supp. 537, 544 (W.D. Mo. 1995) (striking down city prohibition on city employees' display of bumper stickers, buttons, and yard signs).

The AOUSC Code operates to strip an entire class of potential speakers — administrative employees of the judicial branch — of the right to participate in the political conversation concerning any partisan election, a category that includes local, state, and federal legislative races in addition to, of course, the U.S. presidential election. The Supreme Court has expressed concern that government regulation not operate to disadvantage a particular class of speakers and thus silence a particular point of view. *Citizens United v. FEC*, 558 U.S. 310, 341 (2010) ("The Government may not … deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each.") And the interest in hearing public employees' perspectives on political issues "is manifestly great" given their particular insight into the workings of government. *Sanjour*, 56 F.3d at 94.

A comparison between the AOUSC Code and the restrictions imposed on executive-branch employees under the Hatch Act and its implementing regulations is revealing. Of the nine types of political activity barred under the Identified Restrictions, eight of them are permitted for ordinary executive-branch employees as long as the employees are not engaging in these activities on duty, in uniform, in a government room or building, or using government property; the ninth (contributing funds) is restricted only as to political action committees and even then only partially. *See* 5 U.S.C. §§ 7323(a) & 7324(a); 5 C.F.R. §§ 734.202-.06 & .208. Seven of the nine Identified Restrictions are permitted in some manner even for "further restricted" employees such as FBI agents, CIA analysts, DOJ prosecutors, and FEC staff. *See* 5 U.S.C. § 7323(b); 5 C.F.R. §§ 734.401, 734.402, 734.404, 734.410, 734.412. Thus, the AOUSC's new Code imposes more severe restrictions on a judicial-branch IT specialist than Congress has imposed on employees of the Federal Election Commission. The Code forbids more political activity by a judicial-branch

attorney who runs trainings for federal public defenders than by an executive-branch attorney with the power to decide whether or not to prosecute elected officials for alleged violations of law. Special Counsel Robert S. Mueller III can contribute funds to President Trump's primary or general-election challengers for reelection; an AOUSC facilities manager cannot. The potential for mischief or appearance of impropriety arising out of federal employees' partisan activities is not difficult to recognize when the employees in question are responsible for enforcing the nation's election laws or investigating the President of the United States, whereas such mischief is nearly impossible to imagine when the employees in question are responsible for managing the courts' electronic case filing system.

In upholding the Hatch Act, the Supreme Court concluded that it served the following interests: (1) "that employment and advancement in the Government service not depend on political performance;" (2) "to make sure that Government employees would be free from pressure and from express or tacit invitation to vote in a certain way or perform political chores in order to curry favor with their superiors rather than to act out their own beliefs;" (3) "[that civil servants] administer the law in accordance with the will of Congress, rather than in accordance with their own or the will of a political party;" and (4) "that the Government and its employees [not only] in fact avoid practicing political justice, but . . . also . . . that they appear to the public to be avoiding it." *U S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 564-66 (1973). The decision in *Letter Carriers* may be ripe for reconsideration, as the Court has not reexamined *Letter Carriers* in light of the *NTEU* standard that the Court has acknowledged is stricter than the one applied in *Letter Carriers*, *see NTEU*, 513 U.S. at 467, or in light of the Court's recent political speech cases like *Citizens United* and *McCutcheon*, which were less willing than *Letter Carriers* to defer to congressional judgment where political participation is at stake. *Compare Citizens*

*United*, 558 U.S. at 361 ("Here Congress has created categorical bans on speech that are asymmetrical to preventing *quid pro quo* corruption."), *and McCutcheon*, 134 S. Ct. at 1441-42 ("Campaign finance restrictions that pursue other objectives [than preventing *quid pro quo* corruption], we have explained, impermissibly inject the Government into the debate over who should govern. And those who govern should be the *last* people to help decide who *should* govern." (citation and internal quotation marks omitted)), *with Letter Carriers*, 413 U.S. at 567 ("Perhaps Congress at some time will come to a different view of the realities of political life and Government service; but that is its current view of the matter, and we are not now in any position to dispute it."). In any event, the AOUSC's stated reasons for the revised Code of Conduct (the communicative rationale and the alignment rationale) do not reflect that the Identified Restrictions are needed to serve any of the interests on which *Letter Carriers* relied.

