**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **LISA GUFFEY and CHRISTINE SMITH**, | |
| Plaintiffs, | |
| v. | Case No. 18-cv-1271 (CRC) |
| **JAMES C. DUFF, Director, Administrative Office of the U.S. Courts,** | |
| Defendant. | |

## MEMORANDUM OPINION

This case requires the Court to balance two constitutional imperatives: the independence of the federal judiciary on the one hand and the rights of citizens, including government employees, to engage in the political process on the other. The setting is the Administrative Office of the U.S. Courts, an agency in Washington, D.C. that provides centralized support to the federal judiciary. Earlier this year, the Office's Director revised the Code of Conduct that applies to its employees. The Code had always contained some prohibitions on employees' partisan political activity outside the workplace, but the revised Code is much stricter. For example, an employee may no longer express an opinion about a legislative candidate on Facebook. She cannot put a sign in her yard supporting that candidate. And she may not contribute funds to the candidate or his party or attend a party fundraiser.

The plaintiffs are two Administrative Office employees who wish to take part in political activity prohibited under the Code. They believe that some of the Code's restrictions violate their rights of free speech under the First Amendment and ask this Court to enjoin the Administrative Office from enforcing those restrictions against them. The Office admits that the Code limits the plaintiffs' protected speech. But it insists that the new rules are "necessary to

maintain the public's confidence in the Judiciary's work." The question is whether that very legitimate concern outweighs the Code's significant burden on the employees' speech. The Court concludes that, for most of the challenged restrictions, it does not. It will therefore grant the plaintiffs' motion for a preliminary injunction and prohibit the enforcement of those restrictions.

## I.   Factual Background

The Administrative Office (or "AO") provides "legislative, legal, financial, technology, management, administrative, and program support services to federal courts." Judicial Administration, U.S. Courts, https://perma.cc/CW2F-3Q2M (last visited August 2, 2018). The agency is housed in an office building about a half mile from the Supreme Court and has some 1,200 employees. Most are divided between three departments: Technology Services; Administrative Services; and Program Services. Technology Services helps implement the judiciary's IT policies. Administrative Services is responsible for human resources, finance, and facilities. Program Services performs a broader range of functions—from coordinating judges' travel, to evaluating case-management systems, to overseeing the operations of the federal probation and pretrial services offices.

The plaintiffs both work in Program Services, specifically its Defender Services Office. Lisa Guffey is an attorney-advisor who oversees the operation of federal-defender offices and court-appointed attorney programs around the country. Decl. of Lisa Guffey Supp. Mot. Prelim. Inj. ("Guffey Decl.") ¶ 2. Christine Smith evaluates the IT and cybersecurity needs of defender offices. Decl. of Christine Smith Supp. Mot. Prelim. Inj. ("Smith Decl.") ¶ 2. Both interact with federal judges and their staffs a handful of times per year, but neither plays any role in managing or deciding individual cases. Id. ¶ 3–4; Guffey Decl. ¶ 3.

Prior to March 2018, nearly all AO employees (besides a few high-level "designated employees") could engage in certain off-duty "partisan activity"—that is, activity related to political parties, and to elections and candidates affiliated with those parties. These permissible activities included publicly expressing views about candidates, displaying political signs and badges, joining political parties, contributing to parties and candidates, and attending political fundraisers. With respect to state and local (but not federal) offices, employees could also endorse or oppose partisan candidates for office, drive voters to polls on behalf of parties or candidates, and organize fundraisers. Guffey Decl. Ex. D § 260(a)–(f) (AO Code of Conduct, 2016 version).

The plaintiffs engaged in activities permitted under the old policy. Ms. Guffey, an AO employee since 2010, has donated to the Democratic National Committee and to individual candidates, posted yard signs for local candidates, attended partisan fundraisers, and posted opinions about candidates on social media. Guffey Decl. ¶ 13. Ms. Smith, with the AO since 2016, has participated similarly and has also volunteered for local candidates. Smith Decl. ¶¶ 5–8.

The AO is led by a Director, who is appointed by the Chief Justice of the United States following consultation with the Judicial Conference (a group of judges responsible for policymaking in the federal courts). See 28 U.S.C. § 601. The Director has power to make rules "prescribing standards of conduct for Administrative Office employees." Id. § 604(f).

When James C. Duff became the AO's Director in 2015, he and his Deputy Director began reviewing the agency's policies and procedures. They decided that the Code of Conduct, which had not been updated in about 20 years, should be revised to make it more consistent with the code that applies to the judicial-branch employees who work in federal courthouses around

the country.  Decl. of Gary A. Bowden Supp. Def.'s Opp'n ¶¶ 2–3.  They drafted new restrictions on partisan activity to mirror those that apply to courthouse staff (like employees in the Clerk's Office, in payroll, or in the IT department).  These restrictions are somewhat less stringent than those that apply to judges and their immediate staffs (like judicial law clerks and court reporters assigned to a particular judge).  Id.; see also 2 Guide to Judiciary Policy, pt. A, ch. 3, at 3, https://perma.cc/P343-JY6U (Code of Conduct for Judicial Employees).

