**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LISA GUFFEY and CHRISTINE SMITH,

      Plaintiffs,

  v.

JAMES C. DUFF, in his official capacity as
Director of the Administrative Office of the
United States Courts,

      Defendant.

Case No. 1:18-cv-01271-CRC

**MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 4

I.   THE AO PERFORMS ESSENTIAL FUNCTIONS FOR THE JUDICIAL
     BRANCH. .......................................................................................................... 4

     A.   The AO was created as part of reforms to relieve the Judicial Branch from prior
          reliance on the Executive Branch to secure important prerogatives. ..................... 4

     B.   The AO and its employees support the Judiciary in numerous important ways. ..... 6

     C.   AO employees work on behalf of the Judiciary in important matters before
          Congress and with the Executive Branch and are a public face of the Judiciary. .. 8

II.  THE REVISED AO CODE OF CONDUCT ............................................................... 11

III. THIS LITIGATION ............................................................................................... 12

     A.   Plaintiffs' Complaint ................................................................................... 12

     B.   The Court's Preliminary Injunction Memorandum Opinion ............................... 13

LEGAL STANDARD ......................................................................................................... 15

ARGUMENT ................................................................................................................... 15

I.   DEFENDANT IS ENTITLED TO JUDGMENT ON PLAINTIFFS' FIRST
     AMENDMENT CLAIM. ........................................................................................ 15

     A.   Under *Pickering*, the government may justify restrictions on employee speech
          through reasonable predictions of harm, which are entitled to deference. .......... 16

     B.   Unrestricted partisan political activity poses a realistic and reasonably
          foreseeable threat to the Judiciary's appearance of independence within
          the Judiciary, before Congress, and in the eyes of the general public. .............. 22

          1.   Expressing opinions publicly regarding a political party or partisan
               candidate. ............................................................................................ 28

          2.   Wearing or displaying partisan badges, signs, or buttons. ........................ 30

          3.   Driving voters to polls on behalf of a partisan candidate or political

party; organizing events for a partisan candidate; attending a partisan fundraiser. .............................................................................................. 31

    4.   Contributing funds to a political party, political action committee, or partisan candidate.......................................................................................... 33

    5.   Being a member of a partisan organization; attending a party convention, rally, or meeting; attending an event for a partisan candidate. ................. 34

  C.   Public confidence in the Judiciary's independence would suffer if it were drawn into the arena of political dispute with the other branches.................................. 36

  D.   The Challenged Restrictions on partisan political activity are reasonably necessary to protect the Judiciary's independence from partisan politics........... 40

II.   PLAINTIFFS HAVE FAILED TO ALLEGE FACTS ENTITLING THEM TO RELIEF ON THEIR FIFTH AMENDMENT VAGUENESS CLAIM AND, EVEN IF THEY HAD PROPERLY PLED THE CLAIM, IT IS BELIED BY THE EVIDENCE......................................................................................................... 43

CONCLUSION............................................................................................................. 45

# TABLE OF AUTHORITIES

**Cases**

*Baumann v. Dist. of Columbia*,
  795 F.3d 209 (D.C. Cir. 2015) ................................................................. 16, 17, 19
*Bell Atl. V. Twombly*,
  550 U.S. .................................................................................................. 44, 45
*Buckley v. Valeo*,
  424 U.S. 1 (1976) .......................................................................................... 43
*Bynum v. U.S. Capitol Police Bd.*,
  93 F. Supp. 2d 50 (D.D.C. 2000) .......................................................... 43, 44, 45
*Chandler v. Judicial Council of the Tenth Circuit*,
  398 U.S. 74 (1970) ............................................................................................ 6
*Connick v. Myers*,
  461 U.S. 138 (1983) ................................................................................... 19, 40
*Garcetti v. Ceballos*,
  547 U.S. 410 (2006) ....................................................................................... 17
*Geary v. Renne*,
  880 F.2d 1062 (9th Cir. 1989) ....................................................................... 38
*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ...................................................................................... 43
*Hodge v. Talkin*,
  99 F. 3d 1145 (D.C. Cir. 2015) ..................................................................... 20
*Jurgensen v. Fairfax Cty.*,
  745 F.2d 868 (4th Cir. 1984) ........................................................................ 42
*Lalowski v. City of Des Plaines*,
  789 F.3d 784 (7th Cir. 2015) ......................................................................... 19
*Lane v. Franks*,
  573 U.S. 228 (2014) ...................................................................................... 16
*Novell v. United States*,
  109 F. Supp. 2d 22 (D.D.C. 2000) .......................................................... passim
*Orange v. District of Columbia*,
  59 F.3d 1267 (D.C. Cir. 1995) ...................................................................... 17
*Pickering v. Board of Education*,
  391 U.S. 563 (1968) ............................................................................ 16, 17, 40
*Pro-Football, Inc. v. Harjo*,
  284 F. Supp. 2d 96 (D.D.C. 2003) ................................................................ 15
*Sanjour v. EPA*,
  56 F.3d 85 (D.C. Cir. 1995) ..................................................................... 19, 20
*Smith v. Goguen*,
  415 U.S. 566 (1974) ...................................................................................... 43
*U.S. Civil Service Comm'n v. Nat'l Ass'n of Letter Carriers*,
  413 U.S. 548 (1973) ............................................................................ 21, 22, 40

*United Pub. Workers of Am. (C.I.O.) v. Mitchell*,
    330 U.S. 75 (1947)...................................................................................... 41
*United States v. Nat'l Treas. Emps. Union*,
    513 U.S. 454 (1995).............................................................................. passim
*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)...................................................................................... 44
*Weaver v. U.S. Info. Agency*,
    87 F.3d 1429 (D.C. Cir. 1996)............................................................... passim
*Williams-Yulee v. Fla. Bar*,
    *Ass'n*, 135 S. Ct. 1656 (2015)............................................... 1, 14, 18, 20

## Statutes

28 U.S.C. § 331 ................................................................................................. 5
Pub. L. No. 67-298........................................................................................... 5
Pub. L. No. 76-299........................................................................................... 5
Pub L. No. 115-391......................................................................................... 29

## Rules

Federal Rule of Civil Procedure 12 ................................................................ 45
Federal Rule of Civil Procedure 56 ................................................................ 15

## Other Authorities

Arthur S. Miller, *Public Confidence in the Judiciary: Some Notes & Reflections*,
    35 Law & Contemp. Prob. 69 (1970) ........................................................ 23
*Federal Judicial Administration*,
    44 Am. U. L. Rev. 1557 (1995)............................................................... 5, 6
*Interbranch Politics: The Administrative Office of U.S. Courts as Liaison*,
    24 Just. Sys. J. 43 (2003) ......................................................................... 10
*Judicial Independence, Judicial Accountability, and Interbranch Relations*,
    95 Geo. L.J. 909 (2007) .............................................................................. 9
*Judicial System Institutional Frameworks: An Overview of the Interplay Between Self-*
    *Governance and Independence*,
    2011 Utah L. Rev. 121................................................................................. 5

## INTRODUCTION

Because federal courts lack the power of either the sword or the purse, they must depend for their authority on the respect of the public and the other branches of government. *See, e.g.*, Memorandum Opinion, ECF No. 13 ("Mem. Op.") at 13-14 (quoting The Federalist No. 78, at 464-65 (A. Hamilton) (C. Rossiter ed., 1961)).   And the Judiciary has long enjoyed sustained public respect that has enabled its courts to decide cases of great public import—and, sometimes, great controversy—without fear of political reprisal.   Critical to that respect is the Judiciary's reputation for impartiality and independence from partisan influence; preserving that reputation is an interest that this Court and others have uniformly recognized as a compelling one of the highest order.   Mem. Op. 13 (quoting *Williams-Yulee v. Fla. Bar Ass'n*, 135 S. Ct. 1656, 1666 (2015)). This reputation is earned not only through the Judiciary's decisions, but also through policy-making; setting priorities for the Branch; establishing rules of procedure for and access to its courts; managing its finances; overseeing and setting rules for the ethical conduct of its judges and employees; and performing other internal administrative functions it has been entrusted to carry out.   And it is not only the public that renders ultimate judgment on that reputation; the perceptions of the other two branches of government with which the Judiciary interacts and of the judges and employees of the Judicial Branch themselves carry significant consequence as well. Yet there is evidence that this reputation is in danger of slipping, and of doing so with rapidity as today's partisan divides take firmer hold.

The federal courts themselves have long sought to prevent any such harm to their perceived independence and impartiality by restricting the partisan activities of court personnel: the judges, their law clerks, and courtroom and courthouse staff.   But the restrictions on partisan activities for court personnel did not appear in the Code of Conduct for the 1,100 employees of the Judicial Branch entity that serves numerous critical functions on behalf of the Branch, the Administrative

Office of the United States Courts ("AO").  The AO's Director, Defendant James Duff, decided in 2015 to address that discrepancy and conform the AO's Code to that of the courts by restricting partisan political activity by AO employees.  The updated Code went into effect on March 1, 2018, prompting Plaintiffs to challenge nine specific restrictions under the First Amendment.

Because the AO is an integral part of the Judiciary—and thus closely associated with the courts in the eyes of the public, judges, Congress, and the Executive Branch—conformity between its Code and that of the courts represents a sensible policy decision in its own right.  But by restricting observable partisan political activity by AO employees, Director Duff sought more than to unify the conduct rules within the Branch.  He sought to foreclose the increasingly likely possibility that even an isolated episode of partisan affiliation by an AO employee could enter into public view and discourse, and thereby adversely color how the public—and, critically, other branches of government and federal judges themselves—view the Judiciary.

That prospect, Director Duff reasonably feared, could lead the general public, members of Congress and staff, the judges with whom AO employees work, and Executive Branch officials to question the Judicial Branch's independence.  For instance, an AO employee whose official duties entail drafting revisions to a procedural rule concerning nationwide injunctions might raise grave doubts about his objectivity on that subject simply by donning a red "Make America Great Again" baseball cap when he leaves the office for Union Station and his commute home, or for happy hour at a nearby pub on Capitol Hill.  Or imagine a different AO employee who, the day before she meets with the Republican Chairman of the Senate Judiciary Committee to advocate for important legislation affecting the courts, is discovered by a committee staffer's online research to have made recent contributions to the MoveOn.org political action committee.

The potential for that kind of harm, even if initially only incremental, threatens one of the core attributes on which the Judiciary critically relies: its perceived independence from partisan

and political influence.  That is indeed among the reasons the AO was created, one of a series of reforms designed to increase the Judiciary's autonomy and reduce its reliance on the political branches for policy-making, administration, budgeting, and other vital needs.  Yet unrestricted partisan political activity by AO employees, particularly in a climate of deepening and ubiquitous partisan division and dispute, poses a substantial risk of drawing the Judicial Branch into the political squabbles which it has consistently sought, and that it was intended by design, to avoid.

These risks are predicated on reasonable assumptions about behavior in a culture where individuals are increasingly connected, their political acts are increasingly visible, and exploitation of information for partisan advantage is increasingly common.  Moreover, if the Judiciary's reputation for independence were to suffer harm in the eyes of the public, given federal courts' inability or institutional unwillingness to directly influence public opinion, that slide in public confidence would be difficult to arrest, let alone reverse.  The Judiciary's interest in preserving its reputation for independence in the face of these potential harms, even when measured against Plaintiffs' interest in political expression, must prevail in the balancing this Court has been asked to perform.  Measured against the applicable legal standard, and bolstered by the evidence supporting the AO's predictions of harm to the Judiciary, judgment should be entered for Defendant on Plaintiffs' First Amendment claim.

