**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LISA GUFFEY and CHRISTINE SMITH,

        Plaintiffs,

   v.

JAMES C. DUFF, in his official capacity as
Director of the Administrative Office of the
United States Courts,

        Defendant.

Case No. 1:18-cv-01271-CRC

**DEFENDANT'S OPPOSITION TO
PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT
AND REPLY MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.    The Director Correctly Articulated the Legal Standard and Plaintiffs' Suggestion of
Exacting Scrutiny Misreads the Applicable Case Law. .................................................. 2

II.    The AO's Permissible Reliance on Hypotheticals Demonstrates the Potential for
Harm to the Judiciary. .................................................................................................. 5

      A.    Plaintiffs incorrectly argue that the AO's evidence proves their own case and
that the AO has offered no evidence that the Restrictions are necessary to
prevent harm to interbranch relations. .............................................................. 6

      B.    The AO's declarants' testimony falls under Federal Rule of Evidence 701 ...... 10

      C.    The AO's hypotheticals are realistic predictions of likely harm, are entitled
to deference, and are sufficient for the Director to prevail. .............................. 12

      D.    The two Restrictions the Court refused to enjoin preliminarily should be
upheld for the same reasons. ............................................................................ 20

III.    The AO-Wide Applicability of the Restrictions Is Reasonably Necessary to Protect
the Judiciary's Perceived Independence from Partisan Politics. .................................. 21

      A.    Other than by offering unsupported speculation, Plaintiffs do not contest the
AO's showing that AO employees can and do regularly represent the
Judicial Branch in interacting with outside stakeholders.................................. 22

      B.    Potential disruption of AO employees' morale is a valid basis for applying
the Restrictions to all employees. .................................................................... 24

      C.    Plaintiffs' additional "tailoring" arguments are unavailing. ............................. 25

IV.    The Remaining Injunction Factors Favor the AO. ....................................................... 26

V.    Even If the Court Concludes Plaintiffs Have Established a First Amendment
Violation, Any Injunction Should Be Limited to the Parties Before the Court. .......... 28

CONCLUSION.......................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Baumann v. Dist. of Columbia*,
  795 F.3d 209 (D.C. Cir. 2015) .......................................................................... 5, 10

*Connick v. Myers*,
  461 U.S. 138 (1983) ............................................................................. 5, 10, 24, 25

*First Nat. Bank of Bos. v. Bellotti*,
  435 U.S. 765 (1978) ........................................................................................... 27

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ....................................................................................... 29

*Guffey v. Duff*,
  330 F. Supp. 3d 66 (D.D.C. 2018) ........................................................................ 2

*Hecht Co. v. Bowles*,
  321 U.S. 321  (1944) .......................................................................................... 29

*Hodge v. Talkin*,
  799 F. 3d 1145 (D.C. Cir. 2015) ............................................................... 5, 27, 28

*Janus v. AFSCME, Counc. 31*,
  138 S. Ct. 2448 (2018) ..................................................................................... 3, 4

*Jurgensen v. Fairfax County*,
  745 F.2d 868 (4th Cir. 1984) .............................................................................. 24

*Lalowski v. City of Des Plaines*,
  789 F.3d 784 (7th Cir. 2015) ......................................................................... 5, 10

*Nken v. Holder*,
  556 U.S. 418 (2009) ........................................................................................... 27

*Pickering v. Bd. of Educ.*,
  391 U.S. 563 (1968) ..................................................................................... passim

*Pierson v. Ray*,
  386 U.S. 547 (1967) ........................................................................................... 27

*Pursuing Am.'s Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016) ...................................................................... 26, 27

*Rothe Dev., Inc. v. Dep't of Defense*,
  107 F. Supp. 3d 183 (D.D.C. 2015) ..................................................................... 11

*Sanjour v. EPA*,
  56 F.3d 85 (D.C. Cir. 1995) ............................................................................... 5, 30

*Taylor v. Mich. Dep't of Nat. Res.*,
  *Res.*, 502 F.3d 452 (6th Cir. 2007) ......................................................................... 26

*United States v. H & R Block, Inc.*,
  831 F. Supp. 2d 27 (D.D.C. 2011) ......................................................................... 11

*United States v. Hampton*,
  718 F.3d 978 (D.C. Cir. 2013) ......................................................................... 10, 11

*United States v. National Treasury Employees Union*,
  513 U.S. 454 (1995) ................................................................................... passim

*United States v. Robinson*,
  Cr. Case No. 16-98, 2017 WL 2636517 (D.D.C. June 15, 2017) ........................... 11

*Wagner v. FEC*,
  793 F.3d 1 (D.C. Cir. 2015) ............................................................................. 25, 26

*Weaver v. U.S. Info. Agency*,
  87 F.3d 1429 (D.C. Cir. 1996) ......................................................................... 21, 22

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ............................................................................................ 29

*Williams-Yulee v. Fla. Bar Ass'n*,
  135 S. Ct. 1656 (2015) ............................................................................. 3, 8, 9, 27

*Winter v. Nat. Res. D. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................................... 29

## Rules

Fed. R. Evid. 701 ............................................................................................. 10, 13

Fed. R. Civ. P. 56 ............................................................................................... 11

## Other Authorities

GUIDE TO JUDICIARY POLICY, Vol. 2B, Ch. 2, Advisory Opinion No. 112: Use of Electronic
  Social Media by Judges and Judicial Employees ................................................. 14

# INTRODUCTION

The Judicial Branch has distinctive needs, recognized under established law, to protect and preserve its reputation for impartiality, non-partisanship, and independence. A vital component of the Judicial Branch, the Administrative Office of the United States Courts ("AO") and its employees play a critical and important role in policymaking with judges and courts and in their interactions with the other branches of government and the larger public on behalf of the Judiciary. Defendant AO Director James C. Duff has demonstrated the importance of updating the AO Code of Conduct to hold AO employees to the same standards that have been designed and approved by the scores of judges who have served on the Judicial Conference of the United States and applied to all federal courthouse employees for many years. The need is only heightened by the increasing partisan polarization in American politics, the diminishing public confidence in governmental institutions, and the advancements in technology and social media that accelerate the potential for harm to those institutions. Those factors all underscore the validity of the restrictions on partisan political activity (the "Challenged Restrictions" or "Restrictions") that Plaintiffs have challenged.

In their cross-motion for summary judgment and opposition to the Director's motion, Plaintiffs discount the features of the Judiciary that distinguish it from the political branches, and thus misfire on a critical aspect of this case. *See* Pls.' Cross-Mot. for Summ. J & Opp'n to Defs.' Mot. ("Ps.' Br."), ECF No. 26. They instead attempt to draw unfavorable comparisons between the Code and the Hatch Act, which regulates many, many more *Executive* Branch employees and which does not take into account the *Judiciary's* interest in independence from partisan influence. Indeed, other than this Court's preliminary injunction opinion, no First Amendment precedent cited by either party involves the balancing of partisan political speech against the core attributes on which the Judicial Branch relies.

Plaintiffs further ignore contemporary developments, particularly advances in technology

1

and the relatively recent rise of social media, which have accelerated both the ways in which partisanship can be expressed, disseminated, and exploited, and the public's overall diminishing confidence in the federal Judiciary and government institutions generally.  For example, while Plaintiffs say the prospective, concrete harms the AO identified are "implausible," "unlikely" or "absurd," *see* Ps.' Br. 24, 31, 33, they fail to appreciate that even an employee's off-duty partisan conduct can be captured, disseminated, and exploited far more quickly and effectively than in the recent past, and that doing so can confirm already sagging confidence in the Judiciary's reputation.

Finally, in the face of the abundant evidence the AO has submitted, Plaintiffs respond with none of their own, instead asserting that the AO's evidence proves *their* case.  Ps.' Br. 22.  Yet to assail the AO's abundant hypotheticals with argument of counsel is not adequate for Plaintiffs to survive, let alone prevail at, summary judgment.  The Restrictions survive First Amendment scrutiny, and judgment should be entered for Director Duff.

