UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LISA GUFFEY & CHRISTINE SMITH,

                      Plaintiffs,

      v.

JAMES C. DUFF, in his official capacity,

                    Defendant.

Case No. 1:18-cv-01271-CRC

**REPLY IN SUPPORT OF
PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................... ii

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................................................1

ARGUMENT ...................................................................................................................3

    I.      The Government Fails To Justify Applying A Standard Weaker Than *NTEU*'s And Fails To Demonstrate That Speculation About Hypothetical Future Reactions Of Unnamed People To Hypothetical Future Events Is Admissible As Evidence .............3

    II.     The Government Has Failed To Carry Its Burden Under *NTEU*..................................6

          A.  The AO's Feared Harms Are Too Speculative To Support The Identified Restrictions ........................................................................................................6

          B.  The Identified Restrictions Are Not At All Tailored To The Government's Interest......................................................................................................13

    III.    The Government's Argument About The Scope Of The Injunction Conflicts With D.C. Circuit Precedent ...............................................................................................15

CONCLUSION .............................................................................................................16

## TABLE OF AUTHORITIES

### Cases

*Baumann v. District of Columbia*, 795 F.3d 209 (D.C. Cir. 2015)..................................................4

*Connick v. Myers*, 461 U.S. 138 (1983)...................................................................................4

*\*Guffey v. Duff*, 330 F. Supp. 3d 66 (D.D.C. 2018) ................................................................ *passim*

*Harris v. Gonzales*, 488 F.3d 442 (D.C. Cir. 2007)................................................................6

*Janus v. Am. Fed'n of State, Cty., & Mun. Employees*, 138 S. Ct. 2448 (2018) ..................4, 5, 15

*Lalowski v. City of Des Plaines*, 789 F.3d 784 (7th Cir. 2015) ........................................4

*Londrigan v. FBI*, 670 F.2d 1164 (D.C. Cir. 1981) ................................................................6

*NAACP v. Button*, 371 U.S. 415 (1963)................................................................14

*\*Sanjour v. EPA*, 56 F.3d 85 (D.C. Cir. 1995) .................................................................2, 15

*\*United States v. Nat'l Treasury Employees Union*, 513 U.S. 454 (1995) .......................... *passim*

*United States v. Rembert*, 863 F.2d 1023 (D.C. Cir. 1988) ................................................5

*Wagner v. FEC*, 793 F.3d 1 (D.C. Cir. 2015) ................................................................14

*Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656 (2015) ................................................9

### Rules and Regulations

Fed. R. Evid. 1101 .................................................................................................5

Fed. R. Civ. P. 56(c)(4)..........................................................................................6

*\*Authorities on which we chiefly rely are marked with an asterisk.*

## INTRODUCTION AND SUMMARY OF ARGUMENT

The flurry of arguments in the government's opposition to summary judgment fails to overcome the central flaw in the government's position: The Identified Restrictions ban far too much speech based on far too small a risk of harm.

At the heart of this case are two questions: Is it reasonable for the government to fear the harms it does? And is the government's response to these potential harms appropriately tailored in light of their likelihood and seriousness and the importance of the Plaintiffs' interests? The government has the burden to answer both in the affirmative to prevail. It succeeds on neither.

On the reasonableness of the harm, the government does not dispute that no harm has befallen the AO in eighty years of operation without its new Code of Conduct and that the AO has continued to enjoy an excellent reputation for nonpartisanship. The government's main defense of the Identified Restrictions is that social media has changed everything; accordingly, acts of personal political participation that were once anodyne are now at risk of being weaponized by partisan organizations and foreign governments.