Director Duff's post hoc appeal to an amorphous "perception" regarding judicial integrity does speak in terms of the fourth *Letter Carriers* interest — avoiding the appearance of "practicing political justice" — but Director Duff's conclusory assertion of this interest is difficult to credit in light of its speculative nature and the significant gap between what AOUSC employees' actual responsibilities are and any opportunities to "practice political justice." *Letter Carriers*, 413 U.S. at 565. Indeed, Director Duff's "perception" rationale, if credited, would justify a blanket ban on political activity by any government employee with any level of responsibility — in contravention of the Supreme Court's clear requirement that government restrictions on employee speech address actual risks. *NTEU*, 513 U.S. at 474-75. The Supreme Court refused to indulge such tenuous reasoning on the government's part in *NTEU*, and this Court should follow suit. To defend its restrictions, the AOUSC must credibly explain how the work of the agency or public perception of the judiciary would be compromised if a judicial-branch IT specialist were, on her own time,

allowed to attend a Bernie Sanders speech, wear a "Make America Great Again" hat in public, or announce on her personal Facebook page, "I'm With Her."

Any connection that Director Duff attempts to make between these ordinary yet fundamental activities of democracy and concrete adverse effects on the AOUSC should be viewed with an extra dose of skepticism in light of the contrast between the Code of Conduct's treatment of AOUSC employees and the rules governing federal public defenders, who are also members of the judicial branch and whose conduct accordingly reflects on the judiciary to the same extent as that of AOUSC employees. In contrast to the Identified Restrictions, Canon 7 of the Defenders' Code of Conduct merely prohibits defenders from running for or holding partisan elective office, soliciting partisan political contributions, and engaging in "political activity" using federal resources, while on duty or in the workplace, while using their position or title, or if it will "detract from the dignity of the office or interfere with the proper performance of official duties." Judic. Conf. of the U.S., Code of Conduct for Federal Public Defender Employees, Canon 7(A)-(B) (attached to Guffey Decl. as Exhibit C). Otherwise, "political activity" — defined to include "displaying campaign literature, badges, stickers, signs or other items of political advertising on behalf of any party, political committee, or candidate for political office and soliciting signatures for political candidacy or membership in a political party" — is permitted. *Id.* Canon 7(A) (definition); *see id.* Canon 7(B) ("A defender employee may engage in political activity not otherwise prohibited[.]"). Thus, federal public defenders, despite being judicial branch employees, are not subject to any of the Identified Restrictions while off duty and outside of the workplace.

Additionally, in contrast to full-time AOUSC employees like Plaintiffs Guffey and Smith, other judicial-branch employees temporarily detailed to the AOUSC to perform work similar to that of full-time AOUSC employees have been told they are *not* covered by the same restrictions

during their details if they began at the AOUSC prior to March 1, 2018, even though their details may last for months into the new Code's period of effectiveness. *See* Decl. of Joan Politeo ¶¶ 4-7. Where the government has "not even attempted to regulate" the whole "category of behavior … giving rise to precisely the harm that supposedly motivated it to adopt the regulations," courts rightly "have trouble taking the government's avowed interest to heart." *Sanjour*, 56 F.3d at 95.

Further, even indulging for the sake of argument the dubious proposition that some conceivable government interest — whether the interests credited in *Letter Carriers* or other as-yet-unidentified interests — could justify the Identified Restrictions' sweeping impact on AOUSC employees' rights, the inquiry is limited to the AOUSC's actual interests. *See Sanjour*, 56 F.3d at 96 ("The *Pickering/NTEU* question … is not whether some conceivable governmental interest might be constitutionally advanced by the regulations; [instead] … we must limit our inquiry to the interests the State itself asserts. The applicable standard does not permit us to supplant the precise interests put forward by the government with other suppositions." (citation, source's alteration marks, and internal quotation marks omitted)). Still further, even if hypothetical interests could be properly considered, they could not justify the Identified Restrictions if the interests could be accommodated by lesser restrictions, such as a prohibition on pressuring coworkers or subordinates to hold, disavow, act on, or refrain from acting on any political views, along with a prohibition on engaging in partisan political activity at work, when using government resources, or when identifying oneself with the AOUSC. "In performing the *Pickering* balance . . . the courts must consider whether the challenged statute or regulation is tailored to address the harm that the government allegedly aims to protect." *Sanjour*, 56 F.3d at 97; *accord McCutcheon*, 134 S. Ct. at 1456 ("In the First Amendment context, fit matters."); *NTEU*, 513 U.S. at 476-77 (noting that the ban was "crudely crafted" and not "a reasonable response to the [government's] posited harms");