Director Duff announced the revised Code in a July 2017 memorandum addressed to all AO employees.  He explained that the AO's Code was "out of step" with the court-wide code of conduct.  Guffey Decl. Ex. A, at 1.  This "failure to keep pace," he suggested, "conflicts with our significant and important efforts to communicate with the courts about the unity of purpose between the AO and the courts, and that the AO is very much an integral part of the Judicial Branch and not an independent, isolated agency in Washington, DC."  Id.  The memorandum included a chart summarizing the important changes in the Code's restrictions.  Id. at 19.  The gist was that the revised Code added a few new restrictions on partisan activity in connection with federal offices (which, again, was previously regulated), and a host of new restrictions on activity in connection with state and local offices (which before was mostly unregulated).  Id. at 19–21.  Employees were told that violations would lead to discipline.  Guffey Decl. ¶¶ 15–17; Smith Decl. ¶¶ 12–14.

The revised Code took effect on March 1, 2018.  Soon after, counsel for the plaintiffs sent a letter to Director Duff protesting the application of the Code to his clients.  Director Duff's reply reiterated his statement from the July 2017 memorandum that the Code was updated "to achieve consistency with the Judicial Code of Conduct . . . that applies to all employees of the federal Judiciary."  Guffey Decl. Ex. B, at 1.  He further explained that the AO Code, like the

code for courthouse employees on which it was modeled, sought to protect "[t]he government's interest in preserving public confidence in the integrity of its Judiciary"—an interest even weightier than that of preventing "the appearance of corruption in the Legislative and Executive Branches."  Id.  The letter concluded:

> By limiting only partisan political activities of employees while allowing for their nonpartisan and civic engagement, the revised AO Code of Conduct appropriately balances the First Amendment right of employees to comment on matters of public concern with the compelling public interest in preserving the public's confidence in the integrity of the federal Judiciary, as does the branch-wide Code from which it is adopted.  The public's perception of judicial integrity is a government interest of the highest order.

Id. at 2.

On May 31, 2018, the plaintiffs filed a complaint and a motion for a preliminary injunction.  They claim that the following nine restrictions violate their rights under the First Amendment:

a.  expressing opinions publicly, including on social media or via articles or letters to the editor, regarding a political party or partisan candidate for office;

b.  wearing or displaying partisan political badges, signs, or buttons;

c.  driving voters to polls on behalf of a political party or partisan candidate for office;

d.  contributing funds to a political party, political action committee, or partisan candidate for office;

e.  attending partisan fundraisers;

f.  being a member of a partisan political organization;

g.  attending events for a partisan candidate for office;

h.  organizing events for a partisan candidate for office; and

i.  attending party conventions, rallies, or meetings.

Mot. Prelim. Inj. at 1–2.[1]  They seek to halt enforcement of those restrictions with respect to all AO staff except the six high-level "designated employees."  The Court held a hearing on July 16, 2018.

## II.    Legal Framework for Government-Employee Speech Restrictions

The First Amendment prevents the government from abridging the freedom of speech, and the partisan activity restricted by the Code undoubtedly is speech.  So if the government tried to apply the Code's restrictions to ordinary citizens, it would be a clear-cut violation of the First Amendment.

It is well-established, though, that the government has more power to curtail the speech of its employees than it does that of "the public at large."  United States v. Nat'l Treasury Employees Union ("NTEU"), 513 U.S. 454, 465 (1995).  When the government restricts employees' off-duty speech on "matters of public concern" like politics, courts apply the balancing test from Pickering v. Board of Education, 391 U.S. 563 (1968), to decide whether the restriction is justified.  Under Pickering, the government can restrict this type of employee speech only if its interest "'in promoting the efficiency of the public services it performs through its employees' outweighs 'the interests of the [employee], as a citizen, in commenting upon matters of public concern.'"  Janus v. AFSCME, Counc. 31, 138 S. Ct. 2448, 2472 (2018) (alteration in original) (quoting Harris v. Quinn, 134 S. Ct. 2618, 2642 (2014)).

The Pickering test developed in cases involving one-off disciplinary actions against individual employees based on those employees' speech.  See Janus, 138 S. Ct. at 2472.  Courts

---

[1] The plaintiffs do not contest the Code's other prohibitions, including those on holding partisan office, being a poll watcher or challenger for a candidate, initiating or circulating a nominating petition, and taking active part in managing a campaign.  See Guffey Decl. Ex. A, at 2 (memorandum summarizing restrictions).

since then have recognized that the test requires closer scrutiny of the government's interest in cases like this one, where—instead of responding to disruptive speech through individualized "supervisory decision[s]"—it has enacted a prospective rule with "widespread impact." Id. (quoting NTEU, 513 U.S. at 468).[2] To justify this sort of prospective rule, "the government must shoulder a correspondingly 'heav[ier]' burden, and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights." Id. (alteration in original) (quoting NTEU, 513 U.S. at 475–76).