This Court has preliminarily enjoined seven of the nine restrictions, finding on the basis of a limited factual record and expedited briefing that Plaintiffs had satisfied the requirements for temporary relief.  Now, at summary judgment, the record includes declarations from Director Duff, a senior AO official, and two former senior staffers on the Senate Judiciary Committee.  This record, which was not before the Court at the preliminary injunction stage, demonstrates that when this Court conducts the balancing test anew in reviewing Plaintiffs' First Amendment claim, it should reach a different outcome and enter judgment for Director Duff on all nine restrictions.

# BACKGROUND

## I.   THE AO PERFORMS ESSENTIAL FUNCTIONS FOR THE JUDICIAL BRANCH.

The AO was created by Congress as part of broad judicial reforms in the early 20th century designed to relocate responsibility for administering the federal courts from the Executive Branch to the Judiciary itself.  These reforms further created mechanisms for the Judiciary to establish policies that would govern the entire Branch.  The AO's primary mission, which it fulfills through approximately 1,100 employees, is to help draft and carry out the Judicial Branch's policies as set by the Judicial Conference of the United States ("Judicial Conference" or "Conference") and to provide administrative, budgetary, and other support for the federal courts.  In fulfilling these duties, AO employees work closely with hundreds of federal judges at the AO's primary office in Washington, D.C. and with courthouse staff around the country, advocate for the Judiciary before the people's elected representatives in the United States Congress, and, more broadly, serve as the point of contact for matters affecting the Judicial Branch within the federal government.

### A.   The AO was created as part of reforms to relieve the Judicial Branch from prior reliance on the Executive Branch to secure important prerogatives.

From its establishment by Article III of the Constitution until 1939, the federal Judiciary relied on the Executive Branch to serve its budgeting priorities, and personnel and operational needs.  Even then, the agency responsible for providing financial and administrative support to the courts shifted on more than one occasion, from the Treasury Department, *see* Act of Sept. 2, 1789, 1 Stat. 65 (1789); Act of May 8, 1792, ch. 37, § 9, 1 Stat. 279, 281 (1792), to the Department of the Interior in 1849, *see* Act of Mar. 3, 1849, ch. 108, § 4, 9 Stat. 395, 395 (1849), and finally, to the Department of Justice in 1870*, see* Act of June 22, 1870, ch. 150, §15, 16 Stat. 162, 164 (1870).

In 1922, partly in response to the Judiciary's desire for greater self-governance and policy-making prerogative, the Conference of Senior Circuit Judges—now the Judicial Conference—was

created.  *See* Pub. L. No. 67-298, 42 Stat. 837, 838, codified as amended at 28 U.S.C. § 331 *et*

*seq.*; *see also* Markus B. Zimmer, *Judicial System Institutional Frameworks: An Overview of the*

*Interplay Between Self-Governance and Independence*, 2011 Utah L. Rev. 121, 126-27 (describing

how the Judiciary's "growing resistance" to "sometimes heavy-handed [Executive Branch]

oversight and control of the court system's annual budgetary allocations" led to "initiatives for

organizational realignment and the incremental transfer of governance authority from executive

departments to the judicial system").  Among the Conference's responsibilities are to "make a

comprehensive survey of the condition of business in the [federal] courts"; to "submit suggestions

and recommendations to the various courts to promote uniformity of management procedures and

the expeditious conduct of court business"; to "carry on a continuous study of the operation and

effect of the general rules of practice and procedure" used in federal courts; and, through the Chief

Justice, to "submit to Congress an annual report of the proceedings of the Judicial Conference and

its recommendations for legislation."  28 U.S.C. § 331.  Notwithstanding the Conference's

creation, the Justice Department continued daily management for the Judiciary.

In 1939, seeking to further the Judiciary's independence from political influences in the

Executive Branch, Congress established the Administrative Office of the U.S. Courts and separate

judicial councils for each of the judicial circuits then in existence.  *See* Administrative Office Act

of 1939, Pub. L. No. 76-299, 53 Stat. 1223; Harlington Wood, Jr., *Judiciary Reform: Recent*

*Improvements in Federal Judicial Administration*, 44 Am. U. L. Rev. 1557, 1562 (1995) (noting

that Congress passed the 1939 Act out of "[r]ecogni[tion] that an independent judiciary requires a

substantial degree of administrative independence").  The AO, under the supervision of the Judicial

Conference, was to be responsible for all aspects of the administration of the Judiciary and to

support its judges in their policy-making function through the Conference.

The 1939 Act "furnish[ed] to the Federal courts the administrative machinery for self-

improvement, through which those courts will be able to scrutinize their own work and develop efficiency and promptness in their administration of justice." H.R. Rep. No. 76-702, at 2 (1939); *id.* (promoting the bill's "definite separation of the judicial branch . . . from fiscal and administrative control by the executive branch" and observing that "[u]nder the present system, an attorney general wishing to do so could interfere with the freedom of the courts"). The AO "was to be an arm of the judicial branch of government and under the direct control of the Supreme Court and the Judicial Conference of the United States." *Chandler v. Judicial Council of the Tenth Circuit*, 398 U.S. 74, 97, 102 (1970) (Harlan, J., concurring).

Since its establishment, the AO—headquartered in the Thurgood Marshall Federal Judiciary Building adjacent to Capitol Hill in Washington, D.C.—now has over 1,100 employees who work daily with federal judges to create and establish the Judiciary's policies and priorities, provide ethical advice and guidance to judges, serve as liaison to the Legislative and Executive Branches, other governmental entities, and the public, and provide a broad array of support to judges and others working in federal courts nationwide. Duff Decl. ¶¶ 5-7; Baugher Decl. ¶¶ 4-5.

Overall, the creation of the AO, the Judicial Councils, and the Judicial Conference advanced the Judiciary as a fully independent branch of government administering its own policies, operations, and resources. *See* Wood, *supra*, at 1563 (creation of Conference, AO, and Judicial Councils "had a revolutionary impact on federal judicial administration"); Zimmer, *supra*, at 127 (creation of AO in 1939 "usher[ed] in a new era of institutional independence that simultaneously imposed the mantle of strict administrative accountability on the national leadership of the judiciary"). The AO fulfills this "mantle of strict accountability" by reflecting the Judiciary's independence and nonpartisanship in carrying out its functions. Duff Decl. ¶ 15.

**B.      The AO and its employees support the Judiciary in numerous important ways.**

AO employees perform a broad range of services for the Judiciary. Most prominently, the

6

AO supports the Judicial Conference and its many committees, working groups, and advisory councils. Duff Decl. ¶ 9-10. The Conference works closely with the AO and its employees to make national policy for the Judiciary on subjects including court rules, probation and pretrial services, defender services, budgets, information technology, personnel, facilities, courthouse and judicial security, and judicial salaries and benefits. *Id.* ¶ 9. For example, the Conference can make recommendations to amend certain provisions of the Federal Rules of Civil Procedure and determine where and how many new judgeships are needed. Director Duff is the Secretary of the Conference and, in that capacity, supervises and coordinates the Conference's policymaking efforts and the AO staff who support those efforts. *Id.* ¶ 10.

Employees from nearly every office and department in the AO provide support to Judicial Conference committees, workings groups, and councils. Among other tasks, these employees draft proposed legislation for the Judicial Branch, improve the courts' case management processes, develop and prioritize the budget needs for the Branch, and provide recommendations on policy issues pending before Conference committees that, if approved, become the official policy of the Branch. Duff Decl. ¶¶ 10-11. AO employees in the Department of Administrative Services work with judges on the Committee on Judicial Resources to carry out the difficult and sensitive task of determining how many new judgeships are needed, and in which courts. Baugher Decl. ¶ 5.

As but two recent examples, AO staff in the Office of the General Counsel helped to draft changes to the Code of Conduct for U.S. Judges, which broadly governs all lower court federal judges, and the Judicial Conduct and Disability Rules, which establish mechanisms for any person to file a complaint of judicial misconduct or disability against a federal judge. Those changes were approved by the Conference in March 2019 and went into immediate effect. Duff Decl. ¶ 10. Another issue that could soon be addressed by AO employees supporting the Conference is whether to impose geographic limits on a district court's preliminary injunction that is otherwise

national in scope.  *Id.* at ¶ 26.  If taken up by a Committee or the full Conference, that issue could result in changes to the Federal Rules of Civil Procedure or lead to legislation in Congress.  In the past, AO employees have proposed countless policies that have been approved by the Conference in areas that broadly affect how litigants and the public interact with the Judicial Branch, such as courtroom cameras, *pro se* litigant access, and PACER access.  *Id.* at ¶ 10.

AO employees work closely with federal judges.  Supporting the Conference requires collaboration and communication with the more than 250 federal judges who comprise the Conference committees.  Additionally, over 100 federal judges serve on advisory councils which assist the AO in drafting policy recommendations for the Conference and its committees, and for the AO.  Judges supervise AO employees staffing committees, and make recommendations about hiring, promotion, and assignment of AO staff to particular committees or working groups.  Duff Decl. ¶¶ 9-11, 13; Baugher Decl. ¶ 8.  Outside the committees, dozens of AO employees in the Judicial Services Office and Office of the General Counsel regularly counsel federal judges on a variety of topics, including ethics advice on recusals, participation in outside activities, and gifts.  Duff Decl. ¶ 11(a)-(b); Baugher Decl. ¶ 8.  On any given day, judges in the Thurgood Marshall Building may outnumber those in most courthouses around the country.  Duff Decl. ¶ 9.  The AO is a critical component of the Judicial Branch, and its "activities are necessarily interwoven with those of the judiciary."  *Novell v. United States*, 109 F. Supp. 2d 22, 26 (D.D.C. 2000).

## C.   AO employees work on behalf of the Judiciary in important matters before Congress and with the Executive Branch and are a public face of the Judiciary.

AO employees additionally have substantial interaction with the other two branches of the federal government and represent the Judiciary to the public, including the news media.

Some of the Judiciary's most critical work is carried out by AO employees who represent the Judicial Branch before Congress.  The effectiveness of the AO's Office of Legislative Affairs

("OLA") depends on its employees' strong professional relationships with members of Congress and their staffs to advance legislation on behalf of the Judiciary and to convey the Judiciary's positions on proposed legislation affecting federal courts. *See also* Stephen B. Burbank, *Judicial Independence, Judicial Accountability, and Interbranch Relations*, 95 Geo. L.J. 909, 918 (2007) (tracing creation of OLA in 1970s to "increased staff capacity [that] enabl[es] [the House and Senate] to monitor more effectively the decisions and rulemaking activities of the federal courts and the federal judiciary"). OLA employees advocate to Congress on behalf of the Judiciary on such issues as new judgeships, judicial ethics, courthouse construction, and the pros and cons of dividing the Ninth Circuit. Duff Decl. ¶ 14(d); Baugher Decl. ¶¶ 5-6. In the 115th Congress, for example, OLA employees were involved in numerous bills affecting the Judiciary, as well as annual budget requests and creation of new judgeship positions. In addition to OLA employees' regular interactions with Congress, it is not uncommon for subject matter experts from other AO offices to be called upon to present information, formally or informally, to Congress. Duff Decl. ¶¶ 14, 20.