## ARGUMENT

## I.   THE DIRECTOR CORRECTLY ARTICULATED THE LEGAL STANDARD AND PLAINTIFFS' SUGGESTION OF EXACTING SCRUTINY MISREADS THE APPLICABLE CASE LAW.

In its Memorandum Opinion, this Court reviewed and synthesized the case law concerning prospective speech restrictions on government employees and that concerning speech restrictions aimed to protect the appearance of judicial integrity and impartiality.  Mem. Op. 6-9, 13-16, ECF No. 13.[1]  The Court relied primarily on *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995) ("*NTEU*") in which the Supreme Court considered a speech restriction applicable to nearly all of the "hundreds of thousands" of Executive Branch employees.  To justify "a prospective rule with 'widespread impact,'" the Court explained, "the government 'must show that

---

[1] The Memorandum Opinion is published at *Guffey v. Duff*, 330 F. Supp. 3d 66 (D.D.C. 2018).

the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's "necessary impact on the actual operation of the government."'" Mem. Op. 7 (quoting *Janus v. AFSCME*, 138 S. Ct. 2448, 2472 (2018), and *NTEU*, 513 U.S. at 468 (in turn quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 571 (1968))).[2]   It was "[a]gainst that legal backdrop," that this Court recognized that "[t]he nebulous nature of the government's asserted interest [in preserving the appearance of the Judiciary's impartiality] allows it to rely on *predicted* harms to the public's perception of judicial integrity—*i.e.*, *realistic hypotheticals* of how partisan activity restricted under the Code could lead the public to believe that the judiciary is not behaving impartially." *Id.* at 9, 15 (emphases added).   And because the "concept of public confidence in judicial integrity does not easily reduce to precise definition, nor does it lend itself to proof by documentary record," *Williams-Yulee v. Fla. Bar Ass'n*, 135 S. Ct. 1656, 1667 (2015), the Court further held that "the government's predictions of harm here" are entitled to "more deference . . . than would be proper if the government had asserted a different interest."   Mem. Op. 15; *id.* at 19.

As Plaintiffs note, to justify a "speech-restrictive law with 'widespread impact,' . . . the government must shoulder a correspondingly 'heav[ier]' burden, and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights." *Janus*, 138 S. Ct. at 2472 (citation omitted).   The Supreme Court recently explained that "[t]he end product of those adjustments is a test that more closely resembles

---

[2] It is clear from context that *NTEU*'s reference to a "vast group" in its articulation of the legal standard was a description of the "hundreds of thousands" of employees affected by the speech restriction, not an aspect of the legal standard itself.   513 U.S. at 468, 471.   Here, the analog to that "vast group" is much smaller—all AO employees save the six designated employees.   Similarly, *NTEU*'s reference to "widespread impact" must be understood to account, at least to some degree, for the fact that the challenged restriction applied to hundreds of thousands of employees spanning the entire Executive Branch.   *Id.* at 468.

exacting scrutiny than the traditional *Pickering* analysis." *Id.* But this case requires an additional adjustment to the "end product" described in *Janus*. This is because the special nature of the Judiciary's interest in preserving the appearance of impartiality warrants greater solicitude than "would be proper if the government had asserted a different interest." Mem. Op. 15. In that regard, Plaintiffs' insistence that the Court apply such "exacting scrutiny" in this case overlooks a critical component of the Judiciary's interest. Ps.' Br. 15. The greater deference owed to the AO's predictions of harm that "the nebulous nature of the government's interest in maintaining the appearance of judicial independence demands," *id.* at 19, necessarily relaxes the applicable standard from "a test that more closely resembles exacting scrutiny,"[3] *Janus*, 138 S. Ct. at 2472.

For similar reasons, Plaintiffs are wrong that "the modern *NTEU* standard already accounts for the government's interest." Ps.' Br. 14. In *NTEU*, the Executive Branch cited "workplace efficiency" to justify a prospective rule restricting the speech of an "immense class of workers," 513 U.S. at 473 & 475 n.21, which is not the interest the Judiciary asserts here. *NTEU* therefore could not possibly have "already account[ed] for [that] interest," as Plaintiffs contend. Ps.' Br. 14. Notwithstanding this difference, Defendant has not sought to "dislodge *NTEU* as the governing standard," Ps.' Br. 14-15, as Plaintiffs suggest. To the contrary, Defendant submits that *NTEU* offers guidance as to how the competing interests should be balanced in this case, but that, when compared with the honoraria ban found unlawful in *NTEU*, the Restrictions survive First Amendment scrutiny because the *Pickering* balance favors the AO. Mem. Supp. Def.'s Mot. for Summ. J. ("D.'s Br.") 21-22, ECF No. 24-2. That the instant circumstances compel a different outcome than that in *NTEU* is not a rejection of that precedent but rather the result of the necessary recognition that neither *NTEU* nor any other Supreme Court decision "appl[ied] the *Pickering*

---

[3] Notwithstanding their push for exacting scrutiny, Plaintiffs concede that Defendant's "speculative assertions" are entitled to deference where they are "reasonable." Ps.' Br. 15.

framework to speech restrictions on judicial-branch employees," or involved the asserted interest in maintaining the appearance of judicial independence.  Mem. Op. 8; D.'s Br. 21-22.

Additionally, Plaintiffs' argument that only "concrete examples of harms" can satisfy the applicable standard is baseless and ignores their own concession to the contrary.  *See* Ps.' Br. 24; Hr'g Tr. 5:17-23, 35:17-25 (July 16, 2018).  Plaintiffs do not cite a single case requiring evidence of actual harm to survive the *Pickering* test, and wholly ignore the precedent Defendant has cited establishing otherwise.  *Compare* Ps.' Br. 23-24 *with* D.'s Br. 18-19 (citing *Connick v. Myers,* 461 U.S. 138, 152 (1983); *Baumann v. Dist. of Columbia*, 795 F.3d 209, 217-18 (D.C. Cir. 2015); *Lalowski v. City of Des Plaines,* 789 F.3d 784, 791 (7th Cir. 2015)).

Finally, although Plaintiffs vaguely suggest that some "heightened showing of fit" between the Restrictions and the Judiciary's interests is required, Ps.' Br. 34, they cite no case law to support that suggestion.  Significantly, the D.C. Circuit has not construed *Pickering* to require the closely drawn "fit" found in other First Amendment inquiries—a point Plaintiffs do not contest.  *See* D.'s Br. 19-21 (citing *Sanjour v. EPA*, 56 F.3d 85, 97, 98 (D.C. Cir. 1995) (en banc); *Hodge v. Talkin*, 799 F. 3d 1145, 1167 (D.C. Cir. 2015)).

The AO's burden on summary judgment is to demonstrate that its proffered hypotheticals and predictions of harm are reasonable and well-founded, and that the Restrictions are reasonably necessary to prevent that harm.  As discussed below, the AO has met that burden.

## II.   THE AO'S PERMISSIBLE RELIANCE ON HYPOTHETICALS DEMONSTRATES THE POTENTIAL FOR HARM TO THE JUDICIARY.

Director Duff has established that public trust in the Judiciary and its independence is vulnerable to harm should the Judicial Branch—including the AO—be perceived as susceptible to partisan influence in the vein of the Executive and Legislative Branches.  D.'s Br. 22-28.  The Director submitted factual evidence demonstrating that AO employees regularly interact with

judges, members of Congress and their staffs, and Executive Branch officials, and serve as a prominent face of the Judiciary.[4]  *Id.* at 25-28 (citing Duff Decl.; Baugher Decl.; Cooney Decl.; Weich Decl.).  Further, the Director provided factual evidence establishing that AO employees' off-duty activities—including partisan political activity—may be observed by the parties with which they interact in their official capacities because most AO employees live and work in the Washington metropolitan area, alongside members of Congress and their staffs, Executive Branch officials, and more than 100 federal judges.  *Id.* at 30-31.  Finally, on the basis of this factual evidence, together with rational assumptions, Director Duff proffered numerous hypothetical scenarios which explained how AO employees' off-duty partisan political activity threatens the Judiciary's integrity and perception of independence.  *Id.* at 29, 30-35, 37-39.  These hypotheticals are reasonable, realistic, and entitled to deference.