The assertion that the wider availability of previously available information about the political activities of AO employees magnifies the risk of harm depends on the premise that such information is plausibly harmful to the AO's reputation in the first place. It is not. The government fails realistically to explain why any member of public would care whom the Plaintiff Lisa Guffey (or any other AO employee) supports for President. For this key premise, the government must resort to a lengthy chain of speculation regarding a series of unlikely contingencies. Though the government disputes the Plaintiffs' account of the chain of speculation that ties the government's feared harms to the conduct it bans, the government then heaps on yet more speculation about additional unlikely events. Based on the record in this case, the government cannot realistically

show that the reputation of the judiciary is at risk or that any of its other feared harms will occur. And if there is any doubt on this point, it is the government's burden under *United States v. Nat'l Treasury Employees Union*, 513 U.S. 454 (1995) *("NTEU"),* to justify its speech restrictions.

The scope of the Identified Restrictions is an independent reason to enjoin them. The Director has imposed on eleven hundred people far-reaching restrictions on political speech and assembly that this Court has rightly deemed "as serious as they come." *Guffey v. Duff*, 330 F. Supp. 3d 66, 74 (D.D.C. 2018). The Director would prohibit all his employees, off-duty, from a range of ordinary but fundamental political activities that most Americans (including employees in the Executive Branch) take for granted: expressing political views, supporting candidates via monetary contributions, joining a political party, attending campaign events, and more. As this Court held in its prior opinion, narrower rules already in place combined with individualized enforcement would "readily address" the harms the government fears. *Id.* at 79. The government quibbles about the precise level of tailoring required without refuting Plaintiffs' fundamental point that the Identified Restrictions are far too broad under any standard.

Finally, the government raises for the first time in this litigation the argument that the injunction should be narrowed from the agency-wide order granted on Plaintiffs' preliminary injunction motion to relief for just the two individual Plaintiffs. This eleventh-hour objection is at odds with binding authority, *Sanjour v. EPA*, 56 F.3d 85 (D.C. Cir. 1995) (en banc), which squarely addressed the proper scope of an injunction to address broad rules that muzzle federal employees.

The Court should grant summary judgment to Plaintiffs and permanently enjoin the operation of all nine Identified Restrictions against all AO employees except the six high-level "designated" AO employees.

2

**ARGUMENT**

I.  **The Government Fails To Justify Applying A Standard Weaker Than *NTEU*'s And Fails To Demonstrate That Speculation About Hypothetical Future Reactions Of Unnamed People To Hypothetical Future Events Is Admissible As Evidence.**

Before diving into the heart of the dispute, two threshold issues require brief discussion: the legal standard and the evidentiary status of statements not based on personal knowledge.

The government quibbles over the phrasing of the standard, Def.'s Opp. 3-5, but its disputes do not amount to much. The parties agree that *NTEU* provides the governing standard and that the Director may use reasonable speculation to carry his burden regarding his asserted interest in the public perception of judicial integrity. *See id.* at 4.

The government's claim that Plaintiffs have conceded that concrete examples of harm are unnecessary, Def.'s Opp. 5, misrepresents Plaintiffs' position: Plaintiffs have conceded that reasonable speculation may suffice regarding *the specific interest in public perception of the judiciary* (the subject of discussion at the preliminary injunction hearing). But they have made no such concession regarding the interests the government has added into the mix at the summary judgment stage. *See* Pls.' Br. 6 (noting Director Duff's assertion of new inter- and intra-branch harmony interests). These are subject to the regular *NTEU* analysis, unaided by special permission to engage in reasonable speculation. Defendant objects to Plaintiffs' point that these other harms must be "concrete," Def.'s Opp. 5, but as this Court has already suggested, this word is an apt summary of the burden imposed by *NTEU*, under which "[t]he Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's '*necessary impact* on the *actual operation*' of the Government," 513 U.S. at 468 (emphasis added), and that "the recited harms are *real*, not merely conjectural," *id.* at 475; *see Guffey*, 330 F. Supp. 3d at 80 ("[I]nstead

of explaining *concretely* how AO employees' engagement in the restricted activities would lead to public distrust of the judiciary, the government has consistently retreated to generalities." (emphasis added)). Substituting the phrase "examples of harms consisting of real, not merely conjectural, necessary impact on the actual operation of the Government" for the phrase "concrete examples of harms" in Plaintiffs' briefs would yield the same argument, with the same conclusion.