*Fraternal Order*, 763 F.3d at 375 (noting that a "tailoring requirement" was "implicit" in *NTEU*'s analysis); *see also Sanjour*, 56 F.3d at 95 (finding "the obvious lack of 'fit' between the government's purported interest and the sweep of its restrictions" to be of "[f]oremost" concern).

The D.C. Circuit's recent decision in *Wagner v. FEC*, 793 F.3d 1 (D.C. Cir. 2015) (en banc), is not to the contrary. There, the court upheld restrictions on political contributions by federal contractors. *Id.* at 3. Unlike the AOUSC Code, the ban at issue was justified by a demonstrated problem: "Congress enacted [the provision] in the aftermath of a national scandal involving a pay-to-play scheme for federal contracts. … And it was followed by subsequent scandals that led to further legislative refinements, again motivated by concerns over corruption and merit protection." *Id.* at 14. Moreover, the court explicitly distinguished the circumstances of contractors from those of employees: "Because regular employees do not generally need new contracts or renewals with the frequency required by outside contractors, permitting them to make contributions carries less risk of corruption or its appearance: employees have less to gain from making contributions and less to lose from not making them." *Id.* at 31. The court also observed that the contribution ban there left the plaintiff contractors "free to volunteer for candidates, parties, or political committees; to speak in their favor; and to host fundraisers." *Id.* at 25. None of these alternative avenues for political participation remains open to Ms. Guffey or Ms. Smith under the AOUSC Code.

In sum, the Identified Restrictions unnecessarily impinge on the free speech rights of AOUSC employees like Ms. Guffey and Ms. Smith without protecting against any concrete and demonstrable adverse effects on the operation of the AOUSC. The Identified Restrictions therefore violate the First Amendment. Plaintiffs have demonstrated a clear likelihood of success on the merits of their challenge.

**II. Plaintiffs Are Suffering and Will Continue To Suffer Irreparable Harm in the Absence of Relief.**

If the Court finds that Plaintiffs have shown a likelihood that their constitutional rights are being violated, it follows that Plaintiffs are suffering irreparable harm. "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373–74 (1976)); *accord Am. Freedom Def. Initiative v. WMATA,* 898 F. Supp. 2d 73, 84 (D.D.C. 2012) ("Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed." (quoting *Bronx Household of Faith v. Board of Education*, 331 F.3d 342, 349-50 (2d Cir. 2003))); *Student Press Law Ctr. v. Alexander*, 778 F. Supp. 1227, 1234 (D.D.C. 1991) ("The Court presumes that irreparable harm will flow to plaintiffs from a continuing constitutional violation.").

Every day the Identified Restrictions remain in place represents lost opportunities for Plaintiffs Smith and Guffey to attend events in support of their preferred candidates, to seek to persuade others to their views through public expressions of those views, to express support for and aid their chosen candidates through contributions of funds, and so forth. All of these activities, it bears repeating, are at or near the core of the First Amendment, which "'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). As described above, Plaintiffs have already refrained from several acts of political participation — attending a candidate's event, donating to a political party, and posting views on Facebook — because of the Identified Restrictions. Should they violate the Identified Restrictions, Plaintiffs, who are not covered by federal civil service protections, *see* 5

U.S.C. § 7103(a)(2)-(3) (covered "employees" must work for an "Executive agency …, the Library of Congress, the Government Publishing Office, [or] the Smithsonian Institution"), have been informed they will expose themselves to discipline. Guffey Decl. ¶¶ 15-17; Smith Decl. ¶¶ 12-14. The Identified Restrictions are thus stifling Plaintiffs' political speech and thereby causing irreparable harm.