Specifically, the government "must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation of the government.'" NTEU, 513 U.S. at 468 (quoting Pickering, 391 U.S. at 571). "Necessary impact" means that the employee speech will cause harms that are "real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." Id. at 475 (quoting Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664 (1994)). Put another way, the government must show "that the regulation's sweep is 'reasonably necessary to protect the

---

[2] This is a rare context where courts defer *less* to prospective rules than to ad hoc determinations. See NTEU, 513 U.S. at 468 ("We normally accord a stronger presumption of validity to a congressional judgment than to an individual executive's disciplinary action."). The Supreme Court has explained that this anomaly is justified by the speech-protective purpose of the First Amendment: widespread restrictions chill more speech and do so before the speech occurs. Id.; see also Janus, 138 S. Ct. at 2472; Sanjour, 56 F.3d at 91. Several Justices find this approach "perverse" because of "the greater regularity of rulemaking and the lesser danger of its abuse," and have argued that it is not truly demanded by the case law. Janus, 138 S. Ct. at 2494 (Kagan, J., dissenting) ("Nothing in [NTEU] suggests that the Court defers only to ad hoc actions, and not to general rules, about public employee speech."). Nevertheless, the notion that the government gets "considerably less deference" when defending broad rules was reaffirmed by the Supreme Court just last term. Id. at 2472 (majority opinion).

efficiency of the public service.'" <u>Weaver v. U.S. Info. Agency</u>, 87 F.3d 1429, 1439 (D.C. Cir. 1996) (quoting <u>NTEU</u>, 513 U.S. at 475).

The Supreme Court has not had occasion to apply the <u>Pickering</u> framework to speech restrictions on judicial-branch employees. But the Court has twice used it to review rules for other federal employees, and those decisions help situate this case. In <u>NTEU</u>, the Court held that the government could not ban federal employees "from accepting any compensation for making speeches or writing articles." 513 U.S. at 457. While recognizing the government's "powerful" interest in assuring "that federal officers not misuse or appear to misuse power by accepting compensation for their unofficial and nonpolitical writing and speaking activities," the Court found that the ban was not "a reasonable response to [that] threat," largely because it swept in "an immense class of workers with negligible power to confer favors on those who might pay to hear them speak or to read their articles." <u>Id.</u> at 472–73.

<u>NTEU</u> distinguished the other Supreme Court decision in this area, <u>U.S. Civil Service Commission v. National Association of Letter Carriers</u>, 413 U.S. 548 (1973). There, the Court applied the <u>Pickering</u> framework in upholding the Hatch Act's restrictions on the partisan activity of executive-branch employees. <u>Id.</u> at 551. The Hatch Act prohibits certain employees from taking "an active part in political management or political campaigns"—including, for example, serving as an officer in a partisan organization, organizing a partisan fundraiser, or circulating a nominating petition.[3] 5 U.S.C. § 7323(b)(2)(A); <u>see</u> 5 C.F.R. § 734.409(a), .410(b), .411(e). The Court found that the Act struck a proper balance between employees' speech rights

_____

[3] At the time <u>Letter Carriers</u> was decided, the partisan-activity restriction applied to all federal executive employees. <u>See</u> 413 U.S. at 560–61 (citing 5 U.S.C. § 7432 (1972). It now applies only to certain high-level employees, employees of investigatory agencies, and administrative law judges. <u>See</u> 5 U.S.C. § 7323(b)(2)(B) (2016).

on one hand and several government interests on the other. 413 U.S. at 567. Those interests included ensuring that laws are executed "without bias or favoritism for or against any political party"; avoiding the appearance of such bias; preventing the assembly of federal employees into "a powerful, invincible, and perhaps corrupt political machine"; and, relatedly, ensuring that employees would be "free from pressure and from express or tacit invitation to vote in a certain way or perform political chores in order to curry favor with their superiors rather than to act out their own beliefs." Id. at 565–66. Letter Carriers also rejected contentions that the Hatch Act was impermissibly vague and overbroad: the statutory term "an active part in political management or in political campaigns" had been clarified through rulemaking and, importantly, it left certain expressive activities untouched, including an employee's ability "to express his opinion on political subjects and candidates." Id. at 575–76.

## III. Analysis

Against that legal backdrop, the plaintiffs seek a preliminary injunction to halt enforcement of several partisan-activity restrictions in the revised AO Code. They are entitled to an injunction if they show that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The Court will take these factors in turn.

### A. Likelihood of Success on the Merits

Again, the Court's task on the merits is to weigh the Code's burden on the current and future expression of AO employees against the restricted expression's "real" harm "on the actual operation of the government." NTEU, 513 U.S. at 475.