The AO Director testifies before Congress on behalf of the Judiciary when it makes its annual budget request. Duff Decl. ¶ 14(d). To support those budget requests, AO employees in the Department of Administrative Services have frequent communication with members and staff of the Senate and House Appropriations Committees. These employees prepare the detailed budget requests and underlying data, respond to inquiries about the budget requests from Congress, and, sometimes together with subject matter experts from elsewhere in the AO, provide detailed briefings to members and staff to explain the budget requests. Baugher Decl. ¶ 4.

When AO employees interact with members of Congress and their staffs, they are perceived as the public face and representatives of the federal Judiciary, as set forth in the declarations of Manus Cooney and Ronald Weich—a former Chief Counsel to the Senate Judiciary

Committee and a former Chief Counsel to Senator Edward M. Kennedy on the Senate Judiciary Committee, respectively.  Cooney Decl. ¶ 6; Weich Decl. ¶ 6.  Congress accordingly understands that the AO and its employees speak for the Judicial Branch when they work with Congress.  Duff Decl. ¶ 15; Weich Decl. ¶¶ 4, 9; Cooney Decl. ¶¶ 6, 9.  Further, when AO employees advocate for and promote the Judiciary's interests on legislation and other matters pending before Congress, they do so as nonpartisan actors, which preserves the Judiciary's reputation for actual and perceived independence from partisan politics and the political branches of government. Weich Decl. ¶¶ 4, 12; Cooney Decl. ¶ 9.  Thus, if a member of Congress seeks input from the AO on the wisdom of particular policies, about the partisan impacts of legislation, or with an allowance for political considerations, AO employees will generally limit their comments to addressing only its effects on the administration of justice.  Weich Decl. ¶ 10; Cooney Decl. ¶¶ 9-10; John W. Winkle III, *Interbranch Politics: The Administrative Office of U.S. Courts as Liaison*, 24 Just. Sys. J. 43, 47 (2003) ("As a matter of policy, the AO will not comment on the wisdom of substantive proposals before the Congress, even if the Judicial Conference opposes them.").  In their interactions with Congress, AO employees decline to express positions on legislation or issues on which the Conference has not itself reached a view.  Cooney Decl. ¶ 7; Weich Decl. ¶ 10.

In addition to their close working relationships with members of Congress and their staff, AO employees also interact regularly with a number of executive agencies and components, such as the Office of Management and Budget, the U.S. Marshals Service, the General Services Administration, the Federal Protective Service, and the Executive Office for United States Attorneys.  Baugher Decl. ¶ 6; *see also* Winkle, *supra* at 55 ("When it comes to matters of space and facilities management, the judiciary is still dependent upon the executive, much as it was before 1939."); *id.* (explaining that the Judiciary's "requests must be channeled through the President's budget").  AO employees also regularly interact with the Department of Justice on

10

proposals concerning, for example, thee federal hate crimes statute and other criminal justice issues.  Weich Decl. ¶ 8.  AO employees' work with the Executive Branch encompasses a range of issues, including building and courtroom security, courthouse construction and closure, and handling of incarcerated criminal defendants and cooperating witnesses.  *Id.*; Baugher Decl. ¶ 6.

Finally, the publicly visible work of AO employees outside the Judiciary is not limited to Congress and the Executive Branch.  The AO's Office of Public Affairs is the primary point of contact for members of the news media to obtain official information and statements from the Judiciary.  Duff Decl. ¶ 14(b).  Thus, any time that a reporter seeks comment or writes a story about a judicial decision or other developments in the federal district and appellate courts, that reporter's first contact is typically with an AO employee.  *Id.*  In addition, the Conference holds public, televised hearings on proposed policy changes, which are staffed by AO employees from multiple different AO components.  *Id.* at ¶ 14(a); *see, e.g.*, *Proposed Changes to Code of Conduct for U.S. Judges and Judicial Conduct and Disability Rules*, https://www.uscourts.gov/rules-policies/judiciary-policies/proposed-changes-code-conduct-judges-judicial-conduct-disability-rules.  The public, therefore, also has opportunity to observe AO employees performing their job responsibilities on behalf of the independent Judiciary.

## II.     THE REVISED AO CODE OF CONDUCT

Beginning in 2015, upon discovering that the AO Code of Conduct was out of date and inconsistent with the Code of Conduct for Judicial Employees ("Courthouse Employee Code"), Director Duff initiated a process to conform the AO Code more closely to the Courthouse Employee Code.  Duff Decl. ¶¶ 16, 21.  The updated Code took effect March 1, 2018.  *Id.*

With respect to political activity restrictions, the updated AO Code matches the Courthouse Employee Code.  Under the Courthouse Employee Code, which federal judges drafted and the Conference approved, all courthouse employees nationwide must refrain from partisan political

activity. Duff Decl. ¶ 18(a). Judges' personal staffs (*e.g.*, law clerks and secretaries), court staff attorneys, and court executives must additionally refrain from nonpartisan political activity. *Id.* at ¶ 18(b). Similarly, the AO Code restricts six senior employees—the Director, the Deputy Director, the three Assistant Directors, and the General Counsel—from partisan *and* nonpartisan political activity. *Id.* at ¶ 21. For the remaining approximately 1,100 AO employees, the Code of Conduct restricts partisan political activity, while permitting a broad range of nonpartisan political engagement that is otherwise consistent with the Code. *Id.*

In his July 10, 2017 memorandum announcing the changes to the AO Code, Director Duff focused on his goals of ensuring that the courts and the AO operate in sync, reinforcing the fact that the AO is part of the Judiciary and not isolated from the courts, and unifying the work of the AO and the courts. Duff Decl. ¶ 22; *see* AO Code of Conduct, ECF No. 2-5. The reasons for the Director's decision to update the AO Code were not, however, limited to harmonizing it with the Courthouse Employee Code. The Director also sought to preserve the public's, the other branches', and the judges' own perceptions of the Judiciary, and the AO within it, as an independent, apolitical branch of government, and to preserve federal judges' perception of the AO as an apolitical entity dedicated to sound nonpartisan advice and administration in service of federal courts. Duff Decl. ¶ 23.

In conjunction with the July 10, 2017 memorandum announcing the updated AO Code, Director Duff met with AO employees to explain the changes. The AO publicized guidance in response to employee questions about the Code, and made AO supervisors and the Office of the General Counsel available to answer individual questions on a confidential basis. Duff Decl. ¶ 22.

## III.    THIS LITIGATION

### A.    Plaintiffs' Complaint

On May 31, 2018, Plaintiffs filed their Complaint for Declaratory and Injunctive Relief.

Compl., ECF No. 1.  They identified nine activities ("Challenged Restrictions" or "Restrictions")

that AO employees are prohibited from engaging in pursuant to the AO Code's restrictions on

"partisan political activity" and "mak[ing] speeches for or publicly endors[ing] or oppos[ing] a

partisan political organization or candidate."  *Id.* ¶ 21 (quoting AO Code).  The Challenged

Restrictions are as follows:

      a.  expressing opinions publicly, including on social media or via articles or letters to the editor, regarding a political party or partisan candidate for office;
      b.  wearing or displaying partisan political badges, signs, or buttons;
      c.  driving voters to polls on behalf of a political party or partisan candidate for office;
      d.  contributing funds to a political party, political action committee, or partisan candidate for office;
      e.  attending partisan fundraisers;
      f.  being a member of a partisan political organization (other than registering as a member of a party for voting purposes);
      g.  attending events for a partisan candidate for office;
      h.  organizing events for a partisan candidate for office; and
      i.  attending party conventions, rallies, or meetings.

*Id.* ¶ 21.

Plaintiffs asserted two claims against the AO: first, that each of the Restrictions violates

their right to freedom of speech under the First Amendment, Compl. ¶ 50; and second, and in the

alternative, that the term "partisan political activity" is unconstitutionally vague in violation of the

Fifth Amendment's Due Process Clause.  *Id.* ¶ 51.  Plaintiffs seek a declaration that the Restrictions

cannot be enforced against them or any other AO employee (other than "designated employees")

and an injunction barring Director Duff and the AO from enforcing the Restrictions against

Plaintiffs or any other AO employee (other than "designated employees").  *Id.* at 15.  Plaintiffs

concurrently filed a Motion for a Preliminary Injunction.  ECF No. 2.

      **B.**     **The Court's Preliminary Injunction Memorandum Opinion**

After briefing and oral argument, the Court granted in part and denied in part Plaintiffs'

Motion on August 22, 2018.  Mem. Op.  The Court enjoined enforcement of seven Restrictions,

but permitted the AO to enforce the restrictions on (1) organizing events for a partisan candidate; and (2) driving voters to the polls on behalf of a party or candidate. *Id.* at 24-25.

In concluding that Plaintiffs were likely to prevail on their First Amendment claim as to seven of the Restrictions, the Court observed that Judicial independence is a "constitutional imperative." *Id.* at 1.  It determined, however, that AO employees "have a strong interest in freely participating in partisan politics," *id.* at 10, and that the AO had not made a "plausible showing" at the preliminary injunction stage that public trust in the Judiciary's independence "will actually be jeopardized" absent the Restrictions,  *id.* at 22.  The Court's conclusion rested, in part, on the AO's "consistent[] retreat[] to generalities" to explain the necessity of its updated Code.  *Id.*

The Court distinguished the two Restrictions on which it found that Plaintiffs were unlikely to prevail on the merits—organizing or managing political rallies or meetings and driving voters to polls on behalf of a party or candidate—on the grounds that those activities "involve[] not simply a personal display of partisan commitment, but rather an affirmative effort to enlist the partisan support of others." *Id.* at 17.  Owing to the "durable" "partisan tie" that these activities evince, the Court reasoned that a member of the public who viewed an AO employee engaging in them could plausibly—even if possibly erroneously—believe that partisan tie to be so strong that it would unduly affect the employee's job performance.  *Id.*  "[A] layperson," the Court allowed, "might not fully understand the relationship between the AO and federal judges themselves." *Id.*

Throughout its opinion, the Court recognized that "[p]rotecting the appearance of judicial integrity and impartiality is without doubt a government interest 'of the highest order.'"  *Id.* at 13 (quoting *Williams-Yulee*, 135 S. Ct. at 1666); *see also id.* at 14 (describing as "potent" the "interest in preserving public trust in the judiciary"); *id.* at 22 (noting the "paramount importance of public trust in the courts and the fragility of that trust").  It further explained that this interest "demands more deference than is proper in other cases" due to its "nebulous nature," *id.* at 15, 19, and that

14

the AO could therefore "rely on predicted harms to the public's perception of judicial integrity" to justify the Restrictions, *id.* at 15 ("[The AO] need not point to documentary evidence showing that employees' activities have eroded public confidence in the past and will continue to do so if left unrestricted."). Nevertheless, on the record before it, the Court determined that the AO had not adequately justified the Restrictions and that Plaintiffs were therefore likely to prevail on their First Amendment claims as to seven of the nine Restrictions. The Court also concluded that Plaintiffs were likely to suffer irreparable harm from seven of the Restrictions and that the balance of equities and the public interest favored Plaintiffs. *Id.* at 23.