In response to Defendant's showing, Plaintiffs assert that the AO's evidence proves *their* case, mischaracterize the AO's asserted interest, and raise a tepid evidentiary objection.  These contentions fail to overcome the AO's showing and, thus, the AO is entitled to summary judgment.

### A.      Plaintiffs incorrectly argue that the AO's evidence proves their own case and that the AO has offered no evidence that the Restrictions are necessary to prevent harm to interbranch relations.

Plaintiffs argue that Mr. Cooney and Mr. Weich's testimony "affirmatively demonstrate[s] that AO employees' partisan political activities *are not* a problem," Ps.' Br. 22, because both

---

[4] Plaintiffs attempt to minimize the AO by calling it an "obscure federal agency" Ps.' Br. 33.  The AO is the component of the Judicial Branch that enables the Judiciary's independence from the political branches.  *See* D.'s Br. 5-6.  The relative prominence of the AO or its functions within the government has no bearing on the importance of that role; after all, in a 2016 survey of Americans by the Annenberg Public Policy Center, only 26 percent of respondents could name all three branches of government.  *See* Second Declaration of James C. Duff ("Second Duff Decl.") ¶ 2 (citing Annenberg Pub. Policy Ctr., *Americans' Knowledge of the Branches of Government Is Declining* (Sept. 13, 2016), *available at* https://www.annenbergpublicpolicycenter.org/americans-knowledge-of-the-branches-of-government-is-declining/).

declarants testify that the AO enjoyed a nonpartisan reputation during a time before the Code was updated to include the Restrictions.  But this argument ignores reality.  Mr. Cooney interacted with AO employees as a senior congressional staffer between 1988 and 2000, before both the advent of technology like social media[5] and the rise of hyper-partisanship as recounted by the AO.  *See* D.'s Br. 23.  And although social media was extant during Mr. Weich's second period working in Congress from 2005 to early 2009, it was only just beginning to play a role in partisan politics, and the role it did play was far less impactful than the present day, when Director Duff updated the Code.  Indeed, it was not until Barack Obama's first presidential campaign that a national candidate used social media as a tool for political engagement—"to raise money, organize locally, fight smear campaigns and get out the vote."  David Carr, *How Obama Tapped Into Social Networks' Power*, NY TIMES (Nov. 9, 2008), https://www.nytimes.com/2008/11/10/business/media/10carr.html (cited in Second Duff Decl. ¶ 3).

As Defendant's evidence demonstrates, a significant reason partisan political activity by AO employees creates a risk of harm to the Judiciary's perception of independence is precisely because the rise of social media and other technology has allowed widespread capture and dissemination of images and statements by individuals.  Duff Decl. ¶ 30; Baugher Decl. ¶ 10; Cooney Decl. ¶ 14; Weich Decl. ¶ 14.  Consequently, the likelihood that an individual AO employee's partisan political activity will be observed by an interested member of the public has risen substantially.  Similarly, the increasing use of social media as a tool for political engagement portends a concomitant increase in the likelihood that the partisan political activity of AO employees would become known to Legislative or Executive Branch officials with which they

---

[5] Facebook did not launch until 2004 and Twitter until 2006.  *See* Mark Hall, Facebook, ENCYCLOPÆDIA BRITANNICA, *available at* https://www.britannica.com/topic/Facebook; Eds., Twitter, ENCYCLOPÆDIA BRITANNICA, *available at* https://www.britannica.com/topic/Twitter (cited in Second Duff Decl. ¶ 3).

interact professionally.  *See* Baugher Decl. ¶ 10; Cooney Decl. ¶¶ 12-14; Weich Decl. ¶ 14.

Thus, it is not surprising that when Mr. Cooney and Mr. Weich worked in Congress, they observed no harm to the AO's reputation even though AO employees may have engaged in the partisan activities now covered by the Restrictions.[6]  That same historical record demonstrates why the risk of significant harm is much greater than it was between 1987 and 2009, and why it is eminently reasonable to restrict the activities covered by the Restrictions to prevent that harm.  The evidence cannot be evaluated in a vacuum; it must be understood in the context of the changing political landscape, notwithstanding Plaintiffs' refusal even to acknowledge that reality.

Plaintiffs also argue that the AO has offered no evidence that if AO employees were permitted to engage in the activities covered by the Restrictions, intra- and interbranch relations and trust would suffer harm.[7]  This argument hinges on Plaintiffs' flawed effort to differentiate how the Judiciary is perceived within the government from "[t]he concept of public confidence in judicial integrity."  *Williams-Yulee*, 135 S. Ct. at 1667.  But Plaintiffs offer no reason why government actors, such as Executive or Legislative Branch officials or federal judges, warrant different consideration here than the public as a whole.  As to Congress, in particular, it is hard to see why the perception of the public's elected representatives does not constitute a segment of

---

[6] Plaintiffs attempt to extrapolate from these two declarants' testimony alone the broad conclusion that AO employees did engage in partisan activities now covered by the Restrictions and that activity did not cause any harm to the Judiciary, but the evidence cannot prove the negative.  Ps.' Br. 22-23 (asserting that "two of the government's declarants affirmatively demonstrate that AO employees' partisan political activities *are not* a problem").

[7] Plaintiffs' suggestion that the Director "no longer defends the unity interest," misapprehends that interest and its close relationship to the interest in intra-branch confidence.  The "unity interest" is the interest in "promoting the unity of purpose between the AO and the courts, including by establishing consistency within the Judicial Branch and demonstrating 'that the AO [i]s an integral part of the Judicial Branch and not an independent, isolated agency.'"  D.'s Br. 17-18 (quoting Duff Decl. ¶ 22).  Further, the Director explained that the unity interest relates to *federal judges*['] perce[ption of] the AO as an office within the Judiciary, operating in sync with the courts, and embodying the same independence from partisan politics as the judges themselves."  D.'s Br. 18.

"public perception."  The AO is entitled to rely on predicted harms to justify its interest in intra-
and interbranch confidence because the asserted interest "does not easily reduce to precise
definition, nor does it lend itself to proof by documentary record."  *Id.*

Plaintiffs' suggestion that the interest in protecting federal judges' trust in AO employees
is "strange" and "anomalous" disregards how essential AO services are to the Judiciary.  Ps.' Br.
25.  As the evidence demonstrates, AO employees are integral to the Judicial Branch—in many
cases, not unlike how a judicial assistant or a law clerk (to whom identical, if not stricter,
restrictions apply) is essential to the functioning of a judge's chambers.  *See* D.'s Br. 6-8; Duff
Decl. ¶¶ 6-7; Baugher Decl. ¶¶ 4-5.  Even the scenarios which Plaintiffs posit are harmless—that
judges might feel compelled to "reject" AO recommendations or "ask for further analysis" as a
result of perceiving AO employees as partisan, *see* Ps.' Br. 25—could visit significant disruption
to the work of the Judicial Conference and, in fact, much of the Branch as a whole.  If judges could
not rely on AO employees' independence and impartiality in the performance of the broad array
of services and support they provide judges and others working in federal courthouses nationwide,
such work would likely fall on the judges themselves, thereby diverting a significant amount of
the judges' time from deciding cases, and retarding the pace of justice.  *See* Duff Decl. ¶¶ 6-7;
Baugher Decl. ¶¶ 4-5.  Nor does the AO's effort to prevent such harm portend the slippery slope
of justifying "sweeping restrictions" on all other "career [government] employees."  Ps.' Br. 25.
The need for independence from partisan influence is particularly strong for the Judicial Branch,
and amply justifies the imposition of the Restrictions, regardless of how the fact-specific *Pickering*
inquiry might play out elsewhere in the government.

Finally, Plaintiffs' argument ignores that even where the asserted interest in an employee
speech restriction has nothing to do with the Judicial Branch at all, let alone how the Judiciary is
perceived, courts have not required the government to produce evidence of actual harm.  *See, e.g.,*

*Connick*, 461 U.S. at 152; *Baumann*, 795 F.3d at 217-18; *Lalowski,* 789 F.3d at 791.