The government's citations to the *Connick*, *Baumann*, and *Lalowski* cases do not support its argument for a looser standard than *NTEU* requires, *see* Def.'s Opp. 5, 10, because all three cases involved classic *Pickering* claims regarding discipline for a particular public employee's particular speech after the fact. *See Baumann v. District of Columbia*, 795 F.3d 209, 212, 215, 218 (D.C. Cir. 2015) (police officer's challenge to *application* of department rule against disclosing confidential information whose release would impede an investigation; the court noted that the officer conceded the constitutionality of the general rule); *Lalowski v. City of Des Plaines*, 789 F.3d 784, 787-89 (7th Cir. 2015) (police officer's claim that chief retaliated against him for shouting insults and profanity at anti-abortion demonstrators); *Connick v. Myers*, 461 U.S. 138, 141 (1983) (prosecutor fired for circulating a questionnaire concerning internal office affairs). These cases contrast sharply with this broad challenge to an ex ante rule that (as this Court has already held) triggers *NTEU*'s stricter standard. *See Guffey*, 330 F. Supp. 3d at 71 ("The *Pickering* test developed in cases involving one-off disciplinary actions against individual employees based on those employees' speech. Courts since then have recognized that the test requires closer scrutiny of the government's interest in cases like this one, where—instead of responding to disruptive speech through individualized 'supervisory decision[s]'—it has enacted a prospective rule with 'widespread impact.'" (quoting *Janus v. Am. Fed'n of State, Cty., & Mun. Employees*, 138 S. Ct. 2448, 2472 (2018), in turn quoting *NTEU*, 513 U.S. at 468)).

The government further suggests that the Plaintiffs must put forward additional evidence (evidence of what, the government does not say) to survive summary judgment. Def.'s Opp. 2. This is plainly wrong. The burden is on the government to justify its restrictions, *NTEU*, 513 U.S. at 468, 475; *Janus*, 138 S. Ct. at 2472, not on Plaintiffs to prove them unjustified.

The government's burden, it bears repeating, is particularly high in light of the extreme nature of the restrictions it is attempting to impose—restrictions that "strike at the core of" AO employees' "strong interest in freely participating in partisan politics" through "publicly expressing opinions about parties and candidates, ... displaying political messages, ... contributing to parties and candidates, and ... openly associating with political parties," even "on their own time and in their own communities." *Guffey*, 330 F. Supp. 3d at 73-74. The government's response to this Court's description of the restrictions at issue is merely to note that they apply to a smaller group of employees than the ban at issue in *NTEU*. Def.'s Opp. 3 n.2. But stripping eleven hundred people of core political speech rights cannot be justified on the grounds that the Director didn't sweep *more* employees into his ban.

Regarding the evidentiary issue, the government's attempt to salvage its declarants' speculation under Rule 701 fails. In the portions of the declarations that Plaintiffs challenge, the declarants are not testifying to anything like the value or profits of their businesses, *see* Def.'s Opp. 10 n.8, but the hypothetical future reactions of other (in many cases hypothetical) people to hypothetical future events. The Director cites no authority suggesting speculation of that sort is admissible evidence. Nor can the government wave away Plaintiffs' authorities on Rule 701, Pls.' Br. 26-27, on the basis that one of them is a criminal case, Def.'s Opp. 11: the Federal Rules of Evidence apply equally to criminal and civil cases. *See United States v. Rembert*, 863 F.2d 1023, 1028 (D.C. Cir. 1988); Fed. R. Evid. 1101. Additionally, the Federal Rule of *Civil* Procedure

governing summary judgment echoes the evidentiary requirement that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge." Fed. R. Civ. P. 56(c)(4).