### III. The Balance of Equities and the Public Interest Favor Granting Relief.

If the Court finds that Plaintiffs have shown a likelihood that their First Amendment rights are being violated, it likewise follows that the balance of equities and the public interest weigh in Plaintiffs' favor.

As this Court has noted, "[t]he Government cannot suffer harm from an injunction that merely ends an unlawful practice." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (internal quotation marks omitted). And given the speculative and vague nature of the government's interests, it is not clear what harm the government could possibly suffer.

For similar reasons, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (quoting *Abdah v. Bush*, 2005 WL 711814 at *6 (D.D.C. Mar. 29, 2005)); *accord Lamprecht v. FCC*, 958 F.2d 382, 390 (D.C. Cir. 1992) ("a [government] policy that is unconstitutional would inherently conflict with the public interest"); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("injunctions protecting First Amendment freedoms are always in the public interest"). At a minimum, "[t]he public interest in this case will be served by ensuring that plaintiffs' First Amendment rights are not infringed before the constitutionality of the [challenged policy] has been definitively determined." *Stewart v. D.C. Armory Board*, 789 F. Supp. 402, 406 (D.D.C. 1992).

**IV. The Injunction Should Cover All Non-Designated AOUSC Employees.**

As the D.C. Circuit has recognized, challenges to employee-speech rules brought under

*NTEU* are not easily classified as "facial" or "as-applied" in the usual sense:

> Indeed, in *NTEU* itself the Court did not categorize the employees' challenge as either "facial" or "as applied." This was not an oversight; the fact is that the test enunciated in *NTEU* for determining the constitutionality of a statute or regulation restricting government employee speech requires the reviewing court to consider whether the "interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the government." *NTEU*, 115 S. Ct. at 1014 (internal quotations and citation omitted). Because this same test — which requires the court to go beyond the facts of the particular case before it — presumably applies to both "facial" and "as-applied" challenges, the distinction between the two is largely elided.

*Sanjour*, 56 F.3d at 92.

Although it appears that the Code improperly prohibits "a substantial amount of protected

free speech" in relation to its "legitimate sweep," *Initiative & Referendum Inst. v. U.S. Postal Serv.*,

417 F.3d 1299, 1312 (D.C. Cir. 2005) (stating standard for First Amendment facial challenges for

overbreadth), this Court need not invalidate the entire Code. In this motion, rather, Plaintiffs pursue

an "as applied challenge to a broad category of non-official employee speech." *Sanjour*, 56 F.3d

at 93 (source's alternation marks omitted).

Because the unconstitutionality of the Identified Restrictions is clear as to the entire

category of AOUSC employees to which Plaintiffs belong (all employees outside the category of

"designated employees": the Director, the Deputy Director, and the AO Executive Management

Group), Plaintiffs urge the Court to follow the path laid out by the D.C. Circuit in *Sanjour* and

enjoin the Identified Restrictions as to all employees in Plaintiffs' category, *see id.* at 93

(recognizing that "senior executive employees" might present a different question), unless

Defendant can demonstrate some additional sub-category of AOUSC employees beyond the

"designated" category for whom the "necessary impact on the actual operation of the Government"

of their partisan political activity "outweigh[s]" their core First Amendment rights to participate in the democratic process. *NTEU*, 513 U.S. at 468.

## CONCLUSION

For the reasons provided, the Court should grant Plaintiffs' motion for a preliminary injunction.[2] A proposed order is filed herewith.

May 31, 2018

Respectfully submitted,

/s/ *Scott Michelman*
Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union Foundation
  of the District of Columbia
915 15th Street NW, Second Floor
Washington, DC 20005
(202) 457-0800
smichelman@acludc.org

*Attorneys for Plaintiffs*

---

[2] Because the entry of an injunction will not harm the AOUSC, the security required by Fed. R. Civ. P. 65(c) should be set at zero or at a nominal amount, such as $10. *See, e.g., Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) ("The district court retains discretion as to the amount of security required, *if any*." (internal quotation marks omitted)); *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) ("the district court did not abuse its discretion in dispensing with the bond").