9

Before turning to that balancing, one preliminary note: The government has offered no basis on which to distinguish the two plaintiffs here from other AO employees to whom the challenged provisions also apply. And the Court sees no relevant line to be drawn. Cf. NTEU, 513 U.S. at 478 (declining to determine legality of banning honoraria for "more senior officials" not before the Court because the government "conceivably might advance a different justification for an honoraria ban limited to [those] officials"). Thus, in evaluating the Code's restrictions, the Court will consider its effects—its burden on employees and its benefit to the government—as applied to the partisan activity of all AO employees, except for the six high-level "designated employees" not at issue in this case. See Sanjour v. EPA, 56 F.3d 85, 92–93 (D.C. Cir. 1995) (en banc).

### 1. Burden on AO Employees

The government accepts, as it must, that AO employees have a strong interest in freely participating in partisan politics. It also concedes that the challenged restrictions strike at the core of that interest. They prevent employees from publicly expressing opinions about parties and candidates, from displaying political messages, from contributing to parties and candidates,[4] and from openly associating with political parties. All of these activities are squarely protected by the First Amendment. See Mills v. Alabama, 384 U.S. 214, 218 (1966) ("[A] major purpose of [the First] Amendment was to protect the free discussion of governmental affairs . . . of course

---

[4] In upholding a ban on campaign contributions by federal contractors, the D.C. Circuit suggested that restrictions on employee or contractor contributions might need to be "closely drawn" to an asserted government interest—an arguably "less deferential" standard than the one governing restrictions on employee speech set forth in Pickering and NTEU. See Wagner v. FEC, 793 F.3d 1, 7 (D.C. Cir. 2015) (en banc). Because this Court ultimately concludes that the AO's contribution restriction fails even under the NTEU standard, it need not resolve whether a more stringent standard is proper.

includ[ing] discussions of candidates."); <u>Minn. Voters Alliance v. Mansky</u>, 138 S. Ct. 1876, 1885 (2018) ("[The state's] ban on wearing any 'political badge, political button, or other political insignia' plainly restricts a form of expression within the protection of the First Amendment."); <u>Buckley v. Valeo</u>, 424 U.S. 1, 19 (1976) ("A restriction on the amount of money a person . . . can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached."); <u>Kusper v. Pontikes</u>, 414 U.S. 51, 57 (1973) ("The right to associate with the political party of one's choice is an integral part of [the] basic constitutional freedom [of association.]").  AO employees are forbidden from taking part in these activities not just while on duty, but also on their own time and in their own communities.  The resulting burden is as serious as they come.

The government seeks to downplay this burden by emphasizing that employees may still engage in *non-partisan* political expression, so long as that expression does not "tend to reflect adversely on the dignity or impartiality of the court" or interfere with their duties.  Guffey Decl. Ex. A, at 17 (AO Code § 260(b)); <u>see id.</u> at 2 (Director Duff's memorandum).  But partisan and non-partisan political expression have distinct value in a representative democracy.  Full participation in our system requires the ability to voice support for *representatives*, not just for their policies.  <u>See</u> <u>Buckley</u>, 424 U.S. at 14 ("Discussion of public issues *and* debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution." (emphasis added)).  And, for better or for worse, political parties are the primary mechanism for choosing our representatives.  In short, the Code's restrictions impose a significant First Amendment burden on AO employees' rights of free speech.

## 2. *Interest of the Government*

Is the Code's burden on those rights justified? Answering that question first requires pinning down the government interest at stake, as its description has evolved since Director Duff initially issued the revised Code. The memorandum introducing the revisions emphasized the need for "unity of purpose" between the AO and the courts and highlighted the fact that the AO Code was previously "out of step" with rules for other judicial employees. Guffey Decl. Ex. A, at 1. Director Duff's letter responding to plaintiffs' counsel similarly focused on *equalizing* AO employees with courthouse employees. See id. Ex. B. at 1–2 ("Adopting the same standards at the AO regarding partisan political activity that govern the conduct of all judicial employees across the country is necessary to maintain the public's confidence in the Judiciary's work.").

This "unity" rationale has intuitive appeal. Placing identical restrictions on all judiciary employees may serve the worthy goal of publicly recognizing the AO's integral role in the judicial branch's work and overall mission. But achieving unity for its own sake cannot justify extending an existing speech restriction to a new group of employees whose job functions and workplace location distinguish them from those already covered. If uniformity were enough, the requirement that a restriction's scope be reasonably tailored would be meaningless; the scope of any restriction could be expanded to serve the interest of "treating people alike." Rather, the government's asserted interest must be tethered to the speech *and to the speaker* it is restricting. See NTEU, 513 U.S. at 473 ("Congress reasonably could assume that payments of honoraria to judges or high-ranking officials in the Executive Branch might generate [an] appearance of improper influence. Congress could not, however, reasonably extend that assumption to . . . an immense class of workers with negligible power to confer favors on those who might pay to hear them speak or to read their articles."). The First Amendment may allow a regulation to cover

more employees than is absolutely necessary to serve that asserted interest. But if the AO wishes to treat its employees like courthouse employees with regard to their partisan activity, it must provide some independent reason justifying that equal treatment—*i.e.*, that the AO employees' partisan activity would harm the government in some way and that the restrictions will mitigate that harm. See id. at 475.[5]

Recognizing that a bare interest in alignment cannot support the Code's restrictions, the government in its briefing emphasizes a different interest: that of "preserving the public's confidence" in the "integrity and impartiality" of the judicial branch. Def.'s Opp'n at 3.