Director Duff now moves for summary judgment on all claims.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment." *Pro-Football, Inc. v. Harjo*, 284 F. Supp. 2d 96, 112 (D.D.C. 2003). Rather, the dispute must concern a question of fact that is material, meaning that it is "capable of affecting the substantive outcome of the litigation." *Id.* The dispute must also be genuine, meaning that it is "supported by sufficiently admissible evidence such that a reasonable trier-of-fact could find for the nonmoving party." *Id.*

## ARGUMENT

## I.   DEFENDANT IS ENTITLED TO JUDGMENT ON PLAINTIFFS' FIRST AMENDMENT CLAIM.

As detailed below, the Challenged Restrictions in the AO Code are reasonably necessary to stave off realistic threats of harm to the Judiciary's defining independence from partisan

influence and, accordingly, under *Pickering v. Board of Education*, 391 U.S. 563 (1968), and its progeny, summary judgment should be entered for Defendant on the First Amendment claim. These potential harms go beyond the "generalities" that the Court, at the preliminary injunction stage, found likely inadequate to justify the Restrictions.  Mem. Op. 22.  Indeed, the potential harms to the Judiciary are not merely based on the prospect of the overall public's perception of declining judicial independence (though that is a significant likelihood), but are also reasonably likely to accrue due to changes in the ways that other actors in the political branches of government view the Judiciary, as well as how federal judges themselves would react to partisan political activity by AO employees.

**A.    Under *Pickering*, the government may justify restrictions on employee speech through reasonable predictions of harm, which are entitled to deference.**

The Supreme Court has recognized that the government "may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large."  *United States v. Nat'l Treas. Emps. Union*, 513 U.S. 454, 465 (1995) ("*NTEU*"); *see also Pickering*, 391 U.S. at 568("[I]t cannot be gainsaid that the [government] has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.").  "*Pickering* provides the framework for analyzing whether the employee's interest or the government's interest should prevail in cases where the government seeks to curtail the speech of its employees."  *Lane v. Franks*, 573 U.S. 228, 236 (2014); *see also Baumann v. Dist. of Columbia*, 795 F.3d 209, 215 (D.C. Cir. 2015) ("As a general matter, *Pickering* and its progeny continue to be the meter by which the First Amendment rights of public employees are measured." (quotation omitted)).

Under *Pickering*, when considering a challenge to a government restriction on its employees' speech, a court must first ascertain whether the employee "spoke as a private citizen,

addressing matters of public concern." *Baumann*, 795 F.3d at 215; *see also Garcetti v. Ceballos,* 547 U.S. 410, 418 (2006); *Orange v. District of Columbia,* 59 F.3d 1267, 1272 (D.C. Cir. 1995). If these two requirements are met, *Pickering* next requires a court to balance (1) "the interests of the [employee], as a citizen, in commenting upon matters of public concern" and (2) "the interest of the [government], as an employer," in protecting the asserted interest. 391 U.S. at 568. Additionally, under *Pickering*, when the restriction on employees' off-duty expressive activity about matters of public concern operates *prospectively*, "[t]he Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 468 (quoting *Pickering*, 391 U.S. at 571); *see also Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1439-40 (D.C. Cir. 1996)). While "the government's asserted interest must be tethered to the speech *and to the speaker* it is restricting[, . . . t]he First Amendment may allow a regulation to cover more employees than is absolutely necessary to serve that asserted interest," so long as the government "provide[s] some independent reason justifying" the restriction's sweep. Mem. Op. 12-13 (citing *NTEU*, 513 U.S. at 473, 475).

Here, this Court has already recognized and neither party disputes that the speech covered by the Restrictions includes off-duty speech and relates to "matters of public concern," namely, politics. The Court noted that AO employees, including Plaintiffs, "have a strong interest in freely participating in partisan politics," and the Restrictions prevent them from engaging in "activities . . . squarely protected by the First Amendment . . . not just while on duty, but also on their own time and in their own communities," and, consequently, "the resulting burden is as serious as they come." Mem. Op. 10-11.

On the other side, the AO asserts two interests justifying the Restrictions: (1) protecting the Judiciary's actual and perceived independence from partisan politics, both by the public and

within the government, and (2) promoting the unity of purpose between the AO and the courts, including by establishing consistency within the Judicial Branch and demonstrating "that the AO [i]s an integral part of the Judicial Branch and not an independent, isolated agency."  Duff Decl. ¶ 22.  The two interests are linked in that, as the Duff declaration and Section I.B.1. *infra* detail, it is essential for the Judicial Branch's operation both that the public and other branches of government maintain trust in the Judiciary's independence, and that *federal judges* perceive the AO as an office within the Judiciary, operating in sync with the courts, and embodying the same independence from partisan politics as the judges themselves.  In other words, federal judges must maintain their perception of the AO as independent from partisan politics in order for the AO to continue to be an efficient advisor, advocate, and administrator on behalf of the Judiciary.  In that regard, both of the AO's interests fall under the rubric of "[p]rotecting the appearance of judicial integrity and impartiality," which this Court recognized "is without a doubt a government interest 'of the highest order.'"  Mem. Op. 13 (quoting *Williams-Yulee*, 135 S. Ct. at 1666).

As the Supreme Court noted, while "no one denies that" the "concept of public confidence in judicial integrity" is "genuine and compelling," it nonetheless "does not easily reduce to precise definition, nor does it lend itself to proof by documentary record."  *Williams-Yulee*, 135 S. Ct. at 1667.  For that reason, this Court held that "the government's predictions of harm here" are entitled to "more deference . . . than would be proper if the government had asserted a different interest."  Mem. Op. 15; *see also id.* at 19 ("the nebulous nature of the government's interest in maintaining the appearance of judicial independence demands more deference than is proper in other cases").  Accordingly, to demonstrate the necessity of the Restrictions, the government "need not point to documentary evidence showing that employees' activities have eroded public confidence in the past and will continue to do so if left unrestricted," but instead may "rely on predicted harms," or "realistic hypotheticals of how partisan activity restricted under the Code could lead the public to

believe that the judiciary is not behaving impartially." *Id.* at 15; *see also* Hr'g Tr. 5:17-23, July 16, 2018 (Plaintiffs acknowledging that government may rely on "hypotheticals, . . . imagining what the public will react to when they see administrative employees exercising their First Amendment rights" so long as the hypotheticals are based on "well-founded assumptions and reasonable expectations"); *id.* at 35:17-25 (Plaintiffs agreeing that the government may rely on "hypothetical linkages" between the asserted interest and the challenged restrictions, so long as the hypotheticals are "realistic" and not "far-fetched"). The government need not "allow events to unfold to the extent that the disruption . . . is manifest before taking action." *Connick v. Myers,* 461 U.S. 138, 152 (1983); *see also Baumann*, 795 F.3d at 217-18 (explaining that it would be "sufficient" for the government to establish that the employee speech it sought to restrict "could very well have an unfavorable impact on" the government's asserted interest); *Lalowski v. City of Des Plaines,* 789 F.3d 784, 791 (7th Cir. 2015) ("[A] showing of actual disruptiveness is not required; a government employer is allowed to consider the potential disruptiveness of the employee's speech." (internal quotation marks omitted)).

Finally, the D.C. Circuit has stated that "[i]n performing the *Pickering* balance . . . courts must consider whether the challenged statute or regulation is tailored to address the harm that the government allegedly aims to protect." *Sanjour v. EPA*, 56 F.3d 85, 97 (D.C. Cir. 1995); *see* Mem. Op. 21. Specifically, to justify a *prospective* rule regulating employee speech, the government must show "that the regulation's sweep is 'reasonably necessary to protect'" the asserted interest. *Weaver*, 87 F.3d at 1439 (quoting *NTEU*, 513 U.S. at 474); *see* Mem. Op. 7-8. Importantly, the D.C. Circuit has not construed this aspect of the *Pickering* test to require the type of heightened showing of "fit" that is found in other First Amendment inquiries. *See, e.g.*, *Sanjour*, 56 F.3d at 97 (distinguishing courts' consideration of "whether the challenged statute or regulation is tailored to address the harm that the government allegedly aims to protect" from requirement "outside the

*Pickering* context, that the government may not burden substantially more speech than necessary to further the government's legitimate interests" (quotation omitted)); *id.* at 98 (rejecting notion that "*Pickering* test contains a 'least restrictive means' component," explaining instead that fact that challenged regulations affect a "great quantity of speech" simply "weighs heavily on the side of the employees" in the *Pickering* balance); *cf. Hodge v. Talkin*, 99 F. 3d 1145, 1167 (D.C. Cir. 2015) (rejecting narrow tailoring in First Amendment case and acknowledging that because "most problems arise in greater and lesser gradations, and the First Amendment does not confine [the government] to addressing evils in their most acute form" a government speech restriction is not required "to encompass only those forms of expressive activity . . . that most acutely implicate the government's concerns" (quoting *Williams-Yulee*, 135 S. Ct. at 1671)).

With no requirement to find the type of First Amendment "fit" required in other contexts, the task for the Court is clear and limited.  No party disputes that the employee speech affected by the Restrictions is off-duty speech on matters of public concern.  All agree that the interests of both the employees and the AO are compelling.  And neither the Court nor either party disputes that the AO can rely on "predicted harms" and "realistic hypotheticals" based on "well-founded assumptions and reasonable expectations" in justifying the Restrictions, and that the Court properly accords deference to such predictions by the government.  What remains for the Court to decide is whether the hypotheticals and predictions of harm the government offers now at summary judgment are reasonable and well-founded, and whether the Restrictions are reasonably necessary to prevent that harm.  As Section I.B. will make plain, the government's fears that the Judiciary's appearance of independence is vulnerable to harm and that the activities limited by the Restrictions threaten the Judiciary's actual and appearance of independence from partisan politics, are reasonable and well-founded.  The potential for harm from AO employees' partisan political activity occurs both externally to the government, in public perception, and internally, within the

20

Judiciary and in the other branches.  Further, Section I.C. will demonstrate that the reach of the Restrictions is reasonably necessary to protect the Judiciary's independence.

As the Court noted, the Supreme Court "has not had occasion to apply the *Pickering* framework to speech restrictions on judicial-branch employees," Mem. Op. 8, but its decisions in *NTEU*, 513 U.S. 454, and *U.S. Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548 (1973) ("*Letter Carriers*"), offer some guidance as to how the competing interests should be balanced here.  In *NTEU*, the Court held that the restriction on federal employees' speech did not survive the *Pickering* test because the government's cited interest in "workplace efficiency" to justify a prospective rule restricting the speech of an "immense class of workers" was not sufficiently "strong[]."  513 U.S. at 473 & 475 n.21.  Further, the government's interest in preventing the "appearance of improper influence" did not outweigh the First Amendment rights of that "immense class of workers," which included the overwhelming majority of Executive Branch employees, many of whom held "negligible power to confer favors."  *Id.* at 473.  By contrast, the government's interest here—protecting the Judiciary's appearance of independence—is a "constitutional imperative," Mem. Op. 1, and the Challenged Restrictions reach only the several hundred employees of a relatively small agency.  In that regard, when compared with *NTEU*, the *Pickering* balance here favors the AO.  *Letter Carriers*, in which the Court upheld restrictions on Executive Branch employees' political speech, also supports judgment for the AO, as it stands for the proposition that the government may impose even broad restrictions on employees' political speech on a prospective basis.  413 U.S. at 564-66.  Although the Challenged Restrictions cover more speech than the Hatch Act restrictions implicated in *Letter Carriers*, the facts that the governmental interest here—protecting the Judiciary's appearance of independence—is a "constitutional imperative," Mem. Op. 1, and that there are many fewer individuals subject to the Challenged Restrictions weighs heavily in favor of the AO.  The body

of applicable precedent here is small, but clear: the policy survives First Amendment scrutiny.