      **B.**      **The AO's declarants' testimony falls under Federal Rule of Evidence 701.**

Plaintiffs argue that "the bulk" of Defendant's declaration testimony should be discarded as inadmissible lay opinion.  Ps.' Br. 25-27.  Their argument should be rejected because, to the extent the declarants offer opinions, those opinions are admissible under Federal Rule of Evidence 701 and, in any event, much of the testimony is factual, not opinion.

Pursuant to Rule 701, a witness not designated as an expert may offer opinion testimony so long as that opinion is: (1) "rationally based on the witness's perception;" (2) "helpful to clearly understanding the witness's testimony or to determining a fact in issue;" and (3) "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  Notably, in revising this Rule, the advisory committee explicitly noted that lay witnesses may offer some speculation, and may rely on "particularized" knowledge derived from the witnesses' actual position.[8]  In that regard, the opinions offered by the AO's declarants are closely analogous to the advisory committee's guidance, and Plaintiffs' contention that the testimony is inadmissible lay opinion because it is "speculative," Ps.' Br. 25-27, must be rejected.[9]

Moreover, to the extent *United States v. Hampton*, 718 F.3d 978 (D.C. Cir. 2013), stands

---

[8] In the Rule's notes, the advisory committee "provide[d] . . . examples of the kind of testimony that could and could not be proffered" under the Rule, noting that "most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without . . . qualifying the witness as an . . . expert" and explaining that "[s]uch opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business."  Fed. R. Evid. 701 advisory committee's notes to 2000 Amendment.

[9] Plaintiffs do not argue that the testimony is inadmissible because it is based on "specialized knowledge," nor could they reasonably do so.  The testimony is plainly based on the declarants' perceptions of how they and their colleagues perceived certain people—based on interactions they observed and conversations they participated in.  Their professional experience is relevant not because it endows them with "specialized knowledge," but because that experience afforded them the opportunity to observe and participate in the interactions and conversations relevant here.

for the proposition that the D.C. Circuit "strictly polices the line" between lay and expert opinion, the primary reasons for doing so in *Hampton* and similar cases, *see United States v. Robinson*, Cr. Case No. 16-98, 2017 WL 2636517 at \*2-3 (D.D.C. June 15, 2017) (citing cases), are inapplicable here.  First, *Hampton* involved a criminal jury trial, whereas in this case "the importance of the trial court's gatekeeper role is significantly diminished . . . because, there being no jury, there is no risk of tainting the trial by exposing a jury to unreliable evidence."  *United States v. H & R Block, Inc.*, 831 F. Supp. 2d 27, 30 (D.D.C. 2011) (quotation omitted); *contra Hampton*, 718 F.3d at 331-32.  Second, the lay witness challenged in *Hampton* was a law enforcement official, whose testimony in criminal cases courts find "especially important" to scrutinize because of "the risk that the jury will defer to the officer's superior knowledge" of criminal matters.  718 F.3d at 331-32.  Here, there is no concern that the Court, as finder of fact, will be unable to give appropriate weight to the testimony.

Finally, the exclusion remedy Plaintiffs seek is not warranted here.  If Plaintiffs wished to challenge the basis for the declaration testimony, Plaintiffs could have timely sought relief—*e.g.*, an opportunity to cross-examine the witness—under Federal Rule of Civil Procedure 56(d), but they did not; alternatively, they could have asked the Court to deny summary judgment to allow them the opportunity for cross-examination at trial.  But, Plaintiffs have not developed facts disproving that the proffered testimony is within the declarants' personal knowledge, and their conjecture is an inadequate basis for excluding the AO's evidence.

Moreover, the bulk of the AO's declarations consists of admissible testimony as to facts within the declarants' personal knowledge and experience, and is therefore admissible.  *See Rothe Dev., Inc. v. Dep't of Defense*, 107 F. Supp. 3d 183, 203 n.8 (D.D.C. 2015) (noting that pursuant to Fed. R. Evid. 602, a lay witness may "testify[] to facts within his personal knowledge and experience").  Mr. Weich and Mr. Cooney offered factual testimony, obtained through their

personal knowledge and experience, that partisan political activity by AO employees is observable by the public—including, most likely, congressional staffers.  As Mr. Weich explained, when he worked in Congress and for the Department of Justice, he "would routinely come across colleagues and professional acquaintances in non-work settings," and information about such observations "is regularly exchanged" in Congress.  Weich Decl. ¶ 15.  Further, he explained, "Congress is especially sensitive to public opinion expressed on social media, and staff members pay close attention, particularly when they are working with specific individuals, or on specific issues." *Id.* ¶ 14.  And as Mr. Cooney explained, because "it is not uncommon for congressional staffers to perform an Internet search of individuals with whom those staffers meet . . . social media posts made in a personal capacity (or any other available information identifying partisan preferences) could . . . enter into [a] staffer's perception of that AO employee in their representation of the Judiciary."  Cooney Decl. ¶ 13.  And Director Duff offered factual testimony, obtained through his years of work in the Judicial Branch and with federal judges, about the regular, extensive, and often sensitive interactions between AO employees and federal judges.  Duff Decl. ¶¶ 10-12, 33-34.  At bottom, Plaintiffs' objection appears to be less to the admissibility of the evidence, than to the reasonableness of the AO's hypotheticals.  But the latter is simply a question of law for the Court to resolve, and does not warrant excluding the declaration testimony.

### C.       The AO's hypotheticals are realistic predictions of likely harm, are entitled to deference, and are sufficient for the Director to prevail.

To justify the Restrictions, the AO may "rely on predicted harms to the public's perception of judicial integrity—*i.e.*, realistic hypotheticals of how partisan activity restricted under the Code could lead the public to believe that the judiciary is not behaving impartially." Mem. Op. 15.  The AO has shown how each of the activities covered by the Restrictions reasonably poses a realistic risk of harm to the perception of independence and impartiality on which the Judicial Branch

depends.  Although Plaintiffs counter that the AO's hypotheticals are not "realistic," Ps.' Br. 17,

they do not genuinely dispute the vast majority of them or otherwise question the hypotheticals'

factual bases.  Instead, Plaintiffs posit straw man responses that misunderstand the nature of the

Judiciary and its interest here.

First, Plaintiffs argue that because the Hatch Act allows most federal employees to engage

in the partisan activities covered by the Restrictions, there is no basis for barring them of AO

employees.  In support, Plaintiffs attempt to minimize AO employees' responsibilities by way of

contrast with a carefully selected and relatively small sample of federal non-judicial employees.

*See* Ps.' Br. 28 (citing FEC employees and a DOD employee "who evaluates competing bids for

the next billion-dollar fighter jet").  That attempt is wrongheaded for at least two reasons.  First,

the Judicial Branch's reputation for impartiality and independence is essential for it to function as

intended, and distinguishes it from many other federal entities.   Second, Plaintiffs' efforts to

minimize the AO's responsibilities as primarily ministerial is simply incorrect: in fact, many AO

employees work closely with judges on national policy issues affecting the business of federal

courts or on sensitive or confidential matters within the Judiciary, advocate on behalf of the

Judiciary for its legislative priorities, or have other public-facing responsibilities.[10]  Duff Decl.

¶¶ 9-11, 13-14, 20; Baugher Decl. ¶¶ 4-6, 8.

Also missing the mark are Plaintiffs' arguments that the AO has not established that

employees will "bring [their] political commitments to [their] job performance," and that the

Restrictions will not "purify the AO of employees with personal political views."  Ps.' Br. 27, 29-

30.  Both arguments ignore that the Restrictions are essential to protect a *perception* of

independence, even if AO employees in fact discharge their duties apolitically and without partisan

---

[10] Indeed, AO employees helped draft the 2000 Amendment to Rule 701 and advisory committee
notes, on which the parties rely in this very case.  *See supra* at 10-11; Duff Decl. ¶ 11.

influence.  The AO has not argued that the Restrictions are necessary so much because it fears AO employees' personal political views will *necessarily* infect the recommendations they make to the Judicial Conference or the counsel they offer to judges on sensitive issues (although if allowed, the Director has expressed legitimate concerns about the effect that partisan expressions could have on employee morale, *see* Duff Decl. ¶ 21).  Rather, the Restrictions are necessary because if a judge observes an AO employee donning a partisan candidate's campaign hat, that judge may *question* whether the recommendation that AO employee has made regarding, for example, Judicial Conference policy on nationwide injunctions is influenced by personal political views.  And even if the judge knows there is no such influence, he or she may reasonably question whether *others* could have such concerns—and, as a result, the judge may discount the recommendation.