The government's suggestion that "exclusion" is not warranted, Def.'s Opp. 11, contravenes black-letter law: a basic tenet of summary judgment practice is that declarations relied on must "set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4); *accord Harris v. Gonzales*, 488 F.3d 442, 446 (D.C. Cir. 2007) ("[A]ffidavits based upon belief are inadequate to support a motion for summary judgment[.]"); *Londrigan v. FBI*, 670 F.2d 1164, 1174 (D.C. Cir. 1981) ("[Rule 56's] requirement of personal knowledge by the affiant is unequivocal, and cannot be circumvented."). Plaintiffs do not dispute that, for the purpose of evaluating the government's interest, the government may rely on *realistic* hypotheticals in support of its *public-perception* rationale. *Guffey*, 330 F. Supp. 3d at 76. But these hypotheticals must be recognized for what they are: guesses, not facts that can be "found" and then partially shielded on appeal by a "clear error" standard.

The question on the merits, then, is whether these guesses carry the government's burden to justify the extreme restrictions on AO employees' participation in some of the most basic activities of democracy. The clear answer is that they do not.

## II.     The Government Has Failed To Carry Its Burden Under *NTEU*.

The government has failed to make anything close to a realistic showing of harm to justify its restrictions, and in any event the Identified Restrictions sweep far too broadly.

### A.     The AO's Feared Harms Are Too Speculative To Support The Identified Restrictions.

The government does not dispute that in eighty years of the agency's existence, it has no real-life examples of AO employees' political activity causing any problem whatsoever, much less

undermining the reputation of an entire branch of government. Likewise, the government has not shown (and does not even argue) that AO employees' partisan political activities during the past thirteen months—during which time seven of the nine Identified Restrictions have been enjoined by this Court—have damaged the judiciary's reputation or harmed it in any way.

The government's own declarants attest to the AO's excellent reputation for non-partisanship prior to the implementation of the new Code. *See* Cooney Decl. ¶ 10 ("[T]he perception was that the AO consistently and reliably presented views that were solely in the best interest of the courts, without allowance for political considerations."); Weich Decl. ¶ 12 ("In my experience as a congressional staffer, the AO and its employees were uniformly perceived as non-partisan actors advocating on behalf of the federal Judiciary."). The government now seeks to minimize this damaging evidence by pointing to the increasing influence of social media in the years since its declarants worked with the AO. Def.'s Opp. 7. In the Director's telling, social media has changed everything. But a medium is only as powerful as the messages it conveys. And whether information about AO employees' off-duty political activities is shared on Instagram, liked on Facebook, beamed by satellite, or carried by Pony Express, the government has provided no good reason to think that the involvement of AO staffers in the ordinary, run-of-the-mill acts of political and civic engagement would change the public perception of the judiciary in any way. More harmless speech is still harmless. Adding all the zeros in the world will not total one.

For the same reason, the Director's reliance on articles about federal employees from various widely-known agencies, Def.'s Opp. 17-18, is misplaced. In a country where only 26% of respondents can identify the three branches of government, Def.'s Opp. 6 n.4, does the Director seriously contend that the public is as familiar with the AO as with the United States Navy? *See* Def.'s Opp. 17. Or that the political contributions of AO employees will provide the same excuse

for unfounded partisan accusations as the headline-grabbing investigation of Special Counsel Robert Mueller? *See* Def.'s Opp. 18. Likewise, the Director cannot rely on generalizations about attacks on the judiciary generally or the use of FEC data *generally*, Def.'s Opp. at 19; he must explain how there is a reasonable possibility that the speech of *AO employees specifically* will be turned into effective political propaganda that undermines public confidence in the judiciary. That scenario defies common sense to begin with, and the Director's attempts to tie it to events with any serious chance of occurring only underscore that point.