Protecting the appearance of judicial integrity and impartiality is without doubt a government interest "of the highest order." Williams-Yulee v. Florida Bar Ass'n, 135 S. Ct. 1656, 1666 (2015) (upholding state ban on solicitation of funds by judicial candidates); see also Hodge v. Talkin, 799 F.3d 1145, 1150 (D.C. Cir. 2015) (noting "the government's long-recognized interest[] . . . in assuring the appearance (and actuality) of a judiciary uninfluenced by public opinion and pressure"). Because judges have "no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever," the efficacy of their decisions depends on public respect. The Federalist No. 78, p. 464 (C. Rossiter ed. 1961) (A. Hamilton); see Williams-Yulee, 135 S. Ct. at 1666 ("The judiciary's authority . . . depends in large measure of the public's willingness to respect and follow its decisions."). That respect will erode if the public believes that judges merely channel political will—let alone the will of their favored political party. See The Federalist, supra, at 465 ("[L]iberty can have nothing to fear from the judiciary alone, but would have

_____

[5] The restrictions on courthouse employees are not before the Court, and the Court expresses no opinion on their constitutionality.

everything to fear from its union with either of the other departments."). The Constitution's grants of life tenure and fixed salaries are perhaps the main sources of insulation between judging and politics, but no one doubts that the government has the power to go beyond those structural guarantees—particularly when it comes to restrictions on judges themselves. See, e.g., 28 U.S.C. § 455(a) (requiring a judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned"); Bauer v. Shepard, 620 F.3d 704, 711 (7th Cir. 2010) (upholding provision prohibiting state judges from making speeches on behalf of a political organization or publicly endorsing candidates).

Yet the interest in preserving public trust in the judiciary, no matter how potent, cannot be waved as a talisman to justify all restrictions on judicial employees. Deciding whether the government's interest carries the day requires clarifying what exactly the government fears. See Republican Party of Minn. v. White, 536 U.S. 765, 775 (2002) ("Clarity [about the meaning of 'impartiality'] is essential before we can decide whether impartiality is indeed a compelling state interest, and, if so, whether the [challenged provision] is narrowly tailored to achieve it."). How, precisely, might the judiciary's integrity or impartiality be questioned if the plaintiffs or their colleagues were to engage in the restricted activities?

Neither the memorandum announcing the new restrictions, nor Director Duff's letter in response to the plaintiffs' objections, nor even the government's briefing offers a particularized answer to that question. Based on counsel's presentation at the hearing, part of the government's concern seems to be that the public will see AO employees engaging in partisan activity and believe that partisanship has infected the judicial decisionmaking process. See Hr'g Tr. at 30–31. That belief could take one of several forms. The public might think that AO employees will try to exert partisan pressure on federal judges—either by hindering judges appointed by

presidents of their disfavored party, by favoring judges associated with their preferred party, or by trying to influence the outcome of particular cases in ways that further their partisan preferences. Alternatively, the public could think that the expressed partisan preferences of AO employees reflect a partisan bent in the judicial branch as a whole.

The government has conceded that none of those beliefs would be rooted in reality. The relevant AO employees have no actual ability to influence a court's process of managing or deciding individual cases. Hr'g Tr. at 24. Nor do judges play any direct role in hiring or supervising AO employees, and in fact the two groups have limited contact. So save for egregious malfeasance, an AO employee could not sway the outcome of a case if she tried. And there is no factual basis—certainly the government has not offered any—for thinking that the partisan political views of AO employees (whatever they may be) reflect those of judges generally.

But because the government has an interest in preserving the *appearance* of impartiality—separate from its interest in guaranteeing *actual* impartiality—that concession does not defeat the government's position. Moreover, because the concept of public trust in judicial impartiality "does not easily reduce to precise definition, nor does it lend itself to proof by documentary record," Williams-Yulee, 135 S. Ct. at 1667, the Court will give more deference to the government's predictions of harm here than would be proper if the government had asserted a different interest. The nebulous nature of the government's asserted interest allows it to rely on predicted harms to the public's perception of judicial integrity—*i.e.*, realistic hypotheticals of how partisan activity restricted under the Code could lead the public to believe that the judiciary is not behaving impartially. It need not point to documentary evidence showing that employees' activities have eroded public confidence in the past and will continue to do so if left unrestricted.