**B.      Unrestricted partisan political activity poses a realistic and reasonably foreseeable threat to the Judiciary's appearance of independence within the Judiciary, before Congress, and in the eyes of the general public.**

As this Court recognized, the independence of the federal Judiciary is a "constitutional imperative," Mem. Op. 1, and "the government has an interest in preserving the *appearance* of [judicial] impartiality [] separate [and apart] from its interest in guaranteeing *actual* impartiality," *id.* at 15.  The Judicial Branch currently enjoys legitimacy as an institution based on its actual and perceived independence from partisan influence and the political branches of government. Heeding the words of a foundational document of the Republic, the Court acknowledged that "[b]ecause judges have 'no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever,' the efficacy of their decisions depends on public respect," and "[t]hat respect will erode if the public believes that judges merely channel political will—let alone the will of their favored political party."  *Id.* at 13 (quoting The Federalist No. 78, p. 464-65 (C. Rossiter ed. 1961) (A. Hamilton)).

The Code of Conduct for U.S. Judges echoes these principles: "An independent and honorable judiciary is indispensable to justice in our society.  A judge should maintain and enforce high standards of conduct and should personally observe those standards, so that the integrity and independence of the judiciary may be preserved."  Judicial Conference, Code of Conduct for U.S. Judges, Canon 1 (March 2019); *see also id.* at Canon 1 ("Deference to the judgments and rulings of courts depends on public confidence in the integrity and independence of judges.").  This understanding that "public confidence" in the courts reflects a "belief in the fairness and impartiality of the tribunal" is well-accepted.  *See* Arthur S. Miller, *Public Confidence in the Judiciary: Some Notes & Reflections*, 35 Law & Contemp. Prob. 69, 74 (1970).

In recent history, public confidence in the Judicial Branch regularly has surpassed that in

the Legislative and Executive Branches.  For example, Gallup reports that 68% of Americans had "a great deal" or "a fair amount" of trust in the Judicial Branch in 2018 compared to 42% in the Executive Branch and 40% in the Legislative Branch.  *See* Duff Decl. ¶ 31(citing Gallup, *In Depth: Topics A to Z: Trust in Government* (2019)).  Nonetheless, trust in all branches is "down on a long[]-term basis."  *Id.* ¶ 31(citing Jeffrey M. Jones, *et al.*, *Polling Matters: How Americans Perceive Government in 2017*, Gallup News (Nov. 1, 2017)).  Separately, Gallup data demonstrates a strong relationship between partisanship and public confidence in the judiciary.  *See* Duff Decl. ¶ 31 (citing M. Brenan, *Trust in U.S. Legislative Branch 40%, Highest in Nine Years*, Gallup News (Oct. 1, 2018)).  Gallup data shows a strong relationship between the party of the President and judgments of public confidence in the judiciary: Americans express higher levels of public confidence in the judicial branch when the political party they favor controls the presidency.[1]  A second, more significant trend in this data is the growing magnitude of these swings of public confidence when broken down by party affiliation: the partisan shifts accompanying the inaugurations of President Obama and President Trump dwarf that observed surrounding President Bush's inauguration, suggesting increasing partisan polarization, even toward the comparatively well-trusted Judicial Branch.

Taken together, these three conclusions—that public confidence in the Judiciary is

---

[1] Brenan¸ *supra*, details this relationship as follows: In 2000, at the end of the Clinton presidency, Democrats espoused more support for the courts than Republicans.  This relative ordering of support switched in 2001, and Republicans maintained a higher level of support for the Judiciary through George W. Bush's presidency.  When Barack Obama took office in 2009, Democrats became more supportive of the Judiciary than Republicans.  In 2017, this ordering switched again, with Republicans espousing more support for the Judiciary than Democrats.  *See* Brenan, *supra*, at figure entitled "Americans' Trust in U.S. Federal Government's Judicial Branch, by Party." It bears noting that when all Americans were considered, throughout the period from 2000 to the present, trust and confidence in the Judicial Branch never dipped below sixty-one percent, and was always higher than trust and confidence in both of the other two branches.  *See id.* at figure titled "Americans' Trust and Confidence in Three Branches of Government."

declining on a long-term basis; that public confidence in the Judiciary is closely associated with partisanship and, specifically, partisan association with the political party of the President; and that partisan polarization is increasing—provide a reasonable basis for the concern that public confidence in the Judiciary is threatened by the increasing partisan polarization in the United States. They also suggest that the corollary concern that public confidence in the Judiciary is vulnerable to harm should the Judicial Branch be perceived in the same partisan light that has long bathed the Executive Branch and Legislative Branch.

In further support of the reasonableness of these concerns, "research suggests that criticism on politicized grounds has been found to be especially harmful to courts' public support," and "individuals' perceptions of politicized courts are associated with a decrease in public support for courts." Michael J. Nelson & James L. Gibson, *Has Trump Trumped the Courts?*, NYU L. Rev. Online Symposium 32, 36, 38 (April 2018).

It was precisely these concerns about the vulnerability of public trust in the judiciary and its independence that motivated Director Duff's decision to update the AO Code and specifically, to apply the Restrictions to all AO employees. Duff Decl. ¶¶ 23, 26. The aforementioned concerns extend beyond judges to the Judiciary as a whole, including the AO, which provides policy and administrative support and counsel to federal judges, represents the entire Branch before its co-equal Branch in Congress, and serves as a prominent public face of the Judiciary, as shown below. And the Director's predictions of harm—while just that, predictions—are nonetheless realistic, and based on well-founded assumptions and reasonable expectations, as demonstrated in Director Duff's declaration, together with the declarations of James Baugher, Ronald Weich, and Manus Cooney, and detailed below. These realistic predictions of harm, which are to be accorded deference, Mem. Op. 15, 19, further demonstrate that the predicted harm can be actualized not just by widespread, highly public expressions of partisanship by AO employees, but can also come to

pass on an incremental basis through isolated, individual acts of partisanship.

AO employees provide a broad array of administrative and substantive services and support to judges and others working in federal courthouses nationwide. *See supra* at 6-8; Duff Decl. ¶¶ 6-7; Baugher Decl. ¶¶ 4-5.  Much of this work relates to the Conference's role developing and implementing national policy for the Judiciary on subjects from court rules to new judgeships to budget priorities and judicial salaries and benefits.  Duff Decl. ¶ 9.  Further, the regular guidance and counsel AO employees provide to federal judges commonly concerns, among other things, ethics advice on recusals, participation in sponsored outside activities, misconduct issues, and gifts and reimbursements. *Id.* at ¶ 12(a)-(b); Baugher Decl. ¶ 8.

Because of these key functions—supporting the development and implementation of policy for the Judiciary, and providing counsel on ethical or other sensitive topics—it is essential that judges not have cause to question whether they can rely on the AO and its employees for objective, nonpartisan information.  Duff Decl. ¶ 33.  Were judges, or a single judge, to harbor even some doubt on this score, the AO's ability to fulfill its statutory objective would likely suffer.  Were AO employees—many of whom are personally known to at least some federal judges, *see id.* at ¶¶ 8-13, 15—permitted to engage in the restricted activities, however, there is a reasonable likelihood that federal judges would become aware of some of these activities and, as a result, lose at least some faith in the AO's independence from partisan politics, thereby harming the AO's efficacy as the Judiciary's advisor, advocate, and administrator.  Each of the Restrictions realistically threatens this type of harm to the AO's ability to fulfill its statutory and institutional responsibility.

Additionally, the Judiciary relies on congressional action for many of its most important prerogatives, as well as for the passage of legislation positively impacting the courts and opposition to legislation that would harm the Branch.  The AO is the primary agent through which the Judicial Branch carries out this important advocacy function, particularly through the Office of Legislative

Affairs and the Department of Administrative Services.  These components of the AO, and the AO broadly, seek to present themselves—and by extension the Judiciary—as apolitical and nonpartisan, dedicated solely to furthering the administration of justice and the rule of law.  At any given moment, the AO could be before Congress advocating for (or opposing) the passage of specific legislation affecting the Judiciary, requesting funding for court operations, or explaining why Congress should create new judgeships or build a new courthouse in a particular district.  It is crucial to the integrity of the Judicial Branch that such advocacy not be perceived as partisan.

Numerous AO employees interact directly with Congress; indeed, it is "difficult to predict with any degree of certainty which AO employees may be called upon to interact with . . . representatives from the other branches."  Duff Decl. ¶ 15.  And political and partisan neutrality among AO employees is critical to their successful relations with members and congressional staff, many of whom are by definition partisan actors, and thus likely to distrust information presented by those they perceive as partisan opponents.  Were partisan political activity by AO employees freely permitted, however—particularly given the increasingly sharp partisan divisions that mark today's political landscape—there is a realistic likelihood that the perceived independence of the Judiciary would suffer, and with it the AO's efficacy before Congress on behalf of the Judiciary.

AO employees with the backing of the Conference are understood within Congress to speak for the entire Judicial Branch.  Weich Decl. ¶ 9; Cooney Decl. ¶ 6; Duff Decl. ¶¶ 14(b), 14(d).  It is thus reasonable to assume that partisan associations or activities by AO employees could color Congress's views of the overall Judicial Branch.  Cooney Decl. ¶¶ 10, 12; Weich Decl. ¶¶ 12-13.  The AO's effectiveness in representing the Judiciary before Congress accordingly depends in great part on the nonpartisan reputation that AO employees have developed among members and their staffs.  Cooney Decl. ¶ 9; Weich Decl. ¶¶ 4, 12.  AO employees relay the Conference's positions solely in terms that reflect the best interests of the courts, not in terms of the political value that

positions on policies might bring to legislators or in terms that reflect the individual AO employee political or personal views.  Cooney Decl. ¶ 10; Weich Decl. ¶ 10.  That reputation carries over from AO employees' professional capacities to their personal capacities as well; they tend not to mix ideological or political viewpoints with their work for the courts.  Cooney Decl. ¶ 9 ("I . . . do not recall hearing the AO voice a partisan, political, or ideological perspective in presenting the views or positions of the federal judiciary."); Weich Decl. ¶¶ 4, 12 ("I never observed those AO employees bring a political or partisan perspective to their work on behalf of the Judiciary.").

Were AO employees to engage in the activities set forth in the Restrictions, it is reasonable to believe that such engagement would become known within Congress, and that that knowledge would frustrate the AO's efforts on behalf of the Judiciary and damage the Judiciary's nonpartisan reputation in Congress.  Weich Decl. ¶ 12 (citing the likely difficulty "to maintain the perception of the AO and its employees as non-partisan actors if AO employees were known to have publicly engaged in partisan political activity, even in their non-professional capacities").  AO employees engaging in unrestricted partisan political activities could reasonably cause "the Judiciary's overall reputation for actual and perceived independence from partisan politics [to] suffer."  Cooney Decl. ¶ 12.  Likewise, observers could realistically "doubt that the AO was approaching the business of the Judiciary without regard to politics, thereby undermining the federal Judiciary's reputation and effectiveness."  Weich Decl. ¶ 13.  Particularly in a political culture with rising, and even extreme, levels of partisanship, an AO employee's association with partisan politics could lead members of Congress or their staffs to "question whether the Judiciary's decisions are motivated by an inappropriate partisan agenda."  Baugher Decl. ¶ 10.  As detailed below, each of the activities covered by the Restrictions is reasonably likely to cause this type of harm to the Judiciary.