Similarly, that AO employees have expressed their political views in stale social media posts pre-dating their AO employment does not undermine the AO's interest.  That the AO cannot compel erasure of pre-employment partisan activity does not preclude it from imposing conduct restrictions as an employment condition.  Plaintiff Smith, like many of her colleagues, may have been active in partisan politics before joining the AO, but contrary to Plaintiffs' assumption, that has never been the AO's concern.  Ps.' Br. 7.  It is the partisan political activity that Plaintiff Smith and her colleagues engage in *while* working for the Judiciary that has the potential to undermine its reputation.[11]  As Plaintiffs note, while it would be unreasonable to expect federal judges to have been wholly apolitical prior to joining the bench, it is reasonable to expect them to act apolitically in public once joining the Judiciary.  In the same way, key to the perception that the Judicial Branch

---

[11] Within the Judicial Branch, this temporal line-drawing is not unique: when a new federal law clerk begins a clerkship, the Judicial Conference Committee on Codes of Conduct recommends that the law clerk clarify that any of his or her prior political endorsements or statements predated employment with the Judiciary.  *See* Judicial Conference of the United States, Committee on Codes of Conduct, GUIDE TO JUDICIARY POLICY, Vol. 2B, Ch. 2, Advisory Opinion No. 112: Use of Electronic Social Media by Judges and Judicial Employees, § VIII, Political Activity.

is free of partisan influence is the expectation that its employees act apolitically—at least whenever public observation is possible—while working for the Branch. Where an AO employee's personal political views prior to AO employment are made known, that employee can nonetheless promote the Judiciary's perception of independence by a recognition that Judicial Branch employees must hold themselves to a different standard. Mr. Weich testified that "[i]n a few instances, the political affiliations of AO employees, or of their prior employers in Congress, was known to me personally, as a result of interactions I had with those AO employees prior to their employment with the AO" but the fact that "I never learned the personal political affiliation of any AO" served "the credibility of these AO employees and the AO and Judiciary more generally." Weich Decl. ¶ 12.

Further, Plaintiffs semantically argue that the AO's hypotheticals rely on a "chain of speculation" that is, by some undefined standard, too "long." Ps.' Br. 30-34. But Plaintiffs have artificially extended the causal chain the AO had posited by splitting some links and adding others that are specious. For example, if an observer recognizes someone as an AO employee, that observer has surely also heard of the AO. *Id.* at 30. Further, it is not necessary that the observer "assume" that the AO employee's "job performance will be infected by partisan bias," *id.* at 30-31; an observer who merely *questions* whether it will be is likely to suffer reduced confidence in the independence of the Judicial Branch. Nor does the observer need to believe that partisan views are "shared widely . . . by other AO employees" or that the partisan activities of numerous AO employees will operate "together" to "have an effect on the work of the judiciary," *id.* at 31; the observer could reasonably—even if not always accurately—believe that a single AO employee is in a position to affect policy within the Judiciary, for instance by providing policy support to the Judicial Conference or counsel to federal judges on sensitive issues. If an AO employee were, for example, to serve on a presidential campaign in the 2020 election (as Plaintiffs indicate they plan to do, Ps.' Br. 7), their employment with the Judiciary likely would become known to other

campaign workers, volunteers, or the media, who might draw the conclusion, or even advance the proposition—erroneous as it may be—that the Judiciary stands behind its employees' efforts to muster support for one party or candidate in the country's highest profile campaign.

Moreover, the "links" in this chain are not unduly speculative, as Plaintiffs assert, and reasonable predictions are in any event permissible.  Mem. Op. 15, 20.  For example, the off-duty activities of AO employees are reasonably likely to be observed by the general public in the Washington area, including federal judges and members of Congress or their staff, who could recognize the individual as an AO employee.  Duff Decl. ¶¶ 9, 28; Weich Decl. ¶¶ 15-16; Cooney Decl. ¶ 14.  Nor is it necessary for AO employees to self-identify as such on social media for their posts to be associated with the AO; for example, congressional staffers might come across such posts while performing a broad Internet search of individuals with whom those staffers meet.  Cooney Decl. ¶ 13.  And the employer of an individual captured in a photo, on video, or in writing can frequently be discerned after the fact, either by whoever captured the image or by third parties.

Plaintiffs also wrongly suggest that an essential link in the causal chain is the observer's erroneous belief that AO employees decide individual cases; if the observer did hold that mistaken belief, it is clear how the observation would harm his perception of the Judiciary's independence.  *See* D.'s Br. 24-28.  The observer might, however, understand the nature of the support and counsel AO employees provide to the Judiciary, and be concerned that partisan views infect that work, or perceive the AO employee as a representative of the Judicial Branch before Congress or the general public and question the independence of a Branch that has an open partisan as its public face.  *Id.* at 26.  Alternatively, a less knowledgeable observer might recognize an AO employee as working for the federal courts, without needing a full understanding of the AO's specific responsibilities to believe that the employee's partisan activity reflects poorly on the Judiciary.  And while the policy work of the AO and the Conference is not the actual adjudication of individual cases, the same

16

holds for the work of many courthouse employees who have long been subject to the same restrictions.  In addition, Plaintiffs' attempt to minimize the significance of amendments to the federal rules on the fair application of law should not be countenanced.  Ps.' Br. 32.  One can easily see how amendments regarding joinder, class actions, or injunctive relief could substantially impact litigants.  Accordingly, to suggest that concerns about the impartiality of the Judiciary's policy work are wholly distinct from concerns about the impartiality of the Judiciary strains reason.

Nor is it either "fanciful" or "untenable," as Plaintiffs contend, Ps.' Br. 25, that an employee's individual partisan activity would work its way into the public sphere.  *See* Ps.' Br. 32 (questioning, for example, how the public will know "they are reading the social-media post of an AO employee").  In just the past several years, conduct by federal employees, either individually or in the aggregate, that would be covered by the Restrictions has frequently been made public, even when the activity was likely not intended for a broader public audience.  *See, e.g.*, Rebecca Leber, *A Republican Firm Is Targeting EPA Staff Who Have Donated to Democrats*, MOTHER JONES (Aug. 21, 2019), https://www.motherjones.com/politics/2019/08/a-republican-firm-is-targeting-epa-staff-who-have-donated-to-democrats/ (describing effort by PAC to obtain internal EPA records of officials who donated to Rep. Ilhan Omar); Gina Hawkins, *Navy Issues New Memo on Political Activity,* TASK AND PURPOSE (June 26, 2019), https://taskandpurpose.com/navy-issues-memo-on-political-activity-after-uss-john-mccain-make-aircrew-great-again-controversies (describing Navy Secretary's advisory against "activities that could appear to imply sponsorship, approval, or endorsement of a political candidate, campaign or cause" after Navy sailors were pictured attending President's speech wearing "Make Aircrew Great Again" patches); Philip Bump, *What campaign contributions tell us about the partisanship of government employees*, WASH. POST (Dec. 27, 2018), https://www.washingtonpost.com/politics/2018/12/27/is-trumps-dismissal-unpaid-government-employees-democrats-accurate/ (using FEC data to show that

17

majority of employees' 2018 political contributions in four federal agencies went to Democrats).[12]