Plaintiffs have identified a number of unlikely premises that the Director must assume in order to conclude that the off-duty political activities of his employees will harm his agency's reputation. Pls.' Br. 30-31. The Director responds first with the erroneous claim that Plaintiffs "do not genuinely dispute the vast majority of" the government's hypotheticals, Def.'s Opp. 13, *contra* Pls.' Br. 30 (pointing out that "all the government's hypotheticals" rely on a lengthy chain of speculation, with each link in the chain unlikely). The government then nitpicks Plaintiffs' account of the chain of speculation—arguing, for instance, that speculation about whether a member of a public recognizes an AO staffer logically includes that the person has heard of the AO. Def.'s Opp. 15. But focusing on whether the chain of speculation is seven or eight steps long misses the forest for the trees. The point remains that the government must make a great many assumptions—more than the three steps that this Court found too tenuous at the preliminary-injunction stage, *Guffey*, 330 F. Supp. 3d at 79—in order to arrive at its prediction of harm. And as Plaintiffs have previously noted, the government's own assessment of the likelihood of its various contingencies is tellingly tepid. *See* Pls.' Br. 31-32.

The Director's attempt to discount the importance of a key link in his speculative chain—the hypothesis that the public will mistakenly believe that AO employees participate in *case*

*adjudication*—ignores the Supreme Court's explanation of what the "public perception" interest is all about: the need to "assure its people that judges will *apply the law* without fear or favor[.]" *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1662 (2015) (emphasis added). Plaintiffs do not disagree with the Director that amendments to the federal rules affect litigants, Def.'s Opp. 17, but it is not the judiciary's role in crafting amendments to the rules that drives the special interest in judicial neutrality that the Supreme Court has found so important. The public must see the judiciary as neutral *arbiters of disputes*, not as neutral recommenders of amendments to federal procedural rules, which are more akin to rules issued by administrative agencies whose employees are subject to much less restrictive rules under the Hatch Act. It is the judiciary's special role as adjudicators, which the Court traced all the way back to the Magna Carta, that justified the Supreme Court's decision in *Williams-Yulee* to recognize a "rare case[] in which a speech restriction withstands strict scrutiny." 135 S. Ct. at 1666. Accordingly, the allowance here for the government to rely on hypotheticals in support of its public-perception-of-the-judiciary interest must be limited to the function for which the public perception of integrity *is* a compelling interest: adjudicating cases.

Further, in trying to minimize the extent of speculation that is required to carry its burden, the government introduces yet more far-fetched speculation: that a member of the public "could reasonably—even if not always accurately—believe that a single AO employee is in a position to affect policy within the Judiciary," or that an AO employee might "serve on" a presidential campaign. Def.'s Opp. 15. The government offers no reason to think members of the public would believe employees of an "Administrative Office" have the power to make policy decisions for the judiciary. And the government's claim that Plaintiffs themselves wish "to serve on a presidential campaign in the 2020 election," Def.'s Opp. 15, is a distortion; the government is exaggerating for

rhetorical effect Plaintiffs' statements that they have "volunteered" for campaigns in the past and/or wish to do so in the future. *See* Guffey Decl. ¶ 14; Smith Decl. ¶¶ 6-10.

In other instances, the Director doubles down on prior speculation, as in his dogged defense of his parking-garage hypothetical. He insists that an observer of cars with partisan bumper stickers in a parking garage shared by AO and congressional employees is "more likely" to make the specific assumption that these are AO employees' cars as opposed to congressional staffers' cars. Def.'s Opp. 19. That beggars belief, given the likelihood that congressional staffers will have partisan bumper stickers on their cars. The parties can trade guesses back and forth, but there's no avoiding the point that a great deal of questionable speculation is required to imagine how AO employees' partisan activity will undermine the reputation of the judiciary. Core First Amendment rights like expressing one's views on a candidate or attending a candidate's speech cannot be gutted based on such a thin thread. Far-fetched contingencies fall far short of carrying the government's burden to assert "*realistic* hypotheticals of how partisan activity restricted under the Code could lead the public to believe that the judiciary is not behaving impartially." *Guffey*, 330 F. Supp. 3d at 76 (emphasis added); *see also id.* at 80 (requiring "a *plausible* showing that these interests will actually be jeopardized" (emphasis added)).