Cf. NTEU, 513 U.S. at 472 (noting the lack of "evidence" supporting that "the vast rank and file" of employees "misuse or appear to misuse power by accepting compensation for their unofficial and nonpolitical writing and speaking activities"); Sanjour, 56 F.3d at 98 (focusing on government's failure "to demonstrate that the severe measures at issue here were adopted to address genuinely experienced harms").[6]

Even giving the government the benefit of the doubt, however, the Court concludes that its asserted interest in maintaining the appearance of judicial impartiality fails to justify most of the challenged restrictions.

a. The Court finds that two restrictions do pass muster, and they are the two that also appear in the Hatch Act. Again, the Hatch Act forbids certain executive-branch employees— including all administrative law judges and all employees of law enforcement agencies like the FBI and CIA—from "tak[ing] an active part in political management or political campaigns." 5 U.S.C. § 7323(b)(2)(A). The Supreme Court has twice upheld that restriction (even as applied to *all* executive-branch employees) as consistent with the First Amendment. See Letter Carriers, 413 U.S. at 564; United Public Workers of Am. v. Mitchell, 330 U.S. 75, 103–04 (1947). And as relevant here, the restriction has been construed to include prohibitions on two activities that are also forbidden by the AO Code: (1) organizing or managing political rallies or meetings and (2) driving voters to the polls on behalf of a party or candidate. Compare Guffey Decl. Ex. A, at 2 (memorandum re AO Code), with 5 C.F.R. §§ 734.404, .412 (Hatch Act regulations).

---

[6] Plaintiffs' counsel endorsed this approach at the hearing, conceding that the government should "be given a little more leeway when trying to fashion rules that are designed to promote a more nebulous interest" like the appearance of judicial impartiality. Hr'g Tr. at 4; see also id. at 34–35.

True, the Supreme Court's approval of their application to executive-branch employees does not *necessarily* mean that they satisfy the First Amendment as applied to AO employees. There are justifications supporting restrictions in the political branches that have less force in the judicial branch—namely, that the restrictions protect rank-and-file civil servants from pressure from higher-ups to "perform political chores in order to curry favor with their superiors" or, worse, to vote a certain way. Letter Carriers, 413 U.S. at 566; see also NTEU, 513 U.S. at 470–71 ("[T]he Hatch Act aimed to *protect* employees' rights, notably their right to free expression, rather than to restrict those rights.").

Nevertheless, given courts' solicitude for the image of the judiciary, the Court believes that the government is justified in imposing these two restrictions on judicial-branch employees. Both restrictions target activity that involves not simply a personal display of partisan commitment, but rather an affirmative effort to enlist the partisan support of others—at least more so than the other AO Code restrictions that have no analogs in the Hatch Act. Attending a Republican rally reflects personal preference; organizing one requires recruiting others to the cause. Likewise, driving voters to the polls is a (fairly time-intensive) effort to rack up votes for your side. A member of the public could more plausibly view these two activities as evincing a partisan tie so durable that it could affect an AO employee's performance of her day-to-day duties. That belief would be misguided. But a layperson might not fully understand the relationship between the AO and federal judges themselves. He might believe that AO employees who engaged in those activities would exert pressure on judges and their immediate staff to decide cases a certain way or, even more cynically, could hamper judges appointed by presidents of the opposite party. The two restrictions that involve "active" participation in

partisan management and campaigning—in the sense meant by the Hatch Act—seem more likely to instill that belief than the remaining restrictions.

In any event, the Supreme Court has "unhesitatingly" upheld these two restrictions even as applied to rank-and-file executive-branch employees, Letter Carriers, 413 U.S. at 556, and it did so in part based on the government's interest in avoiding the appearance that those employees were "practicing political justice," id. at 565. So while the Court is not fully convinced that the government has adequately justified these restrictions with respect to rank-and-file AO employees, it cannot say that the plaintiffs are likely to show that they violate the First Amendment.

b. By contrast, the Code's remaining seven restrictions—those conspicuously absent in the Hatch Act[7]—are likely invalid under the First Amendment. Those restrictions prevent AO

---

[7] The Hatch Act's prohibition on active partisan participation does prevent certain employees from engaging in *subsets* of activity that fall within these seven AO Code restrictions: The AO Code broadly prohibits "expressing opinions publicly, including on social media or via articles or letters to the editor, regarding a political party or partisan candidate for office"; the Hatch Act for the most part allows public expression, but it prohibits messages made "*in concert with*" a candidate, partisan group, or political party. 5 C.F.R. § 734.402. AO employees cannot be members of a partisan political organization or attend partisan fundraisers; the Hatch Act bars only *leading or founding* partisan groups and *organizing* fundraisers. Id. § 734.409–.410.

In light of the Court's approval of two AO restrictions with parallels in the Hatch Act, this limited overlap raises a question: If the Hatch Act's restrictions are lawful but the AO Code's corresponding (and broader) restrictions are invalid as written, shouldn't the Court attempt to narrow the AO Code restrictions to align with those in the Hatch Act? While courts do sometimes impose those sorts of "saving constructions" on laws that are unconstitutional as written, the Court hesitates to go down that road here. For one, the government has not so much as suggested the possibility of narrowing these restrictions. Even if it had, "the words of the [challenged restrictions] simply leave no room for a narrowing construction." Bd. of Airport Comm'rs of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569, 575 (1987). Nor is there anything in the record suggesting that Director Duff in imposing the restrictions saw any difference between the risks posed by "active" involvement (in the sense meant by the Hatch Act) and that posed by other partisan activities. The Court declines to graft language from the Hatch Act onto the AO Code on its own initiative. See NTEU, 513 U.S. at 479 (citing the

employees from (1) expressing opinions publicly regarding a political party or partisan candidate for office; (2) wearing or displaying partisan political badges, signs, or buttons; (3) contributing funds to a political party, political action committee, or partisan candidate for office; (4) attending partisan fundraisers; (5) being a member of a partisan political organization; (6) attending events for a partisan candidate for office; and (7) attending party conventions, rallies, or meetings.