The general American public may be less likely than federal judges or members of Congress and their staffs to interact with AO employees, let alone recognize them as such or

observe them engaged in partisan political activities with a good understanding of their role in the Judiciary.   Nonetheless, because the AO serves as a prominent public face of the Judiciary—staffing public hearings of the Conference, issuing press releases on behalf of the Judiciary, and serving as the media's point of contact for comment by the Judiciary on federal court decisions or other newsworthy matters concerning the Judiciary, Duff Decl. ¶ 14(a), (b)—it is not entirely outside the public eye.   Further, in today's political climate, the AO's concern that the general public could observe certain of the activities covered by the Challenged Restrictions and attribute those activities to the AO or the Judiciary as a whole is based on reasonable assumptions.

1.      *Expressing opinions publicly regarding a political party or partisan candidate.*

Given the wide distribution and reproducibility of statements on social media, publicly stated opinions about a partisan candidate or political party can easily have a broad reach.   Weich Decl. ¶ 14 ("Expressing partisan opinions on social media has a magnifying effect because online platforms have no geographical limitation, and, once expressed, views can be difficult to remove from social media.   Those views can easily reach members of the public, . . . [and] can also be disseminated further by third parties who republish the statements.").   Moreover, social media is increasingly relevant to political and civic life, and even postings initially intended for a limited audience can attain viral distribution.   *Cf.* Weich Decl. ¶ 14.

In that regard, were an AO employee to express partisan opinions on social media or author a letter to the editor or Internet post, it is readily conceivable that such a posting could sooner or later reach a federal judge who interacts with the employee.   That partisan expression could, in turn, cause that judge to question whether he or she can rely on that AO employee for nonpartisan, objective information or other support.   Duff Decl. ¶¶ 33-34.

The likelihood is even greater that a statement on social media, even if made in a personal capacity, would be discovered by congressional staffers, who often perform Internet searches on

individuals they or their members meet with to discern any relevant information in their background, including political affiliations.  Cooney Decl. ¶ 13; Weich Decl. ¶ 14 ("[S]taff members pay close attention, particularly when they are working with specific individuals, or on specific issues.").  Indeed, social media can play a particularly outsize role in Congress, where members can be "especially sensitive to public opinion expressed on social media."  Weich Decl. ¶ 14.  In short, "any expression of partisan affiliation by an AO employee may reach members and their staffs working with that employee," and "it is especially likely for expressions on social media."  *Id.*

Such a scenario is not difficult to imagine.  For instance, an AO employee working in probation services could write a letter to the editor or Facebook post expressing opposition to (or support for) his or her Senator or Representative based on that member's vote on the recent First Step Act of 2018, Pub L. No. 115-391, 132 Stat. 5194, which reforms the probation system.  Cooney Decl. ¶ 13.  In turn, that partisan expression could create for that member, or those who voted with that member, an appearance of bias in the AO and compromise the AO legislative staff's effectiveness on behalf of the Judiciary on related issues, or with that particular member (or members), in the future.  *Id.*

Finally, AO employees' partisan statements on social media or other Internet sites can potentially reach even members of the general public who have no interaction with the AO, especially if AO employees identify as employees of the AO or the Judiciary on the sites on which the posts appear.  Even when an AO employee intends his statement to have limited distribution, a partisan-aligned media organization or publication, or even a foreign government, could locate such statements and exploit them to promote a partisan agenda or deliberately weaken public trust in the federal Judiciary.  Duff Decl. ¶ 25; Cooney Decl. ¶ 16.  The risk of this harm to the public's perception of the Judiciary occurring may be less than that for federal judges or Congress, but it is

real and it could have a substantial effect.  *See, e.g.*, Nelson & Gibson, *supra*, at 35, 36, 38.

      2.      *Wearing or displaying partisan badges, signs, or buttons.*

Typically, the immediate audience for a campaign sign in an employee's yard or a partisan button on an employee's backpack is not as broad as it is for a social media post or newspaper letter to the editor.  Weich Decl. ¶ 15.  Nonetheless, such a plain display of partisan affiliation and preference remains highly capable of undermining the AO employee's role as part of the Judiciary.

Moreover, aside from the Internet's potential amplifying effects, some partisan displays carry the potential of being directly viewed by a federal judge.  For instance, a campaign bumper sticker affixed to the car an AO employee uses to commute, or a partisan button on the bag an AO employee carries to the office might readily be seen by a judge given the likelihood that on any given day, there are more federal judges in the Thurgood Marshall Building than in any one courthouse in the country.  Duff Decl. ¶ 9.  At the same time, more than 100 federal judges sit on the many courts in the Washington area, and because the AO's primary office is in Washington, most AO employees live in the greater metropolitan area as well.  *Id.* at ¶¶ 7, 20.  It is thus not at all "far-fetched" that an AO employee's putting up a campaign sign or wearing a candidate t-shirt while running errands in her neighborhood could be seen by a federal judge.  Weich Decl. ¶ 15 ("When I worked in Congress and for the Department of Justice, I would routinely come across colleagues and professional acquaintances in non-work settings, for example, at the movies, in the Metro, or at the grocery store.  It would surprise me if a weekend went by and I *did not* run into someone I knew, whether a lobbyist, a congressional staffer, a member, or a Judicial or Executive branch employee.").  That type of visible partisan affiliation by an AO employee could undermine a judge's confidence that the AO employee is providing objective, nonpartisan support or counsel.

Even more likely is that an AO employee's display of a campaign sign or button might reach members of Congress or their staffs.  Weich Decl. ¶ 15; Cooney Decl. ¶ 14.  The Thurgood

Marshall Building is next to Union Station and Capitol Hill, with many government and congressional employees constantly passing by.  Duff Decl. ¶ 28.  Information in Washington can travel quickly and easily, particularly among members of Congress and their staff.  Weich Decl. ¶ 15.  Moreover, with most AO employees living within the greater metropolitan area in which most members of Congress and their staffs reside, it is thus not at all "far-fetched" that an AO employee's display of a campaign sign or candidate t-shirt could become public knowledge within Congress.  *Id.* at ¶ 15; Cooney Decl. ¶ 14.  That type of partisan affiliation by an AO employee, which to date has not typically been known to congressional staffers, *see* Cooney Decl. ¶ 11; Weich Decl. ¶ 12, could undermine the AO's and the Judiciary's nonpartisan reputations.

Finally, a campaign yard sign or partisan button displayed by an AO employee can be readily captured in photo or video, and thereby preserved for potential later distribution to a much wider audience, creating a potential for observation by the general public.  *See* Cooney Decl. ¶ 14.  Additionally, a partisan-aligned media organization or publication, or even a foreign government, could seek to utilize any of these types of images or information to promote a partisan agenda or to deliberately weaken public trust in the federal Judiciary.  Duff Decl. ¶ 25; Cooney Decl. ¶ 16.  Each of these types of partisan activity can potentially be observed by the general public, especially if they occurred on a broad basis across the AO, and that observation could reasonably lead to diminished public confidence in the independence of the Judiciary.

3.  *Driving voters to polls on behalf of a partisan candidate or political party; organizing events for a partisan candidate; attending a partisan fundraiser.*

From the perspective of an outside observer, each of these activities entails a stronger partisan commitment than many of the other restricted activities.  They involve participation in the electoral process in a way that requires a considerable commitment of time, effort, or money, and tend to attract the most motivated partisans.  Weich Decl. ¶ 16 ("[I]t would be reasonable for an

observer to conclude that an employee who engages in that activity harbors a partisan passion beyond mere personal expression."); Cooney Decl. ¶ 15 (noting that these activities "evince an AO employee's willingness not only to associate with partisan politics, but also to give his or her time, energy, and 'sweat equity' to that cause"). It is also far from assured that this type of conduct would escape public view. Further, these types of events are increasingly the subject of social media posts and broadcasts, and an AO employee's participation might be captured in a photo or video that was disseminated within the local community, if not to a broader online audience.

With more than one hundred federal judges and most of the AO's employees living in the Washington, D.C. area, it is not inconceivable that a federal judge might personally observe an AO employee dropping off voters at a polling station or entering or departing a partisan fundraiser if held at a public location (such as a hotel or restaurant) or hear about it from someone who had. To be sure, the risk that a federal judge might directly observe an AO employee participating in one of these "sweat equity" activities might be lower than the risk that a judge might observe a widely distributed statement on social media or the display of a campaign bumper sticker or button. But the risk is not at all "far-fetched" and is indeed likely to occur eventually.

This same reasoning applies to the possibility that members of Congress or their staffs might see an AO employee engaged in such an investment of "sweat equity" on behalf of a partisan cause. It is even less assured that these activities—especially organizing events or attending fundraisers—would escape view by members of Congress or their staffs. Fundraising events are commonly held in dedicated houses on Capitol Hill, frequently with not only the candidate who benefits, but also other members of the same elected body, present. Weich Decl. ¶ 16.

As this Court has acknowledged, the resultant harm from this type of politicking is especially great. The Court noted that activities which involve soliciting others' support for a partisan candidate or party are especially likely to cause an observer to question whether the AO

employee is offering objective, nonpartisan counsel.  Mem. Op. 17 (upholding Restrictions that "involve[] not simply a personal display of partisan commitment, but rather an affirmative effort to enlist the partisan support of others"); *see also* Cooney Decl. ¶ 15 (these activities "entail[] either soliciting partisan support from other individuals or identification with a partisan group").

4.  *Contributing funds to a political party, political action committee, or partisan candidate.*

The history of an individual's political contributions, including his or her reported employer at the time of the contribution, is publicly available.  Cooney Decl. ¶ 16; Weich Decl. ¶ 18; *see also* Fed. Elec. Comm'n, *Campaign Finance Data*, https://www.fec.gov/data/ (offering search features to "Find contributions from specific individuals" or to search by "employer").  Contribution histories could yield information about a particular AO employee or employees or within the AO as a whole—which in either case would be damaging to the perception that AO employees are institutionally nonpartisan.

The specter of this information becoming public is not limited to cases of an individual stumbling inadvertently upon it through searches of the FEC site.  The potential for this data to be discovered or disclosed, including selectively by third parties as a basis for a political narrative, is instead quite high.  Cooney Decl. ¶ 16 ("I am aware of firms whose business models include the dissemination of this type of political information in order to seek to portray particular groups or individuals as supporting or opposing a particular partisan agenda.").  Only one motivated actor need seek out such data, after which it could be exploited to portray certain individuals or groups as supporting or opposing a partisan agenda, and thereafter picked up by aligned news media to be spread as part of a broader political argument or partisan narrative.  *Id.*; Weich Decl. ¶ 18.