What is more, publication of employees' partisan activities can lead to public expressions of skepticism, distrust, or even antipathy toward the employing institution. For example, when Special Counsel Robert Mueller testified before the House Judiciary Committee, he faced questions about political donations, attendance at partisan events, and statements by members of his investigatory team that had been reported in the media. Second Duff Decl. ¶ 6 (citing Transcript of Robert S. Mueller III's testimony before the House Judiciary Committee, WASH. POST (July 24, 2019) ("Mueller Tr."), https://www.washingtonpost.com/politics/transcript-of-robert-s-mueller-iiis-testimony-before-the-house-judiciary-committee/2019/07/24/7164abfe-ad96-11e9-a0c9-6d2d7818f3da_story.html); *see also* Cooney Decl. ¶ 12. Citing this activity, several Committee Members questioned whether the Special Counsel's investigation could be trusted by the public. *See*, *e.g.*, Mueller Tr. ("Millions of Americans today maintain genuine concerns about your work, in large part, because of the infamous and widely publicized bias of your investigating team members, which we now know included 14 Democrats and 0 Republicans.") (statement of Rep. M. Johnson); (questioning Special Counsel's "obligation to operate with independence [and] to operate with the appearance of independence as well") (statement of Rep. Armstrong); (stating that, in light of investigators' partisan political activity, "no matter what this report concluded half of the country was going to be . . . skeptical of your team's findings") (statement of Rep. Armstrong). These examples demonstrate the reasonableness of the Director's prediction that, had he not updated the Code, it would only be a matter of time before an AO employee's partisan expression becomes publicized and causes members of the

---

[12] Defendant cites these examples not to suggest that those employees behaved improperly, but simply to show that federal employees' partisan activities can become the focus of public discussion and awareness even where the employees did not intend to attract public attention.

public to question the Judiciary's independence.

Finally, Plaintiffs actually dispute the realism of only two of the AO's hypotheticals. First, Plaintiffs ridicule as "absurd" the concern that a foreign government or partisan-aligned organization might use AO employees' partisan political expression to undermine confidence in the Judiciary. Ps.' Br. 33. But not only is this a realistic possibility, it has already in fact happened: foreign governments *have* demonstrably "sought to exploit perceived instances of partisanship to sow distrust in the Judiciary." Duff Decl. ¶ 25 (citing Suzanne Spaulding & Harvey Rishikof, "How Putin Works to Weaken Faith in the Rule of Law and our Justice System," LAWFARE (Sept. 17, 2018)). Moreover, the underlying premise for this concern, *see* Cooney Decl. ¶ 16, was recently underscored when Representative Joaquin Castro published FEC contribution data, including donors' names and employers, in a tweet criticizing President Trump. *See* Second Duff Decl. ¶ 4. Regardless of the efficacy of Rep. Castro's statement, it showed the way FEC data can be mined for partisan political purposes. Second, Plaintiffs scoff at the AO's concern that its employees might drive into the office parking garage bearing partisan bumper stickers on their cars. According to them, an observer "will have no way of knowing that [the car] doesn't belong to a congressional staffer" who might use the garage. Ps.' Br. 33. But, because the garage is in the Thurgood Marshall Federal Judiciary Building, it is far more likely that an observer would assume the car is a Judiciary employee's, rather than a Hill staffer's. Duff Decl. ¶ 18. Moreover, the congressional staffers (and visiting judges) who themselves park in the garage undoubtedly know that Judiciary employees are its primary users, and may well be troubled if they see an AO employee's car emblazoned with partisan signage. Duff Decl. ¶ 18. Far from simply "theor[izing] partisan views are contagious at close range," Ps.' Br. 33, the Director has proffered a hypothetical that is entirely reasonable. Finally, in response to both this example and the AO's hypotheticals generally, Plaintiffs conspicuously do not dispute that AO employees work and live in an

environment populated by the individuals whose perception is acutely relevant to potential harm to the Judiciary's intra- and interbranch relations.

For all of these reasons, Plaintiffs have failed to meaningfully contest the AO's evidence that the partisan political activities covered by the Restrictions pose a realistic threat of harm to the Judiciary's reputation for independence and impartiality.

### D. The two Restrictions the Court refused to enjoin preliminarily should be upheld for the same reasons.

The Court declined to preliminarily enjoin two of the Restrictions: organizing or managing political rallies or meetings, and driving voters to the polls on behalf of a party of candidate.  Mem. Op. 16-17.  These activities, the Court observed, "involve[] . . . an affirmative effort to enlist the partisan support of others" and "could more plausibly [be] view[ed] . . . as evincing a partisan tie so durable that it could affect an AO employee's performance of her day-to-day duties."  *Id.* at 17.

Notwithstanding that the AO has now presented evidence in further support of the Court's finding, *see* Cooney Decl. ¶ 15; Weich Decl. ¶ 16, Plaintiffs argue that a different result is proper because the Hatch Act does not restrict these activities for "the vast majority of executive-branch employees."  Ps.' Br. 40.  But the Court made clear it understood that similar restrictions applied only to "certain executive-branch employees."  Mem. Op. 16.  The Court nonetheless found on the basis of the "courts' solicitude for the image of the judiciary," that the AO "is justified in imposing these two restrictions on judicial-branch employees."  *Id.* at 17.  Once again, recognition of the nature of the Judiciary and the interest in preserving its reputation for independence led the Court to treat Judicial Branch employees differently than those in the Executive Branch.  While the AO has presented evidence lending even greater support to the Court's initial finding, Plaintiffs offer nothing more than the speculation of counsel that these two activities are "far less observable" than the activities covered by the other Restrictions.  But that is a far cry from conceding that "there is

no reason to believe [they would be] visible." *Compare* D.'s Br. 32 *with* Ps.' Br. 40.  Moreover, any lower risk of observation is offset by the heightened nature of the resultant harm from this type of politicking, as the Court recognized.  Mem. Op. 17-18.

The Court has already consciously rejected Plaintiffs' invitation to the Court to treat AO employees "as equivalent to less-restricted employees in the executive branch," and appropriately balanced the risks of harm as to these two Restrictions.  In the face of additional support from the AO, Plaintiffs offer no meaningful basis for reversing this conclusion.

## III.   THE AO-WIDE APPLICABILITY OF THE RESTRICTIONS IS REASONABLY NECESSARY TO PROTECT THE JUDICIARY'S PERCEIVED INDEPENDENCE FROM PARTISAN POLITICS.

While Plaintiffs vaguely suggest that some "heightened showing of fit" between the Restrictions and the Judiciary's interests may be required, they cite no case that so holds.  Ps.' Br. 34.  And, contrary to Plaintiffs' suggestions, the AO has never disputed that some degree of "tailoring" or "fit" must be shown, only that when evaluating a prospective rule regulating employee speech, the more exacting standard applicable in other First Amendment contexts does not apply.  D.'s Br. 19-20.  Rather, the AO must show "that the regulation's sweep is 'reasonably necessary to protect'" the asserted interest, *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1439 (D.C. Cir. 1996) (quoting *NTEU*, 513 U.S. at 474); *see also* Mem. Op. 7-8, and it has done so.

The AO has provided three independent justifications for the Code's breadth.  First, given the nature of job functions within the AO, the Director cannot accurately identify in advance the particular employees who might be required to represent the Judicial Branch to the other branches of government or the larger public.  Duff Decl. ¶¶ 15, 21.  Second, even if doing so were possible, imposing selective restrictions would have been unreasonable, because AO employees can often assume additional duties on a temporary basis and because collaborative work among employees often entails tasks beyond official job responsibilities.  *Id.*  Third, the Director determined that,

even if certain AO positions posed comparatively greater or lesser risks of harm from an employee's partisan activity, to impose the Restrictions selectively would have unduly harmed morale, and thereby the quality of the AO's work on behalf of the Judiciary.  *Id.* ¶ 21.

Plaintiffs challenge the first and third of these rationales by, first, disagreeing with the Director's assessment of his own employees' job responsibilities and, second, by erroneously demanding a showing of actual harm to the AO's morale.  As explained below, these arguments find no support in either the record or the law.  Applying the Restrictions to all AO employees is warranted because that agency-wide "sweep is 'reasonably necessary to protect'" the Judiciary's perceived independence from partisan politics.  *Weaver*, 87 F.3d at 1439.

### A.   Other than by offering unsupported speculation, Plaintiffs do not contest the AO's showing that AO employees can and do regularly represent the Judicial Branch in interacting with outside stakeholders.