The government's argument supporting the "public perception" interest is riddled with additional errors. For instance, the government claims that the Plaintiffs' argument is limited to the likelihood that AO employees' *will* perform their jobs in a partisan manner rather than addressing the government's concern that AO employees will be *perceived by the public* as performing their jobs in a partisan manner. Def.'s Opp. 13, 15. In fact, however, Plaintiffs have squarely focused on the government's public-perception interest. *See, e.g.,* Pls.' Br. 27 (discussing what will "be assumed" about AO employees); *id.* at 31 (connecting chain of speculation to the

conclusion that "the federal judiciary is no longer perceived to be impartial"); *id.* at 34 (discussing the absence of threats to "the public perception of the judiciary"). The government claims that the public's ability to discover online evidence of AO employees' political activity from their pre-AO days does not undermine its interest in throttling their off-duty political speech *while* employed by the AO because employees "can nonetheless promote the Judiciary's perception of independence by a recognition that Judicial Branch employees must hold themselves to a different standard." Def.'s Opp. 15. But there is no reason to think the "higher standard" needed to reassure the public is not already embodied within the AO's pre-2018 Code, under which (the Director admits), AO employees were already "required to 'observe high standards of conduct so that the integrity and independence of the judiciary are preserved.'" Def.'s MSJ 38 (quoting AO Code of Conduct § 220(b), ECF No. 2-5); *see also Guffey*, 330 F. Supp. 3d at 79 (citing AO Code's Canon 2, which prohibits employees from "engag[ing] in any activities that would put into question the propriety of the employee's conduct in carrying out the duties of the office").

The government's other asserted interests in inter- and intra-branch relations fare no better than the public-perception interest. The government defends its reliance on intra- and inter-branch relations, first, on the basis that the perceptions of government actors do not "warrant different consideration than the public as a whole," Def.'s Opp. 8, and second, that AO employees are "essential" to the functioning of the judicial branch, Def.'s Opp. 9. The first argument ignores what this Court said in its prior opinion: the government has special leeway vis-à-vis its *NTEU* burden to rely on speculation for the purposes of the "nebulous" interest in "the *public's* perception of judicial integrity." *Guffey*, 330 F. Supp. 3d at 76 (emphasis added). There is no reason to extend that dispensation to the much more concrete interests of inter- and intra-branch relations. As Plaintiffs observed in their prior brief: if members of the "discrete and easily accessible groups of

11

officials" the AO invokes "were distrustful of the AO because of its employees' political activities, it should not be hard for them to say so. They have not." Pls.' Br. 24. The Director has no answer for this gap in his evidence. Moreover, even if the Director were permitted to speculate regarding inter- or intra-branch harms, he would have to invoke much of the same far-fetched speculation as for the public-perception interest, *and* add on the *further* speculation that sophisticated actors like congressional staffers and judges won't understand that AO staffers can separate out their personal political activities views and activities from their jobs—as they have apparently done successfully throughout the AO's eighty-year history. Even the government itself does not argue that AO staffers will actually behave in a biased way. The government offers no reason to believe that well-informed government officials of the various branches would leap to this unwarranted conclusion.

The government's second inter/intra-branch argument is that AO employees are simply so essential to the judiciary and the judiciary's need for independence is so different from that of other branches that judges cannot be tasked with the same responsibility all other federal government officials bear: to supervise staff who might have partisan inclinations. This assumption attributes to federal judges a surprising amount of naivete: in the Director's telling, judges are both easily susceptible to being duped by scheming AO employees with partisan agendas and also easily reassured that AO employees could not possibly be up to any partisan scheming as long as they don't post partisan Facebook messages or contribute to their local House member's campaign. The Director cannot justify deep restrictions to his employees' political activities based on such unlikely assumptions—which, it bears repeating, are far removed from any harms consisting of "real, not merely conjectural" "necessary impact on the actual operation of the Government" as required under *NTEU*. 513 U.S. at 468, 475.