The government faces an uphill battle in defending these restrictions. It has not offered any evidence that, in the twenty-some years during which many of the prohibited activities were allowed (at least with respect to state and local offices), any member of the public noticed that AO employees engaged in them—let alone that the public viewed that engagement as reflecting poorly on the impartiality or integrity of the judicial branch as a whole. Under a faithful application of the Supreme Court's framework for evaluating broad employee-speech regulations, the absence of any documented harm to public perception would doom the Code's restrictions. See NTEU, 513 U.S. at 472.

Again, though, the nebulous nature of the government's interest in maintaining the appearance of judicial independence demands more deference than is proper in other cases. But even allowing for looser predictions of harm, the government has not met its burden with respect to these seven restrictions. It has struggled to generate a single concrete example—even a hypothetical one—where an AO employee's participation in the prohibited activities would cause a member of the public reasonably to question the impartiality or integrity of particular judges or the judiciary as an institution.

---

"obligation to avoid judicial legislation" in declining to impose a "nexus requirement for the [invalidated] honorarium ban").

This is not surprising.  At the core of each restriction lie run-of-the-mill acts of civic participation like speaking out publicly about a candidate, joining or donating to a party, or attending a rally.  These are actions that, in the eyes of a reasonable member of the public, reveal only that the employee is politically engaged and prefers a particular candidate or party.  None give rise to a justifiable inference that the judiciary has been infected by partisanship.

What about the perception that AO employees who engage in these activities might try to influence judges or cases?  For a member of the public to see someone engaged in restricted activity—say, attending a rally—and draw the inference that the government fears, it would first need to know that the participant is an AO employee.  (Or, in the case of a campaign contribution, the public would need to learn of AO employees' donation histories.)  It would then need to draw three tenuous conclusions:  First, that attending a rally reflects a partisan commitment serious enough to influence an AO employee's performance of her job duties.  Second, that the politically inclined administrative employee could meaningfully influence judicial decisionmaking.  And third, that the employee would choose to exert that influence, notwithstanding its obvious impropriety and its near-certain violation of other provisions in the AO Code.[8]  A member of the public might be forgiven for believing one or two of those links, but the Court cannot uphold these restrictions based on the speculative fear that he might accept the whole chain.  See NTEU, 513 U.S. at 476 (attaching "weight to the powerful and realistic presumption that the federal work force consists of dedicated and honorable civil servants").

------

[8] Namely, Canon 1 states that "[a]n independent and honorable judiciary is indispensable to justice in our society.  Public service in the judiciary is a public trust, requiring employees to place loyalty to the Constitution, the laws, and ethical principles above private interests."  Guffey Decl. Ex. A, at 5.  And Canon 3 requires employees to "diligently discharge the responsibilities of the office in a prompt, efficient, nondiscriminatory, fair, and professional manner."  Id. at 8.

What about employees engaging in more extreme displays of partisan belief—say, vitriolic social media postings or cable news interviews? Absent any evidence that such behavior was a problem in the past, the government's speculation that it might occur in the future cannot justify a broad rule that sweeps in a magnitude of more benign partisan activity. Sanjour, 56 F.3d at 97–98 ("In performing the Pickering balance . . . the courts must consider whether the challenged statute or regulation is tailored to address the harm that the government allegedly aims to protect."). And, importantly, the AO could readily address outliers through after-the-fact, isolated disciplinary actions. See, e.g., Guffey Decl. Ex. A, at 6 (AO Code's Canon 2, which prohibits employees from "engag[ing] in any activities that would put into question the propriety of the employee's conduct in carrying out the duties of the office").

If the fear is instead that the public will view the partisan activity of an AO employee as representing the political bent of the judiciary as a whole, the Code's restrictions are too broad a response. The Code forbids partisan activity even where the participant does not identify herself as a judicial-branch employee and even where the activity takes place nowhere near the AO's offices in Washington.[9] Even to the extent that the public can discern that the participants work for the AO, the Court finds it unlikely that an administrative employee's partisan acts would give rise to an inference that the judiciary is itself a partisan institution. AO employees, after all, do not work in courthouses or interact with litigants, and their job titles do not suggest any relationship with judges or their immediate staffs.

---

[9] The case might well be different if the Code restricted only on-duty partisan activity, or even off-duty activity with a publicly visible nexus to the AO (for example, identifying one's self as an AO employee in a social media post or the byline of an op-ed).