Learning AO employees' political contribution histories, particularly on a broad basis across the AO, might reasonably cause federal judges, members of Congress and their staffs, or

the general public to question whether the overall support and guidance the AO provides the Judiciary is objective and nonpartisan.  Members of Congress and their staff are "highly attuned to individuals' and entities' political contribution histories," and "knowledge of AO employees' histories would very likely color how the judiciary's views are heard and understood in the relevant congressional committees."  Cooney Decl. ¶ 16; *cf.* Weich Decl. ¶ 18.

5.      *Being a member of a partisan organization; attending a party convention, rally, or meeting; attending an event for a partisan candidate.*

Party conventions, rallies, and meetings are frequently captured on video, audio, or in photographs and are increasingly the subject of social media posts and media broadcasts. Accordingly, the concern that an AO employee's attendance at such events might become widely observed is not "far-fetched."  Further, these activities would be reasonably understood by observers as the AO employee evincing an inherent partisan preference.  And possibly worse yet, an AO employee's attendance at a candidate event or party rally could be associated with a candidate's or party's policy platform assailing particular decisions or impugning the Judiciary as a whole.  In today's political campaigns, it is increasingly common practice for partisan candidates or parties to target specific judicial decisions, types of judges, or even the Judiciary itself.  Duff Decl. ¶ 25.  To have an AO employee's support for such a candidate or party observed by or known to the public or other actors in the government would undermine confidence in the Judiciary's independence, and judges' confidence in the impartiality of the Branch's policy-making arm.

It is true that an employee might hypothetically attend a candidate event without harboring a preference for the candidate, or any partisan preference at all.  But that fact would not likely reach anyone who observed the employee at the event, or even if it did, quite possibly would not matter.  For example, if an AO employee were to attend a candidate event out of sheer curiosity about the speaker's policy views, an observer would be unable to discern that specific motivation,

rather than simply attributing the employee's attendance to a partisan preference.  Weich Decl. ¶ 17.  And that same motivation would be lost on observers if the employee's attendance were captured on video, audio, or photographs.  Cooney Decl. ¶ 14.  It is also exceedingly unlikely that an employee would join a partisan organization or attend a party convention simply out of curiosity, without holding the relevant partisan preference, given the amount of time and effort involved in undertaking these activities.  *Id.* ¶ 15.

These activities would be reasonably understood by observers as evincing an inherent partisan preference, which could cause federal judges, members and staffers in Congress, or the general public to doubt the objectivity of an AO employee advocating on behalf of the Judiciary. Weich Decl. ¶ 17.  That is particularly true in Congress, where an individual's partisan affiliation tends to be viewed as a defining characteristic, often outweighing the professionalism or expertise they otherwise bring to their substantive work.  *Id.*; Cooney Decl. ¶ 16.

Thus, there is considerable potential for harm to the Judiciary as a result of partisan displays by AO employees.  All of the above activities, if unrestricted, would make it more likely for federal judges to question the objectivity and independence from partisan influence of the AO and its employees, which would significantly impede the AO's ability to fulfill its statutory objective of serving as an effective and efficient advisor, advocate, and administrator for the Judiciary.

Additionally, if AO employees were permitted to engage in these activities on an unrestricted basis, it would be more likely that Congress would view the AO, its employees, or the broader Judiciary they represent as harboring partisan inclinations, directly at odds with the Judicial Branch's role in the constitutional structure.  Cooney Decl. ¶ 19.  Members could question whether the AO's advocacy efforts were strictly neutral, or whether they were instead tinged with a political agenda, even if inadvertent, based on the apparent or expressed partisan preferences of individual employees.  Baugher Decl. ¶ 10.  A perception within Congress of partisanship in the

AO could further diminish congressional—and potentially public—respect for the Judiciary as an independent branch of government.  Weich Decl. ¶ 21; Cooney Decl. ¶ 19.

Moreover, the threatened harm to the Judiciary is not limited to the potential for diminished confidence in its independence in Congress, but extends to actions that Congress could take in response.  The Judiciary relies on the AO to request appropriations, not only for all court operations, but also for new judgeships and construction and renovation needs.  Baugher Decl. ¶¶ 5-6.  Congress also has the power to strip the lower courts of jurisdiction, to reduce court staffing levels, and to overturn decisions through legislation.  Weich Decl. ¶ 20.  In short, beyond the reputational harm that the Judiciary stands to suffer before Congress, unrestricted partisan political activity could lead to more concrete adverse reactions from the Legislative Branch.

Finally, each of these activities can potentially be observed by the general public, especially if they occurred on a broad basis across the AO, or were exploited by a partisan-aligned media organization or publication, or even a foreign government, and that observation could reasonably lead to diminished public confidence in the independence of the Judiciary. Duff Decl. ¶ 25; Cooney Decl. ¶ 16.  The risk of these harms occurring may be less than that of the harms described in Sections II.A and B, *supra*, but it is real and it could have a substantial effect on the general public's confidence in the Judiciary.  *See, e.g.*, Nelson & Gibson, *supra*, at 35, 36, 38.

### C.    Public confidence in the Judiciary's independence would suffer if it were drawn into the arena of political dispute with the other branches.

In addition to threatening the Judiciary with diminished confidence among federal judges, within Congress, and before the general public, if AO employees are permitted to engage in the restricted activities, the Judiciary's independence could further be undermined by its being drawn into political disputes with the other branches of government.  As noted above, if public confidence in the Judiciary drops, it follows that Congress may grow more emboldened to act in ways that

negatively affect the courts, such as passing legislation to overrule certain decisions or increase congressional oversight, stripping jurisdiction, or, in extreme cases, impeaching judicial officers.

The AO has extensive, regular interactions on a variety of different issues with an array of Executive Branch agencies.  *See supra* at 10-11; Baugher Decl. ¶¶ 5-6; Weich Decl. ¶ 8.  And interactions with at least one such agency have in the past been characterized—by no less than Chief Justice William H. Rehnquist—as a "continuing struggle," *AO Celebrates 60 Years of Service*, The Third Branch, June 1996, at 2, and resulted in "[t]ensions . . . surfac[ing] in legislative hearings."  Winkle, *supra* at 55, 57.  Such dynamics in the future would only stand to be exacerbated by displays of AO employees' partisan preferences.  Moreover, although many of the constitutional powers that affect the courts reside in Congress, the Executive Branch retains an array of tools—the veto power, the ability to set priorities through the budgeting process, executive orders, and the bully pulpit—that it can use to scrutinize or act against the Judicial Branch.  If public confidence in the Judiciary falls or if its nonpartisan reputation suffers based on AO employees' unrestricted partisan activity, it is reasonable to foresee that the degree of counter-action that the Judiciary stands to draw from the Executive Branch would likewise increase.  Similarly, visible partisan political activity by AO employees can readily be amplified in today's political discourse, and there is real potential for the Judiciary to be drawn—inappropriately for a Branch independent by design—into disputes with the elected branches of government.

One example of how the Restrictions protect the Branch's independence is illustrated by proposed legislation that would impose an Inspector General over the Judicial Branch who reports to Congress.  Duff Decl. ¶ 37.  In response, the Judiciary has sought to limit Congress's incentives to create an Inspector General.  It has pointed to the AO's initiatives to conduct, through employees in the Office of Audit, independent audits of the Branch's finances and, through employees working on misconduct complaints with the courts and the Committee on Judicial Conduct and

Disability, impartial, nonpartisan review of allegations of judges' disability and misconduct (short of impeachable offenses).  If these AO staff were known to have expressed partisan preferences, it would defeat one of the Judiciary's rationales against a congressionally-controlled Inspector General, which would in turn be ripe for partisan manipulation.  *Id.*

Another example of how enjoining the Restrictions could draw the Judiciary into politicized disputes lies in the disciplinary proceedings that would likely be necessary under an alternative regime.  Absent the Challenged Restrictions, AO employees would nonetheless be required to "observe high standards of conduct so that the integrity and independence of the judiciary are preserved."  *See* AO Code of Conduct § 220(b), ECF No. 2-5.  Whether that standard has been satisfied would necessarily require an exercise of judgment by a supervisory AO official.  Thus, if the AO or the Judiciary undertook to discipline an employee based on a judgment call of whether a given partisan activity was appropriate—as opposed to conduct that was clearly prohibited *ex ante*—it is likely that the disciplinary proceeding itself would become politicized.  Cooney Decl. ¶ 18.  An escalating cycle of political response and counter could ensue, wholly undermining the separation from the "political fray" that the federal courts were intended to enjoy.  *See Geary v. Renne*, 880 F.2d 1062, 1080 (9th Cir. 1989), *on reh'g*, 911 F.2d 280 (9th Cir. 1990), *vacated*, 501 U.S. 312 (1991).  The existence of a Code of Conduct that identifies restricted activities in advance rather than a less restrictive Code supplemented by a *post-hoc* disciplinary regime, reduces the potential for partisan dispute and politicization.

An additional example is, if the AO's determinations of how many new judgeships to request, and where, were to be perceived as the product of partisan influence, those requests could become the subject of protracted political dispute.  A majority in Congress might, for instance, decline to authorize new judgeships if it viewed them as benefitting another party's political or electoral prospects.  It could also, for instance, expose the Judiciary to pressure from an Executive

Branch intent on making more judicial nominations than the AO has determined are necessary. The Judiciary, and the public it serves, would suffer from involvement in such partisan squabbles, and a genuine need for additional judicial resources in particular circuits could go unmet.

*      *      *

There are multiple, independent reasons why unrestricted partisan political activity by AO employees threatens to harm the Judiciary's reputation for independence.  Federal judges, with whom AO employees work closely on Conference Committees and to whom those employees provide confidential and sensitive counsel, would have sharply diminished willingness to rely on the AO for objective, nonpartisan advice were they to learn of an employee's partisan affiliations. Meanwhile, because members of Congress and their staffs are especially attuned to partisan politics, it is critically important for AO employees to protect their well-earned reputations for independence, a prospect that would be severely dimmed if those same employees were permitted free engagement in partisan politics.  The general public, which as shown above has begun to harbor an increasing tendency to view the Judiciary in terms of party politics, is also quite capable of observing partisan conduct by AO employees, attributing it to the Judiciary, and thereby seeing its declining esteem of the Judiciary's independence accelerate.  Finally, permitting partisan political activity by AO employees has the realistic potential to color the Judiciary with a political tint in the eyes of the other branches, and thereby draw it into the cyclical partisan disputes that typify today's political arena—a result directly at odds with the intended constitutional structure.

Properly accorded the deference they are due, the foregoing predictions of harm—founded on "realistic hypotheticals," Mem. Op. 15—readily demonstrate how unrestricted partisan political activity would visit a "'necessary impact on the actual operation' of the Government" that strikes at the Judiciary's defining independence from partisan influence.  *NTEU*, 513 U.S. at 468 (quoting *Pickering*, 391 U.S. at 571).  If that diminished public respect for the Judiciary's independence

39

were to take hold, moreover, it would be "very difficult if not impossible to reverse or eliminate those perceptions, particularly in a political climate where members of the public often seek affirmation of their own partisan preconceptions."  Cooney Decl. ¶ 17; *see Connick,* 461 U.S. at 152(no requirement that the government "allow events to unfold to the extent that the disruption . . . is manifest before taking action").  Unlike some types of government harms, public withdrawal of confidence in a branch of government cannot be easily undone—particularly for the Judiciary, whose judges are not turned over and replenished by regular elections.  The interest in preserving public confidence in judicial independence—core to the Judiciary's function in tripartite government—outweighs the concededly strong interests of AO employees in political expression. *See NTEU*, 513 U.S. at 473 & 475 n.21; *Letter Carriers*, 413 U.S. at 564-66.