The AO has explained that applying the Restrictions on an AO-wide basis was reasonable because it was difficult, if not impossible, to know in advance which employees might end up briefing congressional staff, a federal judge, or members of the general public, or otherwise representing the Judiciary.  D.'s Br. 40-41.  Plaintiffs are thus wrong when they contend that the AO has failed to justify the Code's breadth.  While Plaintiffs are correct that employees of certain offices within the AO have regular, extensive contact with, for example, Congress or the media, *see* Ps.' Br. 35, the AO has shown that *any* of its employees could, at any time, be called upon to represent the Judiciary to other branches of government or the larger public, and that *many* of its employees outside the offices Plaintiffs focus on already do so as part of their regular duties.  Duff Decl. ¶¶ 15, 21; Baugher Decl. ¶¶ 2-8.  Plaintiffs ignore this testimony.  Further, they offer no countervailing evidence affirmatively demonstrating that certain AO employees are not, or could never be, called upon to represent the Judiciary to internal or external stakeholders.

Rather than proffer evidence, Plaintiffs offer baseless speculation that is contradicted by

the record.  For example, Plaintiffs muse that they find it inconceivable for an employee like either of the Plaintiffs—who both work in the Defender Services Office—to "end up briefing Congress or the press."  Ps.' Br. 35.  But that claim is easily rebutted.  As Mr. Baugher stated, "experts from the Defender Services Office (such as attorneys and budget analysts) . . . also participate as needed in briefings with members of Congress, or their staff, to explain the Judiciary's budget requests and its programs in greater detail."  Baugher Decl. ¶ 4.  And the Plaintiffs have each acknowledged that they *themselves* interact directly with federal judges multiple times per year.  *See* Smith Decl. ¶ 3 ("I interact face-to-face with Article III judges 2-3 times per year as part of committee meetings at which I make IT-related recommendations."); Guffey Decl. ¶ 3 ("I interact with Article III judges approximately 5-8 times per year as part of assessment of the court panel attorney programs of districts assigned to me.").  Even by their own telling, Plaintiffs misjudge the prospect of an employee's partisan activities adversely affecting the Judiciary's reputation for independence.

In the face of the AO's showing, Plaintiffs can do little more than speculate, through statements of counsel, that certain groups of AO employees that they list "appear unlikely" to interact with other branches of government or the broader public.  Ps.' Br. 35-36.  But the AO has shown that employees from the Budget Division, Defender Services Office, Human Resources Office, and Facilities and Security Office—all on Plaintiffs' list of purported offices with no outside exposure—have *already* represented the Judiciary in interactions with the Judicial Conference and its committees, judges making individual inquiries, members of Congress and their staff, and officials in a variety of executive and legislative entities.  Baugher Decl. ¶¶ 3-8. And, as noted, Director Duff explained how difficult it is "to predict with certainty which AO employees will be required, as part of their job responsibilities, to represent the Judiciary to the other branches of government or to the broader public."  Duff Decl. ¶ 21.

Moreover, the fact that particular AO employees regularly engage with outside

stakeholders—*e.g.*, employees from the Offices of Legislative Affairs and Public Affairs—does not mean that all other AO employees are categorically excluded from such work.  Indeed, there are not gradations within the AO of which employees are "more" or "less" representative of the Judicial Branch: notwithstanding the frequency with which a particular employee or Office engages with the other branches or the larger public, the *entire* Administrative Office, and *all* of its employees are part of the Judiciary, just as much as all employees in federal courthouses nationwide are equally a part of the Judicial Branch.

**B.     Potential disruption of AO employees' morale is a valid basis for applying the Restrictions to all employees.**

Plaintiffs' response to the AO's third justification for the breadth of the Code—that singling out particular employees or offices would dampen morale, *see* Duff Decl. ¶ 21—is to argue that the AO must show *actual* harm to morale to sustain this justification.  Ps.' Br. 38 (demanding a showing of "real, not merely conjectural harm" (citation omitted)).  But Plaintiffs offer no legal support for imposing this evidentiary burden.  Instead, Plaintiffs resort only to the puzzling claim that Defendant's citation of *Jurgensen v. Fairfax County*, 745 F.2d 868 (4th Cir. 1984), is "pulled out of context."  Ps.' Br. 38-39.  In *Jurgensen*, the Fourth Circuit clearly stated that the defendant need not show that morale "ha[s] actually been adversely affected"—directly contradicting Plaintiffs' demand for proof of an actual drop in morale—but instead "it is sufficient that such damage to morale and efficiency is reasonably to be apprehended."  745 F.2d at 879.  Nothing is "out of context" as Plaintiffs contend.  Moreover, the Fourth Circuit relied on the Supreme Court's decision in *Connick v. Myers*, where, similarly, the Court noted that the defendant supervisor was not "require[d] . . . [to] tolerate action which he *reasonably believed* would disrupt the office, undermine his authority, and destroy close working relationships."  461 U.S. at 154 (emphasis added).  Here, Director Duff declined to apply the Restrictions selectively to particular

parts of the AO precisely because he reasonably anticipated that doing so could harm morale.

Plaintiffs' demand for actual proof of harm to morale is also puzzling for practical reasons: how could the AO show the effects of an action it declined to take? In addition to the lack of legal basis for this proposed requirement, Plaintiffs nowhere explain how it plausibly could be met.

### C.     Plaintiffs' additional "tailoring" arguments are unavailing.

Plaintiffs also contend that the AO must show that the Judiciary's interests could *not* be served by lesser restrictions than those in the Code.  But, under the applicable standard, the AO's burden is not to demonstrate the inadequacy of other remedies.  Plaintiffs cite no case to the contrary.  In any event, the AO has shown why Plaintiffs' proposal for individual *post hoc* disciplinary actions when employees fail to observe high standards of conduct to protect the integrity and independence of the Judiciary would not be sufficient. Ps.' Br. 36.  First, identifying in advance which activities are prohibited offers the benefits of clarity and notice to affected employees.  Second, a *post hoc* disciplinary regime scrutinizing partisan activity under a broader standard would necessitate subjective judgments by at least one AO supervisor and such disciplinary measures for improper political expression could themselves become the subject of partisan scrutiny and politicization.  *See* D.'s Br. 38; Cooney Decl. ¶ 18.

Plaintiffs also argue that *Wagner v. FEC*, 793 F.3d 1 (D.C. Cir. 2015) (en banc), is an "illustrative" case, Ps.' Br. 36, but their reliance on *Wagner* is faulty for several reasons.  First, contrary to Plaintiffs' suggestion, just as in *Wagner*, there is very much a "demonstrated problem" here: as the AO showed, the recent increase in partisan polarization generally, and toward the Judiciary specifically, is coupled with increased visibility and salience of federal employees' political activities.  D.'s Br. 23, 28.  Second, citing *Wagner*, Plaintiffs appear to argue that some line-drawing among employees is necessary to survive First Amendment scrutiny.  But *Wagner* stands for a wholly different proposition because there the speech restriction was alleged to be

underinclusive, which led the court to apply a legal rule not applicable here.  793 F.3d at 27, 31-32 (explaining that underinclusiveness challenges concern "doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint" (quotation omitted)).  The D.C. Circuit did not hold that restrictions can be imposed *only* on contractors but not on employees, as Plaintiffs appear to argue, but simply distinguished the two types of workers in the course of rejecting the underinclusiveness challenge.  Finally, Plaintiffs point to several activities left unrestricted by the statute at issue in *Wagner* to argue that the AO Code goes too far.  Ps.' Br. 37.  But the D.C. Circuit made no ruling that any attempt to regulate those activities would be invalid, particularly if they had been applied to employees of the Judiciary—a distinguishing factor absent in *Wagner*.  Indeed, while noting that "[t]he availability of other avenues of political communication can thus be relevant," the court made clear that the existence of such other avenues "is of course not dispositive."  *Wagner*, 793 F.3d at 26.