In a footnote, the government attempts to resurrect its "unity" interest that this Court has rightly rejected already. Def.'s Opp. 8 n.7. The Court's prior treatment is sufficient rebuttal:

> [A]chieving unity for its own sake cannot justify extending an existing speech restriction to a new group of employees whose job functions and workplace location distinguish them from those already covered. If uniformity were enough, the requirement that a restriction's scope be reasonably tailored would be meaningless ... . [I]f the AO wishes to treat its employees like courthouse employees with regard to their partisan activity, it must provide some independent reason justifying that equal treatment—i.e., that the AO employees' partisan activity would harm the government in some way and that the restrictions will mitigate that harm.

*Guffey*, 330 F. Supp. 3d at 74-75.

Finally, the government offers no reason to continue to permit the Organizing and Driving Restrictions to operate as distinct from the rest of its Code, beyond repeating the arguments that Plaintiffs have previously rebutted.

**B. The Identified Restrictions Are Not At All Tailored To The Government's Interest.**

On the issue of tailoring, the Director initially quarrels over the precise degree of tailoring necessary, Def.'s Opp. 5, but ultimately concedes Plaintiffs' point that some degree of "fit" is required and that regulations must be "reasonably necessary" to protect the asserted interest. Def.'s Opp. 21; *accord Guffey*, 330 F. Supp. 3d at 74 (recognizing "the requirement that a restriction's scope be reasonably tailored"); Pls.' Br. 34-35 (citing Supreme Court and D.C. Circuit precedent).

Under any standard, the Identified Restrictions are not "fit[ted]" or "tailored" to the government's interests. Most fundamentally, the Director never refutes Plaintiffs' basic point— and this Court's conclusion—that the pre-2018 version of the Code was sufficient to prevent harms to the judiciary's reputation. *See* Pls.' Br. 36; *Guffey*, 330 F. Supp. 3d at 79 (explaining that any problematic outliers could be addressed through "after-the-fact, isolated disciplinary actions"). All the Director offers on this score is that the suggestion that individualized, post hoc enforcement of

pre-2018 Code provisions are less preferable to a blanket ban on large swaths of political activity. Def.'s Opp. 25. But *NTEU* teaches precisely the opposite: with regard to a ban with "widespread impact ... the Government's burden is greater ... than with respect to an isolated disciplinary action." 513 U.S. at 468. Although "[p]recision of regulation must be the touchstone" in the First Amendment area, *NAACP v. Button*, 371 U.S. 415, 438 (1963), sweeping ex ante speech restrictions do something far worse than punish a single employee under a clear but general prohibition: they are a "wholesale deterrent to a broad category of expression by a massive number of potential speakers," 513 U.S. at 467, and "chill[] speech before it happens," *id.* at 468. Thus, under *NTEU*, the Director's broad-brush approach is far more problematic than a more tailored regime of individually focused, post hoc discipline.

The Director also argues that, as in *Wagner v. FEC*, 793 F.3d 1 (D.C. Cir. 2015), where an important factor in the D.C. Circuit's decision to uphold a contribution restriction was the existence of a demonstrated problem of pay-to-play among the group subject to the challenged law, the AO has a "demonstrated problem" in the form of "the recent increase in partisan polarization generally, and toward the Judiciary specifically ... coupled with increased visibility and salience of federal employees' political activities." Def.'s Opp. 25. But defining a "problem" at that high a level of generality to justify a draconian speech restriction stretches *NTEU*'s speech-protective standard—requiring a showing of "real, not merely conjectural," "necessary impact on the actual operation of the Government," 513 U.S. at 468, 475—beyond recognition. Heightened partisanship plus the inevitable progress of communications technology does not equal carte blanche for the government to restrict its employees' speech.