At the hearing, government counsel suggested a variant of this concern: that the public could come to view the AO as favoring one party *in the aggregate*, perhaps based on public records of employees' campaign contributions. Hr'g Tr. at 30. The idea being that, if the public thought the AO was filled with supporters of one party, it could think (incorrectly) that the judiciary had a similar partisan tilt. The legitimacy of that concern, however, depends on the premise that a large percentage of AO employees share a partisan viewpoint. That premise has no support in the record. Even if it did, the Court would hesitate to rely on it because it is transitory (it would evaporate if the AO became more ideologically balanced) and it would lead to a bizarre result (politically homogenous agencies could be subjected to tougher partisan-activity restrictions merely because of their homogeneity).

At bottom, instead of explaining concretely how AO employees' engagement in the restricted activities would lead to public distrust of the judiciary, the government has consistently retreated to generalities. It correctly notes the paramount importance of public trust in the courts and the fragility of that trust. Hr'g Tr. at 27, 32–33. But without a plausible showing that these interests will actually be jeopardized, their bare invocation cannot support imposing new speech restrictions on hundreds of employees who have little interaction with judges or litigants and no power over the management or resolution of cases. See Liverman v. City of Petersburg, 844 F.3d 400, 408–09 (4th Cir. 2016) (despite granting a "wide degree of deference" to police department, striking down its "sweeping" social-media restrictions on officers because the assertion that officers' comments would destroy "camaraderie" and "community trust" was overly speculative). As was true of the ban on government employees receiving honoraria for outside speeches and writings, "[t]he speculative benefits the [restrictions] may provide the Government are not sufficient to justify this crudely crafted burden on [employees'] freedom to

engage in expressive activities." <u>NTEU</u>, 513 U.S. at 477. The plaintiffs have shown a strong likelihood of success on the merits of their claim that these restrictions violate the First Amendment.

B.  <u>Other Preliminary Injunction Factors</u>

In addition to showing a likelihood of success on the merits, plaintiffs seeking a preliminary injunction must also show that they are likely to suffer irreparable harm in the absence of relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. <u>Winter</u>, 555 U.S. at 20. In First Amendment cases, though, a strong likelihood of success is often "the determinative factor in the preliminary injunction analysis." <u>Pursuing America's Greatness v. FEC</u>, 831 F.3d 500, 511 (D.C. Cir. 2016) (internal quotation omitted). That is true here.

With respect to the restrictions that likely violate the First Amendment: "The loss of First Amendment 'freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" <u>Id.</u> (quoting <u>Mills v. District of Columbia</u>, 571 F.3d 1304, 1312 (D.C. Cir. 2009)). It also follows from the Court's merits analysis that the harm these restrictions inflict on employees outweigh the harm their restricted political speech will inflict on the government. And "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation." <u>Id.</u>

As for the two restrictions on which the plaintiffs lack a substantial likelihood of success on the merits: for that reason, and because the equities favor the government, the Court declines to issue an injunction.

## IV. Conclusion

An independent judiciary is indeed a government interest "of the highest order," <u>Williams-Yulee</u>, 135 S. Ct. at 1666, and all efforts to protect it—and to preserve its appearance—should be applauded. But this particular effort, laudable as it was, runs headlong into to another vital constitutional principle: the right of citizens, including federal employees, to engage in our participatory democracy through electoral politics.

Given their job responsibilities and the location of their workplace, the plaintiffs and the vast majority of their AO colleagues have no ability to influence judicial decisionmaking or the handling of individual cases. Nor can routine expressions of their political preferences outside the workplace be fairly attributed to a particular judge or the judiciary as a whole. As a result, were Ms. Guffey or Ms. Smith to join the Maryland Republican party, or display a yard sign promoting a Democratic House candidate, or donate $200 to the Virginia Libertarian party—all examples of protected speech barred by the AO Code—it would do little to impugn the integrity or impartiality of the judicial branch in the public's eye. So while it is entirely right for the AO Director to take measures to strengthen judicial independence and its appearance, those chosen in this instance must yield to the plaintiffs' First Amendment rights.

The Court will, accordingly, grant the plaintiffs' motion for a preliminary injunction as to the following seven partisan-activity restrictions in the AO Code: those on (1) expressing opinions publicly regarding a political party or partisan candidate for office; (2) wearing or displaying partisan political badges, signs, or buttons; (3) contributing funds to a political party, political action committee, or partisan candidate for office; (4) attending partisan fundraisers; (5) being a member of a partisan political organization; (6) attending events for a partisan candidate for office; and (7) attending party conventions, rallies, or meetings. Those restrictions may not

be enforced with respect to any AO employees except for the six high-level employees not at issue in this case. The Court will deny the plaintiffs' motion with respect to the other two restrictions: those on organizing events for a partisan candidate for office and on driving voters to the polls on behalf of a party or candidate.

A separate order accompanies this memorandum opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>August 22, 2018</u>