> **D.     The Challenged Restrictions on partisan political activity are reasonably necessary to protect the Judiciary's independence from partisan politics.**

Because the Restrictions operate prospectively, the AO must show that their reach is "'reasonably necessary to protect'" its interest in guarding the Judiciary's perceived independence from partisan politics.  *Weaver*, 87 F.3d at 1439 (quoting *NTEU*, 513 U.S. at 474).  The Code's applicability to all AO employees—except "designated employees," who are subject to more restrictions—is reasonably necessary for three separate reasons, as set forth in the Duff declaration.

*First*, although not every AO employee's job functions would in the ordinary course entail representing the broader Judiciary to the public or the other branches of government, it is difficult to identify in advance which employees might be required to assume such functions, even temporarily.  Duff Decl. ¶¶ 15, 21.  Director Duff could not predict with the certainty that would be necessary to write into the Code exemptions for particular employees, or classes of employees, which AO employees might at some point be called upon to represent the Judiciary publicly or interact with a judge.  *See id.* ("Because of the pervasive nature of the AO's work to support the

other parts of the Judicial Branch, it is difficult to predict with any degree of certainty which AO employees may be called upon to interact with a federal judge or representatives from the other branches of government.").  To do so would have been unwise, as at any point there could emerge a concerted media or political focus on a particular AO office that was previously considered immune from public attention.  Moreover, it is very likely that each AO employee is known to at least several friends or family members to be employed on behalf of the Judiciary.  Exposing one's partisan activities to just those several individuals would, in certain circumstances, be sufficient to pose an incremental risk of harm to the Judicial Branch.  As the Cooney and Weich declarations indicate, information can travel quickly in Washington and can be exploited by motivated actors intent on advancing political agendas.  Cooney Decl. ¶ 16; Weich Decl. ¶¶ 14-15.

Courts have long upheld speech restrictions based on broad categories of employees rather than demanding granular justifications for particular positions.  For example, the Supreme Court brushed aside the distinction between federal employees on the one hand, and federal contractors on the other, as "matters of detail for Congress": "Whatever differences there may be between administrative employees of the Government and industrial workers in its employ are differences in detail so far as the constitutional power under review is concerned."  *United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 102 (1947).  Similarly, the D.C. Circuit upheld agency-wide speech restrictions, even when the "precise contours" of those restrictions were not "absolutely necess[ary] . . . in the case of each and every employee 'from the secretary pool on up to director.'"  *Weaver*, 87 F.3d at 1443 (quoting *id.* at 1453 (Wald, J., dissenting)).  While the Court in *NTEU* rejected the honoraria restriction, in part, due to its breadth, the "massive number of potential speakers" affected there—nearly all Executive Branch employees—differs starkly from the approximately 1,100 AO employees affected here.  513 U.S. at 467-68.  And AO employees here have job functions that are more closely connected to the rationale underlying the Restrictions,

41

unlike what in *NTEU* was an "immense class of workers with negligible power to confer favors on those who might pay to hear them speak or to read their articles." *Id.* at 473.  Director Duff's decision to apply the Code to all AO employees is consistent with these precedents.

<u>*Second*</u>, even if line-drawing among AO positions were feasible, it would have been reasonable for Director Duff to have declined to do it.  He properly recognized that an employee's job functions can evolve over time, that responsibilities can sometimes be shifted from one AO employee to another and back, and that AO employees often work collaboratively in ways that go beyond their formal, official job duties.  Duff Decl. ¶¶ 15, 21.  Given the flexibility in what an employee does, or might be expected to do, in his or her job at the AO, it was reasonable for the Director to allow for the likelihood of sometimes overlapping job functions, and therefore decline to exempt particular positions from the Restrictions.

<u>*Third and finally*</u>, the Director determined that even if all positions within the AO do not carry equivalent risks of harm from partisan political activity, the AO's efficiency and morale, and by extension its work for the Judiciary, would suffer if the Restrictions did not apply universally. Duff Decl. ¶ 21.  Restrictions on public employee expression have been held permissible so long as "damage to morale and efficiency is reasonably to be apprehended" from the restricted speech. *Jurgensen v. Fairfax Cty.*, 745 F.2d 868, 879 (4th Cir. 1984); *id.* ("If the perception of potential harm or damage is present, that fact may outweigh any First Amendment rights involved.").  Here, Director Duff reasonably forecast that adopting varying levels of restrictions, depending on the AO component or even the specific position within a particular component, could lead to tension among employees or even disruption within the office.  That potential for discord is particularly acute when the topic covered by the restriction—partisan politics—is inherently the subject of intense debate.  It was reasonable for Director Duff to decline to risk employee morale at an office where "[a]ll AO employees work together to fulfill the constitutional and statutory mission of the

42

federal Judiciary."  Duff Decl. ¶ 15.  In short, there was a high possibility that exempting certain employees (if that were feasible) would cause substantial internal harm to the AO.  Permitting some, but not all employees, to engage in unrestricted partisan political activities would also not be consistent with the historical independence of the Judiciary from partisan politics.

The AO-wide applicability of the Restrictions is justified because such an agency-wide "sweep is 'reasonably necessary to protect'" the Judicial Branch's perceived independence from partisan influence.  *Weaver*, 87 F.3d at 1439 (quoting *NTEU*, 513 U.S. at 474).

## II.   PLAINTIFFS HAVE FAILED TO ALLEGE FACTS ENTITLING THEM TO RELIEF ON THEIR FIFTH AMENDMENT VAGUENESS CLAIM AND, EVEN IF THEY HAD PROPERLY PLED THE CLAIM, IT IS BELIED BY THE EVIDENCE.

Plaintiffs bring a second, alternative cause of action under the Fifth Amendment.  The Complaint asserts that the term "partisan political activity" in the AO Code of Conduct is unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.  Compl. ¶ 51.  However, the Complaint is wholly devoid of any factual allegations supporting this claim and, accordingly, the government is entitled to judgment thereon.

A regulation is unconstitutionally vague if it fails to "provide adequate notice to a person of ordinary intelligence that his conduct is illegal," *Buckley v. Valeo,* 424 U.S. 1, 77 (1976), or fails to provide "explicit standards for those who apply" it, *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  "Where First Amendment rights are involved, an even 'greater degree of specificity' is required."  *Buckley,* 424 U.S. at 77 (quoting *Smith v. Goguen,* 415 U.S. 566, 573 (1974)); *see also Bynum v. U.S. Capitol Police Bd.*, 93 F. Supp. 2d 50, 59 (D.D.C. 2000).Yet, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."  *Ward v. Rock Against Racism,* 491 U.S. 781, 794 (1989).

Nowhere in their Complaint do Plaintiffs allege that the AO Code "fails to give [them] a reasonable opportunity to know what is prohibited," "fails to provide explicit standards to those

43

who enforce it," or inhibits and chills "the free exercise of First Amendment freedoms . . . by its uncertain meaning." *Bynum*, 93 F. Supp. 2d at 59.  To the contrary, Plaintiffs allege that Director Duff's July 10, 2017 memorandum constitutes "interpretive guidance" on the AO Code of Conduct provisions and treat that memorandum as providing the "adequate notice" and "explicit standards" that preclude a vagueness finding.  Plaintiffs make hollow allusion to the concept of vagueness only twice in the Complaint: (1) in their conclusory statement that "the term 'partisan political activity' in the AOUSC Code of Conduct is unconstitutionally vague," Compl. ¶ 51; and (2) in the Requested Relief, in which Plaintiffs ask the Court to declare "that the Identified Restrictions of the AOUSC Code of Conduct cannot be enforced . . . because the term 'partisan political activity' in the AOUSC Code of Conduct is unconstitutionally vague," Compl. Requested Relief ¶ A. Neither of these references to vagueness constitutes a factual allegation, let alone one that is sufficient to "raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true." *Bell Atl.*, 550 U.S. at 555.

Moreover, the simple fact that Plaintiffs' Requested Relief asks the Court to enjoin not any provision of the AO Code of Conduct itself but only the "Identified Restrictions" outlined in "the interpretive guidance issued by Defendant Duff" in his July 10, 2017 memorandum, makes plain that Plaintiffs' grievance is not with the term "partisan political activity." *See* Compl., ¶ 21 & Requested Relief ¶ B.  If it were, Plaintiffs would have asked the Court to enjoin Canon 5 of the AO Code (or at least portions thereof).  Because plaintiffs have not done so, the relief they seek will not actually remedy the complained-of vagueness, because an injunction aimed at the "Identified Restrictions" would not affect whatever remains of the term "partisan political activity" that is vague because it lacks definition in the memorandum.  In that regard, Plaintiffs' Complaint plainly demonstrates that Plaintiffs believe that the AO Code, together with Director Duff's July

10, 2017 memorandum, provides clear notice of its restrictions.[2]

If, after considering the pleading deficiencies that defeat Plaintiffs' Fifth Amendment claim, there were any residual doubt about the purported vagueness of the term "partisan political activity," that doubt is readily allayed by the Director's July 10, 2017 Memorandum and the many steps the AO took to provide guidance to its employees.  In the Memorandum to all employees, the Director invited all AO employees to "submit any questions or comments" by use of an AO intranet form.  *See* ECF No. 2-5; Duff Decl. ¶ 24.  The Director also attached to the Memorandum a detailed chart specifying the activities that are and are not permissible under partisan political activity restrictions (from which Plaintiffs have clearly been able to identify the Restrictions they challenge in this case).  ECF No. 2-5.  Further, if additional guidance were still needed on what activities are covered, the Director expressly invited AO employees to speak with their supervisors and attorneys in the Office of the General Counsel.  *Id.*  Further still, the Director held multiple in-person meetings with AO employees to explain the changes to the Code, and made available on the AO's intranet site guidance on the applicability of the Code.  Duff Decl. ¶ 24.  In sum, even if Plaintiffs had properly pled a due process vagueness claim, any suggestion that the AO "fail[ed] to give [Plaintiffs] a reasonable opportunity to know what is prohibited" by the term "partisan political activity" is belied by the evidence.  *Bynum*, 93 F. Supp. 2d at 59.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment should be granted, the preliminary injunction should be vacated, and Judgment should be entered for Defendant.


Dated:  June 6, 2019                                    Respectfully submitted,

---

[2] Plaintiffs' vagueness claim is also susceptible to dismissal pursuant to Federal Rule of Civil Procedure 12(c), which, like Rule 12(b)(6), compels dismissal when the plaintiff fails to furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).

JOSEPH H. HUNT
Assistant Attorney General

JENNIFER D. RICKETTS
Director
Federal Programs Branch

CHRISTOPHER R. HALL
Assistant Director
Federal Programs Branch

 */s/ M. Andrew Zee*
M. ANDREW ZEE (CA Bar No. 272510)
JULIE STRAUS HARRIS (DC Bar No. 1021928)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
450 Golden Gate Avenue, Room 7-5395
San Francisco, CA 94102
Telephone: (415) 436-6646
Email: m.andrew.zee@usdoj.gov

*Counsel for Defendant*