## IV.    THE REMAINING INJUNCTION FACTORS FAVOR THE AO.

While courts have presumed irreparable harm from regulations limiting speech, *see* Ps.' Br. 42 (citing cases), that is only so when the plaintiff has established an actual constitutional deprivation.  Plaintiffs can no longer rest their claim of harm on a likelihood of success and must instead show an actual deprivation.  For the reasons detailed above and in Defendant's opening memorandum, they cannot do so because the Restrictions do not violate the First Amendment.  There is thus a lack of cognizable harm that would support the issuance of an injunction.  *See Taylor v. Mich. Dep't of Nat. Res.*, 502 F.3d 452, 458 (6th Cir. 2007) ("[T]here was no constitutional violation and therefore there is no ongoing unconstitutional conduct to enjoin.").

The remaining injunction factors—the balance of equities and public interest—likewise favor the AO.  When the government is a party, these two factors collapse into a single inquiry "because the government's interest *is* the public interest."  *Pursuing Am.'s Greatness v. FEC*, 831

F.3d 500, 511 (D.C. Cir. 2016); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009) (explaining that, in stay context, "the harm to the opposing party and weighing the public interest . . . merge when the Government is the opposing party").

The defendant here, however, is not an executive agency or official as in most cases brought against the federal government, but instead an integral part of the federal Judiciary. *See* D.'s Br. 4-11. Thus, the potential for harm to the public interest merits even greater consideration given the particular role the Judiciary plays in the constitutional system. *See Williams-Yulee*, 135 S. Ct. at 1666; Mem. Op. 17. As this Court recognizes, preserving the Judiciary's reputation for impartiality and independence is a compelling interest of the highest order. Mem. Op. 13 (quoting *Williams-Yulee*, 135 S. Ct. at 1666). What is more, the public's interest in maintaining a Judicial Branch that is, and is perceived as, independent from political partisanship is a cornerstone of the public's overall confidence in their government, which has long been held "vital," *NTEU*, 513 U.S. at 462, and an interest "of the highest importance," *First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 789 (1978); *cf. Pierson v. Ray*, 386 U.S. 547, 554 (1967) (citing the public interest that "judges should be at liberty to exercise their functions with independence and without fear of consequences" (quotation omitted)). The public interest at issue here, and the threat of any consequent harm to that interest, are thus of special significance.

Were the Restrictions permanently enjoined, and partisan political activity by AO employees freely allowed, it would pose heightened risk to the Judiciary, and the public interest would suffer. Given a political culture rising in both visibility and partisan polarization, as well as the overall susceptibility of government institutions to partisan critique, *see* D.'s Br. 22-24; Cooney Decl. ¶ 16; Weich Decl. ¶ 14; Baugher Decl. ¶ 10, "the government's interest in preserving (or restoring) the public's impression of a judiciary immune to outside pressure would have only gained in salience." *Hodge*, 799 F.3d at 1164. Indeed, the D.C. Circuit has observed that the

"vitality" of the Judiciary's interest in countering contemporary assumptions about its perceived politicization is particularly great for just that reason. *Id.* (finding Judiciary's interest in maintaining neutral reputation *more* salient when "it may have become fashionable in certain quarters to assume that any reference to an apolitical judiciary free from outside control and influence, should be met with a roll of one's eyes" (quotation and citation omitted)). The undisputed backdrop of the current political culture puts the AO "on strong footing in invoking that interest here." *Id.*

Finally, harm to the Judiciary's reputation cannot be wiped clean as easily as it could for the other two branches. That is because federal judges are by design not susceptible to electoral competition, popular recall, or other forms of public pressure. D.'s Br. 40. Moreover, once harm to the Judiciary's reputation for independence were to occur, it would, by the very nature of that harm, be "very difficult if not impossible to reverse or eliminate those perceptions, particularly in a political climate where members of the public often seek affirmation of their own partisan preconceptions." Cooney Decl. ¶ 17.

Enjoining the Restrictions would likely leave the Judiciary exposed to potential claims of bias and partisan favoritism attributable to the observable partisan political activity of AO employees. And even if those claims turn out to be based on perceptual errors, a mere perception of bias still threatens to undermine the reservoir of reputational goodwill that the Judicial Branch has earned over the many years. If, on the other hand, the Restrictions remain in place, Plaintiffs will remain free to engage in a wide range of political activity and speech under the First Amendment, just not certain activities with a direct tie to partisan politics.

## V.    EVEN IF THE COURT CONCLUDES PLAINTIFFS HAVE ESTABLISHED A FIRST AMENDMENT VIOLATION, ANY INJUNCTION SHOULD BE LIMITED TO THE PARTIES BEFORE THE COURT.

If the Court ultimately decides to permanently enjoin any or all of the Restrictions, the

injunction should apply only to Plaintiffs Guffey and Smith, and not to the other AO employees not before the Court.  Limiting injunctive relief to the Plaintiffs comports with the Supreme Court's recognition that a court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."  *Gill v. Whitford*, 138 S. Ct. 1916, 1921, 1933-34 (2018) ("A plaintiff's remedy must be tailored to redress *the plaintiff's* particular injury." (emphasis added)).  Even in the First Amendment context, the Supreme Court has agreed that "relief should be limited to the parties before the Court," and declined "to provide relief to nonparties when a narrower remedy will fully protect the litigants."  *NTEU*, 513 U.S. at 477-78.

Further, "[a]n injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 32 (2008).  Thus, when a court determines to award relief, it should "mould each decree to the necessities of the particular case."  *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944).  If this Court elects to award an injunction, it should not only abide by limitations on its power, but it also "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  The potential harm to the Judiciary's reputation for independence would be all the greater if an agency-wide injunction—permitting a dramatically larger amount of partisan political activity—were to be awarded.

Plaintiffs' resort to case law contrasting facial with as-applied challenges does not affect this analysis and indeed has little relevance in determining the scope of any injunction the Court might award.  Plaintiffs in any event make clear that their challenge is an as-applied one.  *See* Ps.' Br. 44 ("In this motion, . . . Plaintiffs pursue an as applied challenge to a broad category of non-official employee speech." (citation omitted)); Compl. Requested Relief ¶ A.  Further, Defendant agrees with Plaintiffs that the D.C. Circuit has observed that the "same test . . . presumably applies to both 'facial' and 'as-applied' challenges" to restrictions of government employee speech, and

"the distinction between the two is largely elided" in such cases. *Sanjour*, 56 F.3d at 92. But these pronouncements have no bearing on the scope of the remedy a court should award in such a case if it decides in the plaintiff's favor. Rather, Plaintiffs' quoted passage from *Sanjour* merely expresses doubt that the differences between a facial and as-applied challenge—which, in turn, affect which test a court will apply in evaluating the constitutionality of a speech restriction—have great relevance—or any at all—in government employee speech cases. *Id.* That courts may permissibly consider the interests of AO employees other than Plaintiffs themselves does not mean that the Court should automatically provide *relief* more broadly than to the parties before it.

In this case, even if the Court finds that Plaintiffs' have proven a violation of their First Amendment rights, Plaintiffs have not shown that the Restrictions are invalid when applied to other AO employees. Moreover, if the Court were to enjoin the Restrictions as to *all* AO employees, the risk of harm to the Judiciary would increase substantially, given the much broader range of partisan political activity that would be allowed. Accordingly, if the Court awards any relief, it should be limited to the two Plaintiffs who are party to this action.

## CONCLUSION

For the foregoing reasons, and for the reasons explained in Defendant's opening memorandum, Defendant's Motion for Summary Judgment should be granted, Plaintiffs' Cross-Motion for Summary Judgment should be denied, the preliminary injunction should be vacated, and Judgment should be entered for Defendant.

Dated: August 29, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JENNIFER D. RICKETTS
Director
Federal Programs Branch

CHRISTOPHER R. HALL
Assistant Director
Federal Programs Branch

 */s/ M. Andrew Zee*
M. ANDREW ZEE (CA Bar No. 272510)
JULIE STRAUS HARRIS (DC Bar No. 1021928)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
450 Golden Gate Avenue, Room 7-5395
San Francisco, CA 94102
Telephone: (415) 436-6646
Email: m.andrew.zee@usdoj.gov

*Counsel for Defendant*