In sum, the AO has imposed a maximally strict speech Code to protect against minimally likely harms. The Code fails First Amendment scrutiny by a wide margin.

III.    **The Government's Argument About The Scope Of The Injunction Conflicts With D.C. Circuit Precedent.**

For the first time in this litigation, the government argues that relief should be limited to the two Plaintiffs. In support of this argument, the government invokes various principles regarding the role of the courts generally. *See* Def.'s Opp. 28-30. But as Plaintiffs have shown, precedent specific to this precise context permits agency-wide relief: Plaintiffs follow D.C. Circuit precedent in pursuing an "as applied challenge to a broad category of non-official employee speech." *Sanjour*, 56 F.3d at 93 (source's alternation marks omitted). In *Sanjour*, the court struck down regulations barring EPA employees from receiving travel expense reimbursement from private sources for certain unofficial speaking or writing engagements. *Id.* at 87-88. The court carefully considered the scope of the case and held that the nature of the challenge "requires that we look beyond the particular facts of the appellants' case"; it thus excluded only "senior executive employees" (analogous to the six "designated" AO employees here) from its holding. *Id.* at 93. This Court has already recognized that this approach is the correct one: Because the Director "offered no basis on which to distinguish the two plaintiffs here from other AO employees to whom the challenged provisions also apply," the Court in its preliminary injunction opinion followed the path laid out by the D.C. Circuit in *Sanjour* and enjoined the Director from enforcing, against "any AO employees except for the six high-level employees not at issue in this case," the provisions the Court found constitutionally problematic. *Guffey*, 330 F. Supp. 3d at 73, 81.

The Director's response—that "Plaintiffs have not shown that the Restrictions are invalid when applied to other AO employees," Def.'s Opp. at 30—rests on the erroneous premise that it is Plaintiffs' burden to show the Code's invalidity as to all of their colleagues. Again, the Director runs into contrary instruction from *NTEU*, which places the burden squarely on the government to justify its restriction. *NTEU*, 513 U.S. at 468, 475; *accord Janus*, 138 S. Ct. at 2472. Despite the

Director's attempt to co-opt *NTEU* to support his argument about the scope of relief, *see* Def.'s Opp. at 29, the decision in that case applied to "all Executive Branch employees below grade GS-16." 513 U.S. at 478. Because that case was a class action, the Court had no occasion there to consider whether it should restrict injunctive relief from an unconstitutional speech restriction to just a handful of employees. Accordingly, the binding, on-point authority here is *Sanjour*.

This Court properly issued its preliminary injunction agency-wide, based on the Director's failure to explain why his restriction was more appropriate as to any subset of his employees. Because he adheres to that position now, *see* Def.'s Opp. 22-24 (arguing that AO employees should be treated together, not broken up by division or job description), an agency-wide injunction (again excepting the same six "designated" AO executives excluded from the scope of the preliminary injunction) remains appropriate. A broad injunction is particularly warranted in light of the serious affront to the First Amendment that the Identified Restrictions represent. The other thousand-plus AO employees should not be required to come to court individually and begin the litigation process anew to seek relief from the onerous restrictions at issue.

## CONCLUSION

The Court should grant summary judgment to Plaintiffs and deny it to Defendant.

October 3, 2019                              Respectfully submitted,

                                            /s/ *Scott Michelman*
                                            Scott Michelman (D.C. Bar No. 1006945)
                                            Arthur B. Spitzer (D.C. Bar No. 235960)
                                            Michael Perloff (D.C. Bar No. 1601047)
                                            American Civil Liberties Union Foundation
                                              of the District of Columbia
                                            915 15th Street NW, Second Floor
                                            Washington, DC 20005
                                            (202) 457-0800
                                            smichelman@acludc.org

                                            *Attorneys for Plaintiffs*