**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **LISA GUFFEY and CHRISTINE SMITH**, <br><br> Plaintiffs, <br><br> v. <br><br> **JAMES C. DUFF, Director, Administrative Office of the U.S. Courts**, <br><br> Defendant. | Case No. 18-cv-1271 (CRC) |

## <u>MEMORANDUM OPINION</u>

The Administrative Office of the United States Courts ("AO") performs a wide range of administrative, policy-related, and legislative functions for the federal judiciary. It is an integral part of the judicial branch and its work is critical to the proper functioning of the federal court system. But, unlike federal courthouse personnel, its 1,100 or so employees toil mainly outside the public's view, and none of them are involved in handling or deciding individual cases. The question presented in this case is whether the First Amendment permits the AO, in the interest of maintaining public confidence in the impartiality of the federal judiciary, to ban its employees from engaging in virtually all forms of partisan political activity outside the workplace.

In 2018, the AO imposed significant new prohibitions on the partisan activities that its employees may undertake at all levels of electoral politics. The restrictions included bans on routine political expression like donating to a candidate, displaying a campaign bumper sticker or yard sign, attending a fundraiser, and being a member of a political party. The limitations were necessary, the AO's Director explained, to recognize the "unity of purpose" between the AO and the judicial branch as a whole by harmonizing the code of conduct that applies to AO employees with the code that applies to most federal courthouse staff across the country. The Director also

indicated that the prohibitions were needed to preserve public confidence in the integrity and impartiality of the judicial branch.

Two AO employees responded by filing this lawsuit, alleging that the prohibitions violated their First Amendment rights to engage in core political speech. In an August 2018 ruling, the Court preliminarily enjoined the AO from enforcing all but two of the prohibitions. The Court held, first, that the AO's desire to treat its employees and courthouse staff the same cannot by itself "justify extending an existing speech restriction to a new group of employees whose job functions and workplace location distinguish them from those already covered." Guffey v. Duff, 330 F. Supp. 3d 66, 74 (D.D.C. 2018) ("Guffey I"). Second, the Court found that the AO's interest in protecting the appearance of judicial integrity and impartiality, compelling as it is, was likely to be outweighed by the substantial burdens that the new prohibitions placed on Plaintiffs' protected speech. Id. at 76–77. The Court reached that conclusion because the government had not "generate[d] a single concrete example—even a hypothetical one—where an AO employee's participation in the prohibited activities would cause a member of the public reasonably to question the impartiality or integrity of particular judges or the judiciary as an institution." Id. at 78–79.

The parties have now returned to the Court with cross motions for summary judgment on the merits of Plaintiffs' claim. The government downplays its "unity" rationale this time around but continues to assert its interest in preserving public confidence in the integrity of the courts as justification for the prohibitions. And, it now offers two new reasons for banning AO employees' partisan political activity: (1) to maintain the trust of federal judges to whom AO employees offer impartial advice and recommendations on judicial policy issues, and (2) to

ensure that representatives of the other two branches of government—especially Congress—do not view AO employees as politically motivated in their dealings on matters affecting the courts.

Having carefully considered each side's arguments and governing precedent, the Court again concludes that while the AO's efforts to protect the judiciary from perceptions of political influence are laudable, the government has not, for most of the prohibitions, satisfied its burden of justifying the bans on AO employees' First Amendment-protected activities.  The Court will, accordingly, grant summary judgment for Plaintiffs as to those prohibitions and enjoin their application to all AO employees except its most senior leadership.

## I.    Background

### A.   The Administrative Office of the U.S. Courts

The following facts are undisputed.  Established in 1939, the Administrative Office of the U.S. Courts furnishes "legislative, legal, financial, technology, management, administrative, and program support services to federal courts."  U.S. Courts, Judicial Administration, https://www.uscourts.gov/about-federal-courts/judicial-administration (last visited April 28, 2020).  The AO's headquarters are on Capitol Hill in Washington, D.C., about a half mile from the Supreme Court, and 900 of the AO's approximately 1,100 employees work out of that building.[1]  The AO is comprised of three broad departments—Technology Services, Administrative Services, and Program Services—each of which contains offices dedicated to specific subject areas.  Technology Services helps develop and implement the judiciary's information technology policies across the federal courts.  Administrative Services provides human resources, finance, and facilities-related support.  Program Services tackles a wider array

---

[1] The rest work in small satellite offices or through telework arrangements in Arizona, South Carolina, and Texas.  Decl. of James C. Duff ("Duff Decl.") ¶ 7, ECF No. 24-3.

of issues, ranging from evaluating the judiciary's case-management systems to overseeing the operations of federal probation and pretrial services offices across the country.  The AO is led by a Director, who is selected by the Chief Justice of the United States and effectively serves as the chief administrative officer of the federal courts.  None of the AO's employees work in federal courthouses or interact directly with the general public as part of their work.  Nor are they involved in the processing or adjudication of individual cases.

AO employees work under the supervision and direction of the Judicial Conference, the group of judges who set the policy prerogatives for the federal courts.[2]  Some AO employees, drawn from each of the three departments, work closely with the approximately 250 federal judges who serve at any given time on the Judicial Conference's twenty-five committees.  Duff. Decl. ¶¶ 9–10.  These committees help establish policy and formulate the position of the judicial branch in such areas as: the creation and elimination of judgeships; changes to the federal rules of practice, procedure, and evidence; the operation of probation and pretrial services offices; the provision of legal representation to indigent criminal defendants; the judiciary's budget; information technology; space and facilities; courthouse security; and judicial salaries and benefits.  Id.  AO staff who serve in this capacity assist the committees by conducting research and analysis on relevant issues and submitting written recommendations for the committees to consider.  Id. ¶¶ 10–11.  If their proposals are accepted by their committee, and ultimately the Judicial Conference, they become the judiciary's official policies.  Id.

---

[2] The Judicial Conference is made up of twenty-six judges: the Chief Justice of the United States, the chief judge from each judicial circuit, the Chief Judge of the Court of International Trade, and a district judge from each judicial circuit.  Duff Decl. ¶ 9.

AO employees also serve the judiciary in other ways.  Those in the Judicial Services Office and Office of the General Counsel provide counsel to judges on ethics issues, including recusals, participation in outside activities, and acceptance of gifts.  Id. ¶¶ 11–12; Decl. of James R. Baugher ("Baugher Decl.") ¶ 8, ECF No. 24-4.  Employees in the Office of Legislative Affairs act as liaisons for the judiciary in its dealings with Congress and the Department of Justice.  Duff Decl. ¶ 14(d).  They represent the judiciary's views on various issues, including the creation of new judgeships, the construction of new courthouses, the judiciary's budget, and particular legislative proposals affecting the judiciary that Congress or the executive branch may be considering.  Id.; Baugher Decl. ¶¶ 5-6.  Additionally, employees in the AO's Office of Public Affairs serve as points of contact between the judicial branch and the media, including by issuing press releases and statements on behalf of the judiciary.  Duff Decl. ¶ 14.

B.  The New Code of Conduct

AO employees are subject to a code of conduct.  In 2015, AO Director James C. Duff began the process of revising the code for the first time in twenty years, in accordance with his authority to "prescribe[e] standards of conduct for Administrative Office employees."  28 U.S.C. § 604(f).

Under previous versions of the code, most AO staff were allowed "to take an active part in political activities."  Decl. of Lisa Guffey ("Guffey Decl.") Ex. D § 260(a)(1) ("2016 AO Code"), ECF No. 2-8.  Employees were permitted to publicly express opinions on political subjects, join political parties, donate to political organizations, and attend partisan fundraisers. Id. § 260(a)(2)(A), (b)(1), (e)(1).  With regard to all campaigns for elective office, employees could also wear political paraphernalia, sign nominating petitions, and act as poll watchers on behalf of a political party or candidate.  Id. § 260(c)(1)–(2), (4).  With regard to local and state

(but not federal) campaigns, employees were permitted to endorse or oppose a political candidate, drive voters to polls on behalf of a partisan organization or a candidate, and organize fundraisers.  Id. § 260(c)(8) & (10), (e)(2)(C).  While engaging in any political activity, however, AO employees could not "use their position, title, or authority in connection with the activity." Id. § 260(a)(4).  Nor could they engage in any political activity "while on duty" or while "utiliz[ing] any federal resources."  Id. § 260(a)(5).  More generally, the former code required AO employees to "act impartially and not [to] give preferential treatment to any private organization or individual" and to "observe high standards of conduct so that the integrity and independence of the judiciary are preserved."  Id. § 220, (d)(1).

In July 2017, the Director released the revised AO Code of Conduct (the "Code"), which was modeled on the Code of Conduct for Judicial Employees—the standards that apply to most federal courthouse staff across the country.  Guffey Decl. Ex. A, at 1 ("2017 Memo"), ECF No. 2-5.  While not as severe as the restrictions that apply to judges and their immediate staff, the new Code was significantly more stringent than the previous AO code with regard to partisan political activity.[3]  In particular, it added new prohibitions on partisan activity in connection with federal elections (though, as noted above, there were some prohibitions already in place) and greatly increased the prohibitions on partisan activity related to state and local elections (which had been largely unregulated).  Id. at 2.  Employees were instructed that violations of the Code could lead to discipline.  Guffey Decl. ¶ 17; Decl. of Lisa Smith ("Smith Decl.") ¶ 14, ECF No. 2-3.

---

[3] Six senior AO officials—the Director, the Deputy Director, the three Assistant Directors, and the General Counsel—are subject to more stringent political-activity restrictions that mirror those that apply to judges and law clerks.  Duff Decl. ¶ 21.  Those restrictions are not challenged here.

In announcing the revised Code to AO staff, Director Duff explained that the new speech prohibitions were needed because the old code was "out of step" with the court-wide code of conduct.  2017 Memo 1.  This "failure to keep pace," he explained, "conflicts with our significant and important efforts to communicate with the courts about the unity of purpose between the AO and the courts, and that the AO is very much an integral part of the Judicial Branch and not an independent, isolated agency in Washington, DC."  Id.

C.  Plaintiffs' Lawsuit

Plaintiffs Lisa Guffey and Christine Smith work in the AO's Defender Services Office, a subdivision of Program Services.  Ms. Guffey, who is an attorney, helps administer court-appointed attorney programs and federal-defender offices.  Guffey Decl. ¶ 2.  Ms. Smith provides information-technology support to federal-defender offices.  She also offers policy recommendations regarding cybersecurity to the Judicial Conference's Committee on Information Technology.  Smith Decl. ¶ 2.  Smith encounters federal judges two or three times a year at committee meetings, id. ¶ 3–4, while Guffey interacts with federal judges five to eight times a year in the course of her work, Guffey Decl. ¶ 3.  Neither Plaintiff interacts with the general public in connection with her job nor has any involvement with individual cases.  Id.; Smith Decl. ¶ 3–4.[4]

Prior to the new code's enactment, both Plaintiffs engaged in permitted partisan activities.  An AO employee since 2010, Guffey has donated to partisan candidates and organizations, posted political yard signs, attended partisan fundraisers, and shared her political

---

[4] On April 20, 2020, the government notified the Court that the AO had eliminated Smith's position and, consequently, she is no longer employed there.  Despite this late-stage development, the Court will include facts pertaining to Smith in this ruling.

opinions on social media.  Guffey Decl. ¶ 13.  Smith, who joined the AO in 2016, has displayed

partisan bumper stickers, driven voters to polls on behalf of a political party, and organized

fundraising events for a candidate.  Smith Decl. ¶¶ 5–8.  Plaintiffs both wish to remain active in

the political process through these activities.  Guffey Decl. ¶ 14; Smith Decl. ¶ 10.

After the new Code went into effect in March 2018, Plaintiffs' counsel sent a letter to

Director Duff, expressing Plaintiffs' frustration with the new restrictions.  In reply, Director Duff

reiterated his statement that the partisan-activity prohibitions were necessary "to achieve

consistency with the Judicial Code of Conduct . . . that applies to all employees of the federal

Judiciary."  Guffey Decl. Ex. B, at 1, ECF No. 2-6.  The prohibitions also served to protect "[t]he

government's interest in preserving public confidence in the integrity of its Judiciary," he

explained.  Id.  In May 2018, Plaintiffs filed a complaint and a separate motion for a preliminary

injunction, alleging that the Code's prohibitions against the following activities violate the First

Amendment rights of all AO employees to engage in core political speech:

> a. expressing opinions publicly, including on social media or via articles or
> letters to the editor, regarding a political party or partisan candidate for office;
>
> b. wearing or displaying partisan political badges, signs, or buttons;
>
> c. driving voters to polls on behalf of a political party or partisan candidate for
> office;
>
> d. contributing funds to a political party, political action committee, or partisan
> candidate for office;
>
> e. attending partisan fundraisers;
>
> f. being a member of a partisan political organization (other than registering as
> a member of a party for voting purposes);
>
> g. attending events for a partisan candidate for office;
>
> h. organizing events for a partisan candidate for office; and

i. attending party conventions, rallies, or meetings.

Defending the Code's restrictions, the government asserted that two distinct interests outweighed any burdens that the new Code imposed on AO employees' First Amendment rights. First, it argued that the government had a significant interest in recognizing the "unity of purpose" between the AO and the rest of the judicial branch by "ensuring that [the AO's] ethics requirements are aligned with the ethics rules that apply to all other judicial employees in federal courts nationwide." Def. Opp'n to Prelim. Inj. 11, ECF No. 9. Second, it argued that "[t]he public's confidence in an impartial judiciary will be tainted if it believes that the employees who work for the judicial branch are driven by partisan political interests." Id. at 3.

After expedited briefing and oral argument, the Court in large part granted Plaintiffs' motion, concluding that they were likely to prevail in their challenge to most of the Code's provisions. Rejecting the government's "unity" rationale, the Court reasoned that "achieving unity for its own sake cannot justify extending an existing speech restriction to a new group of employees whose job functions and workplace location distinguish them from those already covered." Guffey I, 330 F. Supp. 3d at 74. If "unity" were a sufficient governmental interest, the Court explained, "the requirement that a restriction's scope be reasonably tailored would be meaningless; the scope of any restriction could be expanded to serve the interest of 'treating people alike.'" Id.

Turning to the government's second identified interest, the Court held that because the concept of public trust in judicial impartiality "does not easily reduce to precise definition, nor does it lend itself to proof by documentary record," id. at 76 (quoting Williams-Yulee v. Fla. Bar, 575 U.S. 433, 447 (2015)), the government should not be held to the customary standard for justifying an *ex ante* regulation on government employees' protected speech. That standard

requires the government to demonstrate that the speech it seeks to prohibit will cause "real, not merely conjectural" harm to the "actual operation of the government" and "that the regulation will in fact alleviate [that] harm[] in a direct and material way." Id. at 72 (quoting United States v. National Treasury Employees Union ("NTEU"), 513 U.S. 454, 468, 475 (1995)). Rather, given the "nebulous" nature of the government's interest in protecting judicial integrity, the Court held that the government could satisfy its burden by identifying "realistic hypotheticals of how partisan activity restricted under the Code could lead the public to believe that the judiciary is not behaving impartially." Id. at 76. The Court nonetheless concluded that the government had failed to satisfy this lower evidentiary standard with respect to seven of the nine prohibitions because it had not identified "a single concrete example—even a hypothetical one—where an AO employee's participation in the prohibited activities would cause a member of the public reasonably to question the impartiality or integrity of particular judges or the judiciary as an institution." Id. at 79. The Court therefore preliminarily enjoined enforcement of those seven prohibitions.

The Court found that the government had satisfied its burden with respect to two of the nine challenged prohibitions: the ban on organizing or managing political rallies and meetings and the ban on driving voters to the polls on behalf of a party or candidate. Because the Hatch Act similarly banned most executive-branch employees from engaging in those acts—and the Supreme Court had twice upheld those restrictions—the Court concluded that Plaintiffs were unlikely to prevail on their claim that these two restrictions violate the First Amendment. Id. at 77–78.

D.  <u>Summary Judgment Motions</u>

The parties have now filed cross-motions for summary judgment.  As noted above, the government contends that the challenged restrictions advance three distinct interests.

First, the government reiterates that the new prohibitions are reasonably necessary to protect the general public's perception of judicial impartiality.  The Court will refer to this as the Public Perception Interest.  If members of the public were to observe off-duty partisan activity by AO employees, the government argues, they would attribute it to the judiciary as a whole and thereby come to question federal judges' impartiality in deciding individual cases.  Moreover, the government views public confidence in the judiciary's impartiality in setting *policies* for the judicial branch as part and parcel of the concept of judicial integrity.  Because partisan activity by AO employees could compromise the judiciary's reputation for fair decision-making—in both deciding cases and making policy—the government contends that the AO should be allowed to ban that activity through the Code.  Duff Decl. ¶ 26.

Second, the government submits that the Code's restrictions are needed to ensure the continued efficient operation of the judiciary by maintaining the perception among federal judges that the AO functions in a non-partisan manner.  Following the parties' lead, the Court calls this concern the Intra-branch Interest.  Were federal judges to learn of an AO employee's partisan affiliations, the argument goes, they would no longer trust that employee to provide objective advice on administrative and policy issues before the Judicial Conference committees and in personal consultations with the judges.  This is especially so, the government suggests, with

respect to AO advice on issues that could be seen as having a partisan element.[5]  Duff Decl.

¶¶ 33–34.

Third, the government maintains that the new Code prohibitions are necessary to protect

the nonpartisan image of the judiciary in the eyes of those in the political branches with whom

AO employees interact on issues affecting the courts.  The Court refers to this rationale as the

Inter-branch Interest.  The government expresses a particular concern with Congress.  The

argument goes that a member of Congress or a congressional staffer could easily become aware

of off-duty partisan political activity by an AO employee responsible for representing the

judiciary's views on, say, the branch's annual budget authorization or a particular legislative

proposal.  If that member or staffer held a different party affiliation, he might question the

objectivity of the AO employee advancing the judiciary's position.  That perception, in turn,

could weaken the judiciary's position in the relevant discussions and, more broadly, embroil the

courts in "the cynical partisan disputes that typify today's political arena."  Def. Mot. for Summ.

J. 39, ECF No. 24-2.  The government warns that inserting the judiciary into the political fray in

this fashion could erode the public's confidence in the branch, leading Congress to "grow more

emboldened to act in ways that negatively affect the courts[.]"  Id. at 36–37.[6]

---

[5] The government offers as examples of such situations AO advice on whether a judge
may attend a seminar sponsored by an outside organization known to have "political leanings,"
Duff Decl. ¶ 33, and staff recommendations on the need to construct a new courthouse in a
particular state or legislative district, Baugher Decl. ¶ 12.

[6] The government cites its "unity" rationale just once in its summary judgment motion.
See Def. Mot. for Summ. J. 18.  Rather than assert the need for uniformity between the AO Code
and the courthouse staff code as a stand-alone interest, as it did at the preliminary injunction
stage, it incorporates the general idea of unity into its arguments regarding the Intra- and Inter-
branch Interests.

In support of all three asserted interests, the government has submitted evidence in the form of four non-expert declarations.  First, the government offers two declarations from Director Duff.  Duff Decl.; Supplemental Decl. of James C. Duff ("Supp. Duff Decl."), ECF No. 29-2.  In addition to supplying background information regarding the organization and function of the AO, Director Duff explains his rationale for implementing the revised Code.  Duff Decl. ¶¶ 16, 21.  He reiterates, as he said to AO employees at the time of the Code's enactment, that he updated the code in order to "unify [the AO's] work within the Judicial Branch."  Id. ¶ 22.  But he explains that his contemporaneous responses were "never intended to be an exhaustive list of [his] justifications" for revising the code.  Id. ¶ 23.  Rather, although he did not express it at the time, Director Duff indicates that he was motivated to revise the code out of concern that "[i]f the staff at the AO was perceived to be of a partisan political bent, it would have a profound and detrimental impact on the public's, the other branches', and judges' confidence in the nonpartisan establishment" of the judiciary's policy on various issues.  Id. ¶¶ 24–28

Next, the government submits a declaration from James Baugher, a 25-year veteran of the AO and one of its associate directors.  Baugher Decl. ¶ 1.  Mr. Baugher attests that "members of Congress, their staffs, and Executive Branch officials view AO employees . . . as representatives of the Judicial Branch as a whole" and "expect them to be nonpartisan."  Id. ¶ 9.  Yet, because of the rise of "hyper-partisanship" and "the ability of anyone to disseminate information through the Internet and social media," Baugher opines that "observable partisan political activity by AO employees would cause harm to the AO's ability to carry out its duties on behalf of the Judicial Conference and the Judicial Branch as a whole."  Id. ¶ 10.  That would be so, Baugher fears, because "[i]f Congress viewed AO employees as being associated with partisan

politics, . . . members of Congress and their staff would likely question whether the Judiciary's decisions are motivated by an inappropriate partisan agenda." Id.

Third, the government provides a declaration from Manus Cooney, a lawyer who served on the Senate Judiciary Committee's staff from 1988–2000, including as chief counsel. Decl. of Manus Cooney ("Cooney Decl.") ¶¶ 1–2, ECF No. 24-5. Based on his professional experience working closely with the AO, Mr. Cooney believes that "the legitimacy of the federal judiciary depends . . . . in significant part on the conduct and reputation of AO employees[.]" Id. ¶ 6. In his view, "the AO is understood by congressional members and their staffs to be the backbone of the judiciary, and to serve the judiciary, by analogy, as both a Chief Operating Officer and Chief Financial Officer, and to do so in an objective and politically neutral manner." Id. Specifically, he declares that the perception "among the approximately forty staffers on the congressional committees most important to the operation of the federal judiciary" during his time working for Congress "was that the AO consistently and reliably presented views that were solely in the best interests of the courts, without allowance for political considerations." Id. ¶ 10. The AO's reputation for neutrality, he explains, "allowed Congress to place trust in the AO and to advance legislation on important issues affecting the federal judiciary that, if handled differently by the AO and its employees, could quickly have become the subjects of intense partisan dispute and gridlock." Id. In his estimation, "[w]ere individual AO employees, or the AO generally, to be perceived as engaged in partisan political activity," it could result in "increased congressional skepticism toward the positions of the AO and the Judicial Conference and possibly to reduced congressional willingness to advance legislation in the best interests of the federal judiciary, all to the detriment of the institution of the Judiciary." Id.

Lastly, the government submits a declaration from Ronald Weich, who served from 2009 to 2012 as the Assistant Attorney General for Legislative Affairs for the United States Department of Justice and from 2005 to 2009 as chief counsel to Senate Majority Leader Harry Reid.  Decl. of Ronald Weich ("Weich Decl.") ¶ 2, ECF No. 24-6.  Mr. Weich states that when he worked as a legislative official, he knew the political affiliations of particular AO employees "[i]n a few instances" because "of interactions [he] had with those AO employees prior to their employment with the AO," but he "never learned the personal political affiliation of any AO employee while he or she was working for the AO."  Id. ¶ 12.  In his experience, "the AO and its employees were uniformly perceived as non-partisan actors advocating on behalf of the federal Judiciary."  Id. ¶ 12.  "[I]f the AO and its employees, who represent the judiciary before the public's elected representatives, were to be perceived as partisan actors or as motivated, even in part, by partisan considerations," Weich opines, "the public's perception of the federal judiciary as an independent and non-partisan branch of government could suffer substantial harm."  Id. ¶ 4.

Through these declarations and in its briefing, the government advances a number of hypothetical situations in which it contends that members of the public, federal judges, and employees of the executive and legislative branches could become aware of AO employees' off-duty partisan activity and react in the manner the declarants predict.  The Court will specifically address some of these hypotheticals in the Analysis section below.[7]

---

[7] Plaintiffs urge the Court to disregard the government's declarations as inadmissible lay opinion testimony because the declarants lack factual bases for their opinions regarding how other federal employees would react to learning of AO employees' partisan activity.  See Gleklen v. Democratic Cong. Campaign Comm., Inc., 199 F.3d 1365, 1369 (D.C. Cir. 2000)

Plaintiffs counter that none of these interests outweigh the burdens that the Code's

outright bans impose on AO employees' First Amendment speech and ask the Court to

permanently enjoin its enforcement.  The Court heard argument on the motions on December 20,

2019.

## II.    Legal Standards

A party is entitled to summary judgment if the pleadings and other materials in the record

establish that "there is no genuine issue as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' if a dispute over it

might affect the outcome of a suit under governing law."  Holcomb v. Powell, 433 F.3d 889, 895

_____

(noting that evidence considered at summary judgment must be capable of being converted into
admissible evidence at trial).

Federal Rule of Evidence 602 allows lay witnesses to testify regarding any matter about
which they have personal knowledge.  Fed. R. Evid. 602.  Rule 701, meanwhile, allows lay
witnesses to rationally extrapolate from their personal knowledge to opine on matters "helpful
to . . . determining a fact in issue" provided the opinion testimony is "rationally based on the
witness's perception" and does not rely on "scientific, technical, or otherwise specialized
knowledge."  Fed. R. Evid. 701.  Taken together, these two rules "ensure that any opinions
offered by a lay witness are based on personal, 'first-hand knowledge or observation,' and 'a
process of reasoning familiar in everyday life'" while still permitting witnesses to offer
conclusions "'that cannot be described factually . . . apart from inferences.'"  United States v.
Williams, 827 F.3d 1134, 1155–56 (D.C. Cir. 2016) (citations omitted) (quoting Fed. R. Evid.
701 adv. comm. note to 2000 amend.).  District courts are afforded "broad discretion in
admitting opinion testimony of lay witnesses."  United States v. Williams, 212 F.3d 1305, 1310
n.6 (D.C. Cir. 2000).

The Court will consider the declarations.  Each declarant has extensive first-hand
knowledge, based on years of senior government service, regarding how executive-, legislative-,
and judicial-branch personnel interact with the AO.  Based on that knowledge and experience,
the declarants are able to draw reasoned inferences about the matters set forth in their
declarations.  See Williams, 827 F.3d at 1155–56.  Any gaps in the declarants' personal
knowledge—such as Mssrs. Cooney and Weich's absence from government since 2000 and
2012, respectively—go to the weight of the declarations, not their admissibility.  Cooney Decl.
¶ 2; Weich Decl. ¶ 2.

(D.C. Cir. 2006).  An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on a particular claim.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  At bottom, the question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251–52.  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  When reviewing a motion for summary judgment, courts "view the evidence in the light most favorable to the nonmoving party and draw all inferences in its favor."  Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 850 (D.C. Cir. 2006).  Nonetheless, a party seeking to defeat summary judgment cannot simply rest on its pleadings but rather must support its opposition with depositions, affidavits, declarations, or other evidence setting forth specific facts that reveal a genuine issue warranting a trial.  Fed. R. Civ. P. 56(c)(1)(A).

In determining whether to enter a permanent injunction, the Court considers a slightly modified iteration of the factors used to assess a motion for a preliminary injunction: (1) success on the merits, (2) whether the plaintiffs will suffer irreparable injury absent an injunction, (3) whether, balancing the hardships, there is harm to defendants or other interested parties, and (4) whether the public interest favors granting the injunction.  See Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.").

### III.   Analysis

A.   The Merits

*1.   Legal Framework for Government-Employee Speech Restrictions*

"[P]ublic employees do not surrender all their First Amendment rights by reason of their

employment."  Garcetti v. Ceballos, 547 U.S. 410, 417 (2006).  Nevertheless, the government

"has a significant interest, as an employer, in regulating the speech of its employees in order to

perform its public services effectively."  Am. Postal Workers Union, AFL-CIO v. U.S. Postal

Service, 830 F.2d 294, 300 (D.C. Cir. 1987) (internal quotations omitted).  To further that

interest, the government, as an employer, may impose restraints on public employees' speech

that the government, as a sovereign, could not constitutionally impose on the public at large.  See

Waters v. Churchill, 511 U.S. 661, 671–72 (1994).  When a public employee speaks as a citizen

on a matter of public concern, courts employ the balancing test from Pickering v. Board of

Education of Township High School District 205, Will County, 391 U.S. 563 (1968), to

determine if the speech is protected.  Under the traditional Pickering test, "the employee's speech

is protected unless 'the interest of the state, as an employer, in promoting the efficiency of the

public services it performs through its employees' outweighs 'the interests of the [employee], as

a citizen, in commenting upon matters of public concern.'"  Janus v. Am. Fed'n of State, Cty., &

Mun. Emps., Council 31, 138 S. Ct. 2448, 2471 (2018) (quoting Harris v. Quinn, 573 U.S. 616,

653 (2014)) (alteration in original).

The Pickering test developed in cases where a public employer sanctioned an individual

employee for past expression.  In United States v. National Treasury Employees Union, 513 U.S.

454 (1995), the Supreme Court modified the Pickering test to deal with broad, prospective

speech prohibitions.  NTEU involved a First Amendment challenge to the constitutionality of a

statute that banned federal employees from accepting honoraria for giving speeches and writing articles, even when the topic was not related to the employee's duties.  Id. at 457, 459–60. Emphasizing that the ban silenced a "broad category of expression by a massive number of potential speakers" and "chill[ed] potential speech before it happens," the Supreme Court held that "the Government's burden is greater with respect to this statutory restriction on expression than with respect to [the] isolated disciplinary action" at issue in Pickering.  Id. at 467–68.  To justify a broad, *ex ante* speech prohibition, the government is required under the NTEU test to "show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government."  Id. at 468 (quoting Pickering, 391 U.S. at 571).  To satisfy that burden, the government "must demonstrate that [1] the recited harms are real, not merely conjectural, and that [2] the regulation will in fact alleviate these harms in a direct and material way."  Id. at 475 (quoting Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664 (1994)).[8]

---

[8] NTEU distinguished the other Supreme Court decision in this area, U.S. Civil Service Commission v. National Association of Letter Carriers( "Letter Carriers"), 413 U.S. 548 (1973). In Letter Carriers, the Court applied the Pickering framework to the Hatch Act's prohibitions on executive-branch employees taking "an active part in political management or political campaigns."  Id. at 551.  Upholding the Hatch Act, the Court found that it struck a proper balance between employees' speech rights and the government's interest in ensuring that laws are enforced "without bias" (and without the appearance of bias) and preventing corruption in the executive branch.  413 U.S. at 565–67.  NTEU distinguished Letter Carriers on the basis that it "essentially restated in balancing terms [the Court's prior] approval of the Hatch Act in Public Workers v. Mitchell, 330 U.S. 75 (1947)," and had not considered whether the Pickering test required modification "in the context of a sweeping statutory impediment to speech."  NTEU, 513 U.S. at 467.

While the <u>NTEU</u> Court recognized that Congress had an "undeniably powerful" interest in maintaining government employees' integrity (both actual and perceived), it characterized the honoraria ban as "crudely crafted" to serve this interest.  <u>Id.</u> at 472, 477.  For example, although a payment to a high-ranking official in exchange for a speech could create an appearance of impropriety, the same could not be said of the "vast group of present and future employees" who had "negligible power to confer favor on those who might pay to hear them speak or to read their articles."  <u>Id.</u> at 468, 473.  Nor was there any documented "evidence of misconduct related to honoraria in the vast rank and file of federal employees[.]"  <u>Id.</u> at 472.  The Court further questioned Congress's justification for limiting the ban to "expressive activities" when other extracurricular activities presented equal opportunity for abuse.  <u>Id.</u> at 472–74, 475.  These incongruities, among others, "diminish[ed] the credibility of the Government's rationale[.]"  <u>Id.</u> at 476 (internal quotation marks omitted).

The Supreme Court recently reaffirmed the <u>NTEU</u> test in <u>Janus v. American Federation of State, County, & Municipal Employees, Council 31</u>, 138 S. Ct. 2448 (2018).  In <u>Janus</u>, the Court struck down an Illinois law that authorized public-sector unions to charge non-members an "agency fee" to compensate the union for costs associated with its collective bargaining activities.  The Court held that imposing the fee violated the First Amendment by forcing non-members to subsidize the union's speech on matters of public concern.  <u>Id.</u> at 2459–60.  <u>Janus</u> did not apply the <u>Pickering</u> framework to the challenged law, analyzing it instead under the Court's compelled-speech doctrine.  <u>See id.</u> at 2464–65 (citing <u>Knox v. Serv. Emps. Int'l Union, Local 1000</u>, 567 U.S. 298, 309 (2012); <u>United States v. United Foods, Inc.</u>, 533 U.S. 405, 410 (2001)).  In reaching its holding, however, <u>Janus</u> discussed how to apply <u>Pickering</u> to "general [speech-restrictive] rules that affect broad categories of employees."  <u>Id.</u> at 2473.  The Court

confirmed that "the standard <u>Pickering</u> analysis requires modification" in that situation.  <u>Id.</u>

(citing <u>NTEU</u>, 513 U.S. at 466–68).  It explained that because "[a] speech-restrictive law with

widespread impact . . . gives rise to far more serious concerns than could any single supervisory

decision, . . . the government must shoulder a correspondingly heavier burden."  <u>Id.</u> (internal

citation and quotation marks omitted).  Accordingly, the government is "entitled to considerably

less deference in its assessment that a predicted harm justifies a particular impingement on First

Amendment rights."  <u>Id.</u>  "The end product of those adjustments is a test that more closely

resembles exacting scrutiny," <u>id.</u>, meaning the government must show that a speech restriction is

"narrowly tailored to serve compelling state interests," <u>Reed v. Town of Gilbert</u>, 135 S. Ct. 2218,

2226 (2015).

While <u>NTEU</u> and <u>Janus</u> provide considerable guidance, neither the Supreme Court nor

the D.C. Circuit has applied <u>Pickering</u> or <u>NTEU</u> to speech restrictions imposed on judicial-

branch employees.  This case therefore casts the Court into largely uncharted waters.[9]

Navigating the proper course requires the Court not only to apply the <u>NTEU</u> test to new facts but

also to reconcile <u>NTEU</u> with existing Supreme Court precedent concerning the government's

interest in protecting judicial integrity.

As the Court explained in <u>Guffey I</u>, "[j]udicial integrity is . . . a state interest of the

highest order."  <u>Republican Party of Minn. v. White</u>, 536 U.S. 765, 793 (2002) (Kennedy, J.,

concurring).  The judiciary occupies a unique place in our system of governance.  For one,

judicial "decision-making processes are different from those of the other branches."  <u>United

States v. Grace</u>, 461 U.S. 171, 182–83 (1983).  While legislators and executive-branch officials

---

[9] The parties do not cite—and the Court has not found—any federal court decision
applying <u>Pickering</u> or <u>NTEU</u> in similar circumstances.

should be expected to consider their constituents' views when making decisions, "it is the business of judges to be indifferent to popularity." Chisom v. Roemer, 501 U.S. 380, 401 n.29 (1991) (internal quotation marks omitted).  The process of adjudication is  designed to be removed from public influence.  That is why judicial decisions "are made on the record before them and in accordance with the applicable law";  "[t]he views of the parties and of others are to be presented by briefs and oral argument"; and "[c]ourts are not subject to lobbying [and] judges do not entertain visitors in their chambers for the purpose of urging that cases be resolved one way or another." Grace, 461 U.S. at 183.  Only by adhering to such procedures may courts attain legitimacy in the eyes of the public. See White, 536 U.S. at 793 (Kennedy, J., concurring) (The court's power to "resolv[e] disputes . . . rest[s], in the end, upon the respect accorded to its judgments.  The citizen's respect for judgments depends in turn upon the issuing court's absolute probity.").  Unlike the other branches, moreover, the judiciary "has no influence over either the sword or the purse" and "may truly be said to have neither Force nor Will but merely judgment[.]"  The Federalist No. 78, at 465 (Alexander Hamilton) (C. Rossiter ed. 1961).  It is, therefore, "of the utmost importance that the administration of justice be absolutely fair and orderly." Cox v. Louisiana, 379 U.S. 559, 562 (1965).

Out of respect for the gravity of this interest, courts have afforded special solicitude to government efforts to protect the independence of the judiciary.  The most instructive case is Williams-Yulee v. Florida Bar, 575 U.S. 433 (2015).  There the Supreme Court considered a First Amendment challenge to a provision of the Florida Supreme Court's Code of Judicial Conduct that forbade candidates for judicial office from personally soliciting campaign funds.[10]

---

[10] Because Williams-Yulee concerned speech restrictions placed upon private citizens, *i.e.*, candidates for judicial office, it had no occasion to apply or consider NTEU or Pickering.

While acknowledging that "[t]he concept of public confidence in judicial integrity does not easily reduce to precise definition, nor does it lend itself to proof by documentary record," the Court nonetheless found Florida's interest to be "genuine and compelling."  Id. at 447.  In the Court's view, the state realistically feared that if judicial candidates were able to personally solicit funds, "the public may lack confidence in a judge's ability to administer justice without fear or favor if he comes to office by asking for favors."  Id. at 445.  And, "[e]ven if judges were able to refrain from favoring donors, the mere possibility that judges' decisions may be motivated by the desire to repay campaign contributions is likely to undermine the public's confidence in the judiciary."  Id. (quoting White, 536 U.S. at 790 (O'Connor, J., concurring)) (alteration in original).  Applying strict scrutiny analysis to the First Amendment burdens imposed by the provision, the Court concluded that the speech restriction was narrowly tailored to serve a compelling state interest: namely, the interest "in safeguarding 'public confidence in the fairness and integrity of the nation's elected judges.'" Id. (quoting Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 889 (2009)).

In Guffey I, the Court attempted to reconcile the NTEU test with Williams-Yulee's deference to government efforts to protect the public perception of judicial impartiality.  Heeding the Supreme Court's observation that "the concept of public trust in judicial impartiality 'does not easily reduce to precise definition, nor does it lend itself to proof by documentary record,'" the Court held that the government was due "more deference" in its "predictions of harm here than would be proper if the government had asserted a different interest."  Guffey I, 330 F. Supp. 3d at 76 (quoting Williams-Yulee, 575 U.S. at 447).  The Court thus lightened the government's customary burden to "point to documentary evidence showing that employees' activities have eroded public confidence in the past and will continue to do so if left unrestricted."  Id.; see also

Lodge No. 5 of Fraternal Order of Police ex rel. McNesby v. City of Philadelphia, 763 F.3d 358,

373–74 (3d Cir. 2014) (explaining that judicial restraint is appropriate in applying the NTEU test

to the government's interest in protecting against corruption, which due to "its amorphous

nature, is particularly hard to quantify and prove").  Instead, the Court held that the government

could carry its burden by relying on "realistic hypotheticals of how partisan activity restricted

under the Code could lead the public to believe that the judiciary is not behaving impartially."

Id.

Against this background, the Court considers the government's position that all three of

its identified interests—the Public Perception Interest, the Intra-branch Interest, and the Inter-

branch Interest—should be assessed under Guffey I's relaxed burden of proof.  The government

contends that the concept of "judicial integrity" encompasses not only nonpartisanship in the

exercise of the courts' adjudicative function—i.e., handling and deciding individual cases—but

also nonpartisanship in its administrative role—setting and advising on judicial branch policies.

In this same vein, the government asserts that its concern for maintaining the public's perception

of judicial integrity includes not only the general public but also executive-branch employees,

legislative-branch employees, and federal judges themselves.

The Court again concludes, for the reasons laid out in Guffey I, that it is appropriate to

hold the government to the more lenient burden of proof when assessing its asserted Public

Perception Interest.  But it declines to extend that relaxed burden to the Intra- and Inter-branch

interests.  Doing so would be at odds with the general rule, recently reiterated in Janus, that the

government must carry a "heavier burden" to show that broad, ex ante speech restrictions

comply with the First Amendment.  138 S. Ct. at 2472 (emphasis added) (internal quotation

marks omitted).  It would also be unsupported by precedent.  While the Supreme Court struggled

to distill a precise definition of "judicial integrity" in <u>Williams-Yulee</u>, the concept is not so unmoored that the government may recite it to justify any speech restriction related to the judiciary.  <u>Williams-Yulee</u> specifically concerned the integrity of *judicial decision-making in individual cases*.  575 U.S. at 447.  The Court made clear that the personal solicitation ban was necessary because "the mere possibility that *judges' decisions* may be motivated by the desire to repay campaign contributions is likely to undermine the public's confidence in the judiciary." <u>Id.</u> (emphasis added) (quoting <u>White</u>, 536 U.S. at 790 (O'Connor, J., concurring)); <u>see also</u> <u>id.</u> at 445 (describing the state interest as protecting against the concern that the public may believe that a judge would not "*administer justice* without fear or favor if he comes to office by asking for favors") (emphasis added).  The government's interest in <u>Caperton v. A.T. Massey Coal Co.</u>, 556 U.S. 868 (2009), on which <u>Williams-Yulee</u> heavily relied, was likewise cabined to judicial integrity as it relates to decision making in particular cases.[11]  The same is true of Supreme Court cases discussing the concept of judicial integrity in other contexts.  <u>See</u> <u>White</u>, 536 U.S. at 775– 779 (describing three possible meanings of judicial impartiality, each tied to a judge's approach

---

[11] <u>Caperton</u> concerned whether due process required an elected state supreme court justice to recuse himself when the circumstances of his election cast doubt on his ability to decide a particular case without bias.  556 U.S. at 872.  The justice in question had accepted $3 million in campaign contributions from the CEO of a company that had recently received a $50 million adverse jury verdict.  Soon after winning election to the court, the justice voted in the majority to vacate the jury verdict on appeal.

The U.S. Supreme Court reversed.  Because the CEO's campaign contributions had played a critical role in the justice's election and were made at a time when it was foreseeable that the company would seek review of the $50 million verdict, due process required the justice's recusal.  The Court explained that "there is a serious risk of actual bias—based on objective and reasonable perceptions—when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent."  <u>Id.</u> at 884.

to deciding individual cases); id. at 775–76 ("One meaning of 'impartiality' in the judicial context—and of course its root meaning—is the lack of bias for or against either party to the proceeding.") (emphasis in original); cf. Grace, 461 U.S. at 183; Cox, 379 U.S. at 562.  And the government has not identified any federal case that has defined its interest in judicial integrity so broadly as to include judicial branch administration and policymaking.[12]

Moreover, Williams-Yulee's conclusion that the public's perception of judicial integrity is a nebulous interest that does not "lend itself to proof by documentary record," 575 U.S. at 447, was premised on the difficulty of surveying a representative sample of the public on the topic. The same concern does not exist for federal judges or government employees.  Federal judges and executive- and legislative-branch employees are a discrete subset of the general public and are easily accessible to the Department of Justice.  The government could procure affidavits from former judges and employees; indeed, it has done so here in the case of the latter.  See Cooney Decl. ¶ 2 (declaration of former legislative-branch attorney); Weich Decl. ¶ 2 (declaration of former executive- and legislative-branch attorney).

While the Court recognizes the critical importance of protecting the impartiality of the judicial branch, it finds no concrete basis in Supreme Court or D.C. Circuit precedent for reducing the government's burden to show the harms caused by its Intra- and Inter-branch concerns merely because the challenged restrictions apply to judicial-branch employees.  Absent precedent extending the government's significant interest in protecting judicial integrity beyond the courts' adjudicatory role, the Court declines to break new ground.  The Court therefore concludes that while the government need only identify realistic hypotheticals to carry its burden

---

[12] Indeed, government counsel acknowledged at the hearing that it could not cite any such case.  Hr'g on Mot. for Summ. J. Tr. 5:8–6:7, Dec. 20, 2019 (rough).

regarding the Public Perception Interest, it must satisfy the customary NTEU burden to

successfully defend the Code based on its Intra- and Inter-branch Interests.  That is, it must

demonstrate (1) that the prohibited activities will cause harms that are "real, not merely

conjectural," and (2) "that the regulation will in fact alleviate these harms in a direct and material

way."  NTEU, 513 U.S. at 475 (quoting Turner Broad. Sys., 512 U.S. at 664).

       2.   *Application*

      The governing framework now in place, the Court turns to balancing the competing

interests.

       a.   The Employees' Interests

      On Plaintiffs' side of the ledger, "[t]here is no right more basic in our democracy than the

right to participate in electing our political leaders."  McCutcheon v. FEC, 572 U.S. 185, 191

(2014) (plurality opinion).  And all of "the challenged restrictions strike at the core of that [First

Amendment-protected right]."  Guffey I, 330 F. Supp. at 73; see, e.g., Minn. Voters Alliance v.

Mansky, 138 S. Ct. 1876, 1885 (2018) ("[The state's] ban on wearing any 'political badge,

political button, or other political insignia' plainly restricts a form of expression within the

protection of the First Amendment."); Buckley v. Valeo, 424 U.S. 1, 19 (1976) ("A restriction on

the amount of money a person . . . can spend on political communication during a campaign

necessarily reduces the quantity of expression by restricting the number of issues discussed, the

depth of their exploration, and the size of the audience reached."); Kusper v. Pontikes, 414 U.S.

51, 57 (1973) ("The right to associate with the political party of one's choice is an integral part

of [the] basic constitutional freedom [of association.]"); Mills v. Alabama, 384 U.S. 214, 218

(1966) ("[A] major purpose of [the First] Amendment was to protect the free discussion of

governmental affairs . . . of course includ[ing] discussions of candidates.").  The burden imposed

by the Code on Plaintiffs' First Amendment rights is therefore "as serious as they come."

Guffey I, 330 F. Supp. 3d at 74.

The government attempts to minimize the imposition caused by the prohibitions, noting that "the Challenged Restrictions reach only the several hundred employees of a relatively small agency." Def. Mot. for Summ. J. 21. But there is no requirement that a speech prohibition affect a threshold number of government employees before the more onerous NTEU test kicks in. To be sure, NTEU mentioned the honoraria ban's effect on a "vast group of present and future employees" as one consideration weighing against the government in that case, 513 U.S. at 455, but it does not follow that a restriction must affect a large number of employees before the government is required to meet the NTEU standard. See Latino Officers Ass'n, New York, Inc. v. City of New York, 196 F.3d 458, 464 (2d Cir. 1999) ("[N]othing in NTEU implies that the stricter standard applies only when a 'vast group' of employees is involved or when a regulation restricts a 'broad range' of expression.") (emphasis in original); see also Swartzwelder v. McNeilly, 297 F.3d 228, 238 (3d Cir. 2002) (Alito, J.) (holding that NTEU applies, in full force, to a restriction affecting "only . . . the employees of a single city department"). Even if the number of affected employees mattered, the restrictions here still would be considered severe. They entirely ban some 1,100 citizens from engaging in bedrock First Amendment expression— even though the activities would occur on the employees' own time, without the use of any government resources, and without a readily identifiable link to the AO. The government must demonstrate that the prohibitions are necessary and will be materially effective in eliminating its identified harms. See Sanjour v. EPA, 56 F.3d 85, 97 (D.C. Cir. 1995) (en banc) (concluding

that the fact that the challenged regulations affected a "great quantity of speech . . . weighs heavily on the side of the employees").[13]

### b. The Government's Interests

### i. The Public Perception Interest

As explained above, the government may satisfy its burden to show that the challenged prohibitions are necessary to maintain public confidence in the federal judiciary by identifying "predicted harms to the public's perception of judicial integrity—*i.e.*, realistic hypotheticals of how partisan activity restricted under the Code could lead the public to believe that the judiciary is not behaving impartially." Guffey I, 330 F. Supp. 3d at 76.  The government's hypotheticals also must show "that the regulation's sweep is 'reasonably necessary to protect the efficiency of the public service.'" Weaver, 87 F.3d at 1439 (quoting NTEU, 513 U.S. at 474).

At the preliminary injunction stage, the government surmised that if members of the general public were to observe AO staff engaging in the restricted activities, they would come to "believe that partisanship had infected the judicial decisionmaking process." Guffey I, 330 F. Supp. 3d at 76.  The public could form that belief, the government posited, by concluding "that AO employees will try to exert partisan pressure on federal judges—either by hindering judges appointed by presidents of their disfavored party, by favoring judges associated with their preferred party, or by trying to influence the outcome of particular cases in ways that further their partisan preferences." Id.  Alternatively, the government suggested that "the public could

---

[13] The government has wisely abandoned its argument that employees' ability to participate in *non-partisan* political expression somehow mitigates the First Amendment burden imposed by the Code.  See Guffey I, 330 F. Supp. 3d at 74 (rejecting that argument because "partisan and non-partisan political expression have distinct value in a representative democracy").

think that the expressed partisan preferences of AO employees reflect a partisan bent in the judicial branch as a whole." Id.

The Court rejected each supposition.  First, the Court explained why it would be unreasonable for the public to draw the overarching inference that the government feared:

> At the core of each restriction lie run-of-the mill acts of civic participation like speaking out publicly about a candidate, joining or donating to a party, or attending a rally.  These are actions that, in the eyes of a reasonable member of the public, reveal only that the *employee* is politically engaged and prefers a particular candidate or party.  None give rise to a justifiable inference that the *judiciary* has been infected by partisanship.

Id. at 79 (emphasis added).

Second, the Court exposed the logical weaknesses in the government's argument that the public is likely to believe that politically-active AO employees might try to influence judges or cases:

> For a member of the public to see someone engaged in restricted activity—say, attending a rally—and draw the inference that the government fears, it would first need to know that the participant is an AO employee.  (Or, in the case of a campaign contribution, the public would need to learn of AO employees' donation histories.) It would then need to draw three tenuous conclusions:  First, that attending a rally reflects a partisan commitment serious enough to influence an AO employee's performance of her job duties.  Second, that the politically inclined administrative employee could meaningfully influence judicial decisionmaking.  And third, that the employee would choose to exert that influence, notwithstanding its obvious impropriety and its near-certain violation of other provisions in the AO Code.  A member of the public might be forgiven for believing one or two of those links, but the Court cannot uphold these restrictions based on the speculative fear that he might accept the whole chain.  See NTEU, 513 U.S. at 476 (attaching "weight to the powerful and realistic presumption that the federal work force consists of dedicated and honorable civil servants").

Id.

The Court next addressed the "fit" between the new restrictions and the predicted harm. Given the lack of evidence that any AO employee had acted in ways that might realistically be

perceived to jeopardize judicial integrity, the Court questioned whether the prohibitions were

impermissibly over-inclusive:

> What about employees engaging in more extreme displays of partisan belief—say, vitriolic social media postings or cable news interviews? Absent any evidence that such behavior was a problem in the past, the government's speculation that it might occur in the future cannot justify a broad rule that sweeps in a magnitude of more benign partisan activity. Sanjour, 56 F.3d at 97–98 ("In performing the Pickering balance . . . the courts must consider whether the challenged statute or regulation is tailored to address the harm that the government allegedly aims to protect."). And, importantly, the AO could readily address outliers through after-the-fact, isolated disciplinary actions. See, e.g., Guffey Decl. Ex. A, at 6 (AO Code's Canon 2, which prohibits employees from "engag[ing] in any activities that would put into question the propriety of the employee's conduct in carrying out the duties of the office").

Id.

Finally, the Court resisted the government's attempt to project the partisan views of

individual AO employees onto the judicial branch writ large:

> If the fear is instead that the public will view the partisan activity of an AO employee as representing the political bent of the judiciary as a whole, the Code's restrictions are too broad a response. The Code forbids partisan activity even where the participant does not identify herself as a judicial-branch employee and even where the activity takes place nowhere near the AO's offices in Washington. Even to the extent that the public can discern that the participants work for the AO, the Court finds it unlikely that an administrative employee's partisan acts would give rise to an inference that the judiciary is itself a partisan institution. AO employees, after all, do not work in courthouses or interact with litigants, and their job titles do not suggest any relationship with judges or their immediate staffs.

Id. at 79–80.

Now facing summary judgment, the government still has not offered any evidence that a

single AO employee has allowed their partisan views to affect their work. To the contrary, the

government readily acknowledges that "AO employees execute their job duties and tasks without

regard for partisan considerations." Def. Statement of Material Facts ¶ 28, ECF No. 24-1. Nor

has it advanced evidence indicating that any AO employee has acted in ways—like posting

partisan social media screeds—that might reasonably cause a member of the public to question

their professional objectivity.  The government has, however, offered additional and more detailed hypotheticals in an effort to show that the public's perception of judges is likely to suffer without the Code's proposed prohibitions.

Before discussing the government's new hypotheticals, the Court pauses briefly to consider what it means for a hypothetical scenario to be "realistic."  Consistent with its preliminary injunction ruling, the Court considers a "realistic" hypothetical to mean more than an imagined scenario that has sound internal logic.  Otherwise, the government could defend a speech restriction by conjuring situations that, while likely to create appearances of partisanship *if* they came to pass, have no reasonable prospect of occurring and thus cannot justify silencing a swath of protected speech.  For example, the government cannot simply posit that "if an AO employee pens a highly partisan social-media post, people would see it and identify the author as an AO employee, and then view the judiciary as a whole as partisan" without supplying some reason to believe that any of those steps would be reasonably likely to happen without the Code.  And while the government does not have to show that its hypothetical scenarios have actually arisen in the past, history certainly bears on how "realistic" the hypothetical is.

Moving, then, to some of the government's proffered hypotheticals.  The government posits that if an employee's political social media post were noticed by a partisan-aligned media organization, that organization could distribute the post to its readers in an effort to convince the public that the federal judiciary is infected with political bias.  Similarly, if an AO employee were to wear a partisan button, attend a partisan fundraiser, or take part in a political party meeting, her image could be captured in a photo or on video and then distributed to the general public.  Def. Mot. for Summ. J. 30–31, 34.  Along the same lines, if an AO employee were to donate to a political organization, that donation would be published on the Federal Election

Commission's website.  A nefarious actor could find that data and use it to portray the employee as a partisan actor who has compromised the impartiality of the federal judiciary.  Id. at 33.  The nub of all these hypotheticals is this: if members of the public were somehow informed that AO employees engaged in partisan activity, public confidence in an impartial judiciary would suffer because the public would assume that partisan bias has influenced judges' handling and adjudication of cases.  Id. at 28.

No one doubts that the government has a vital interest in maintaining public confidence in judicial impartiality and its appearance.  See, e.g., Williams-Yulee, 575 U.S. at 446 ("[P]ublic perception of judicial integrity is . . . a state interest of the highest order." (internal quotation marks omitted)); Caperton, 556 U.S. at 889 (recognizing a "vital state interest" in safeguarding "public confidence in the fairness and integrity of the nation's elected judges"); White, 536 U.S. at 793 (Kennedy, J., concurring) ("The citizen's respect for judgments depends in turn upon the issuing court's absolute probity.  Judicial integrity is, in consequence, a state interest of the highest order."); Cox, 379 U.S. at 562 ("[I]t is of the utmost importance that the administration of justice be absolutely fair and orderly.").  But it is not enough for the government to merely identify a compelling state interest to justify a speech ban.  Rather, its hypotheticals must draw a link between the feared harms and the restrictions it wishes to impose.  On this score, the government again falters.  The hypothetical situations offered by the government—which vividly illustrate its legitimate concerns regarding judicial integrity in the adjudication of individual cases—do not establish a realistic link between the prohibited activities and the predicted harms. To create the appearance of impropriety at which the Code is aimed, members of the public would need to observe an AO employee engaged in partisan activity, somehow come to know that the person in the photo or social media post is an AO employee, understand that AO

employees work with federal judges, but mistakenly believe that they play a role in handling individual cases, and assume—based on ordinary expressions of political preference—that the AO employee is so politically biased that she would be willing to violate her professional ethical obligations by attempting to sway the outcome of a case.

The links in this chain are fatally weak.  To start, it is unrealistic that members of the public would be so attuned to the inner workings of the federal judiciary that they have heard of the AO *and* yet at the same time misapprehend its basic role.  Moreover, it is unrealistic that the public would interpret routine acts of political expression—such as making a $100 donation or wearing a button or putting up a yard sign—as evidence of such extreme partisanship that the AO employees would choose to subvert the processes of judicial decision-making.

The government's main rebuttal to this critique is to point to the growth of social media and the purported rise of hyper-partisanship in our political culture.  The former broadens the exposure of AO employees' partisan activity to the general public, the government claims, while the latter increases the likelihood that such activity will be exploited to create the impression that judicial decision making is politically biased.  But those societal phenomena do not tip the balance in the government's favor.  First, neither is exactly new.  While social media use may be more prevalent now, people have been posting their personal comings and goings on Facebook and other sites for over a decade, with no documented ill-effect on the public's perception of the federal judiciary.  And hyper-partisanship has been an unfortunate feature of our politics for far longer.  So, while the government may be correct that the combination of the two factors creates greater opportunity for mischief, it is far from clear to the Court that the government's worst fears are likely to materialize.  The government certainly has not offered evidence to that

effect.[14]   Second, neither development changes the Court's conclusion that it would be

unrealistic for members of the public to misperceive ordinary displays of political preference as

indicative of bias so strong as to lead an AO employee to attempt to influence a judge's ruling, or

for them to conclude that an AO employee had the ability to do so.   Finally, the Court declines to

sanction a ban on protected speech simply because a media outlet or other partisan actor could

sow public distrust of the judiciary by deceiving people about the AO's true role in judges'

handling of cases.   (The Court will return to this point in its discussion of the government's Intra-

branch interest.)

   The government's Public Perception justification also fails for another reason: the

government still has not shown "that the regulation's sweep is 'reasonably necessary to protect

the efficiency of the public service.'"   Weaver, 87 F.3d at 1439 (quoting NTEU, 513 U.S. at

475).   That is to say, the hypotheticals advanced by the government do not demonstrate that

blanket, *ex ante* restrictions on protected activities are "reasonably necessary" to further the

stated interest in the public's perception of judicial integrity.   After all, under the prior version of

the code, AO employees could engage in partisan activity, but were forbidden from "us[ing] their

position, title, or authority in connection with the activity," and engaging in it "while on duty" or

while "utilizing any federal resources."   2016 AO Code § 260(c).   And more generally,

employees were obligated to "act impartially and not give preferential treatment to any private

organization or individual" and to "observe high standards of conduct so that the integrity and

independence of the judiciary are preserved."   Id. § 220, (d)(1).   The Court appreciates the

---

[14] While the government may rely on realistic hypotheticals to justify the proposed restrictions, it is not relieved of its burden to support the factual underpinnings of those hypotheticals.  Here, it has not attempted to buttress its contentions regarding the increase in social media use and political partisanship with anything more than anecdotal opinions.

government's argument that after-the-fact disciplinary actions may be more difficult to carry out and could themselves be perceived as partisan.  But while sweeping, forward-looking prohibitions are inherently easier to administer, they also chill more speech—which is why courts require the government to meet a higher burden to justify them.  *Supra* at 18–20.  Still, the government fails to explain why these more tailored standards of conduct are insufficient to address isolated instances of improper behavior that has rarely, if ever, arisen in the past.[15]

The necessity of the challenged prohibitions to the government's asserted interest is further diminished by their under-inclusivity.  Because the Code applies only to future conduct and does not require employees to cleanse their past digital lives of all displays of partisan activity, the hypotheticals feared by the government could still occur even if the Code were in effect.  (This is especially true of employees' political contribution histories, which will live forever in the FEC's public disclosure database.)  While the First Amendment imposes no freestanding "underinclusiveness limitation," R.A.V. v. City of St. Paul, 505 U.S. 377, 387 (1992) (internal quotation marks omitted), and the government "need not address all aspects of a problem in one fell swoop," Williams-Yulee, 575 U.S. at 449, the substantial under-inclusivity of the restrictions bolsters the conclusion that the government has not established that the

---

[15] Relying on Sanjour, 56 F.3d at 97, the government argues that there "is no requirement to find the type of First Amendment 'fit' required in other contexts."  Def. Mot. for Summ. J. 20. Subsequent to Sanjour, however, the D.C. Circuit, sitting en banc, strongly suggested that speech restrictions on government employees must be "closely drawn" to an asserted government interest—an arguably "less deferential" standard than that governing restrictions on employee speech set forth in NTEU.  See Wagner v. FEC, 793 F.3d 1, 7 (D.C. Cir. 2015) (en banc). Moreover, "[e]ven when the Court is not applying strict scrutiny," the government must still demonstrate "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, . . . that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective."  McCutcheon, 572 U.S. at 218 (quoting Bd. of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989)).

restrictions are "'reasonably necessary to protect the efficiency of the public service.'" Weaver,

87 F.3d at 1439 (quoting NTEU, 513 U.S. at 475); see Sanjour, 56 F.3d 85 (holding that an

under-inclusive regulation could not survive under NTEU even though the government identified

a legitimate interest).

*   *   *

While the bulk of the Code's speech restrictions violate the First Amendment, the Court

concludes, as it did at the preliminary injunction stage, that two pass muster: the prohibitions

against driving voters to polls on behalf of a political party or partisan candidate for office and

organizing events for a partisan candidate for office.

These two restrictions mirror those that the Hatch Act places on *all* executive-branch

employees, who are prohibited from "tak[ing] an active part in political management or political

campaigns." 5 U.S.C. § 7323(b)(2)(A). The Supreme Court has twice upheld that restriction

against First Amendment challenges. See Letter Carriers, 413 U.S. at 564; United Public

Workers of Am. v. Mitchell, 330 U.S. 75 (1947); see also Citizens United v. FEC, 558 U.S. 310,

341 (2010) (citing Letter Carriers as support for the observation that "there are certain

governmental functions that cannot operate without some restrictions on particular kinds of

speech"). Although the Hatch Act's prohibitions also curtail the speech of lower-level

employees with no power to initiate executive action, the Court has nonetheless upheld the

application of the restrictions to the entire executive branch. Letter Carriers, 413 U.S. at 564;

United Public Workers of Am, 330 U.S. at 77. Indeed, the Supreme Court has upheld similar

restrictions since 1882. See Ex parte Curtis, 106 U.S. 371, 386 (1882) (upholding statute

prohibiting certain federal employees from giving money to other employees for political

purposes). While that does not necessarily validate the restrictions at issue here, the Supreme

Court's longstanding approval of these kinds of restrictions, even as applied to low-level executive-branch employees, strongly supports their legality—particularly when coupled with the deference afforded to the government in seeking to protect the judiciary's reputation for impartiality.

These two prohibitions also differ in kind from the other seven.  Both activities—actively organizing an event for a candidate and driving voters to the polls on behalf of a party or candidate—evince particularly strong commitments to enlisting partisan support.  While a casual political observer might passively attend a campaign rally, organizing that rally requires a more serious dedication to the cause.  Similarly, volunteering to drive voters to the polls on behalf of a candidate requires greater political engagement than simply driving to work in a car with a political bumper sticker.  Because they involve more committed and visible participation in elections and campaign management, a member of the public could more reasonably conclude that these two activities demonstrate a partisan tie so enduring that it could inspire an AO employee to inject partisan affiliations into her performance of day-to-day duties. While that perception would be mistaken, a member of the public may not fully appreciate that an AO employee would have no ability to sway the outcome in a given case.  These two activities, which suggest more substantial ties of partisanship, are more vulnerable to this interpretation than the others.  The Court therefore finds that the government has satisfied its burden.

### ii.  The Intra-branch Interest

The Code's speech prohibitions are also needed, the government says, to protect federal judges' perception of the AO's impartiality.  Should judges somehow learn, say, that an AO employee who staffs a Judicial Conference committee had donated to political campaigns or worn partisan t-shirts, the government predicts that they would no longer be able to fully trust

that employee's recommendations on matters that come before the committee. And because the AO assists judges in a wide range of ways, this anticipated erosion of trust would harm the branch as a whole.

To reiterate, with regard to the Intra-branch Interest, the government must satisfy the customary NTEU burden because this interest lies beyond the public's perception of judicial integrity in adjudication. That is, the Court must rule in Plaintiffs' favor unless the government demonstrates that the identified harms to its Intra-branch Interest "are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." NTEU, 513 U.S. at 475. "Fear of serious injury cannot alone justify suppression of free speech and assembly." Id. (quoting Whitney v. California, 274 U.S. 357, 376 (1927) (concurring opinion)). Because the government has not shown that the harm it asserts is real—let alone through evidence reflecting the views of a federal judge—the remaining restrictions necessarily fail this test. The lack of evidentiary support is telling. Given that the AO allowed its employees to participate in partisan activities for more than 80 years, one would expect that the government could identify a few concrete instances in which this problem has surfaced. See NTEU, 513 U.S. at 472 (concluding that the government's interest was insufficient because there was not any documented "evidence of misconduct related to honoraria in the vast rank and file of federal employees"); cf. Lodge No. 5 of Fraternal Order of Police, 763 F.3d at 379 (striking down a rule that banned police officers from contributing to a political action committee because the government had failed to "cite a single explanation as to how the contribution ban has directly mitigated its concerns" regarding corruption).

Even if the Court were to assess the government's Intra-branch hypotheticals under the lighter Guffey I burden, none are realistic. While members of the public might not understand

the role of the AO, federal judges certainly do. They know that rank-and-file AO staff could not affect the outcome of an individual case if they tried. Nor would judges presume that the political affiliations of AO employees could alter the judiciary's policy stances, since they realize that AO staff make no final decisions on the matters on which they advise; their recommendations become the policy of the judiciary if and only if the Judicial Conference adopts them.

While it is perhaps possible that an individual federal judge might question the objectivity of policy recommendations or ethics advice received from an AO employee whose differing partisan affiliations became known to her, it is unrealistic to believe that she would actually do so. First, a judge would have to care enough to notice what the employee's beliefs are. Moreover, as explained in Guffey I, the mine run of the activity prohibited by the Code indicates nothing more than an interest in general civic participation. Given "the powerful and realistic presumption that the federal work force consists of dedicated and honorable civil servants," NTEU, 513 U.S. at 476, it would be unreasonable for a judge to infer that AO employees would allow their political leanings to affect the policy recommendations or ethics advice they offer. Judges more than anyone recognize that political affiliation can, and must, be checked at the door when doing the business of the federal courts.

In emphasizing the importance of maintaining judges' trust in the integrity of the advice they receive from the AO, the government compares AO employees' role to that of law clerks, to whom similarly strict partisan-activity restrictions apply. The comparison actually weakens the government's Intra-branch rationale. Law clerk partisan-activity prohibitions may well help ensure that litigants and the general public know that judges' rulings in individual cases are free from inappropriate influences—*i.e.*, they further the Public Perception Interest. But judges

themselves usually know (or at least can reasonably guess) their clerks' party affiliations and

political leanings. And they still rely on their advice in handling even the most politically-

sensitive cases. Judges do so because they appreciate that duty-bound professionals can offer

objective advice on even the most sensitive topics regardless of whom they might support in the

next election. Especially in light of the government's acknowledgment that "AO employees

[currently] execute their job duties and tasks without regard for partisan considerations," Def.

Statement of Material Facts ¶ 28, there is simply no reason to believe that judges—even if they

knew (and cared) which party a particular AO employee belonged to or that he had recently

made a campaign contribution—would perceive AO employees any differently than they do their

law clerks in this regard. The government's asserted Intra-branch Interest thus provides no basis

for upholding the Code's speech prohibitions.

### iii. The Inter-branch Interest

Finally, the government insists that the Code is necessary to ensure that representatives of

the other two branches of government with whom AO employees interact, especially members of

Congress and their staff, do not come to view them as partisan actors. If legislative-branch

employees were to discover off-duty partisan activity by AO staffers, the government

hypothesizes, they would cease to trust the objectivity of the policy and legislative positions that

AO employees advance on behalf of the judicial branch. The government also predicts that

partisan displays by individual AO employees would draw the AO into political disputes, which

in turn would lead Congress to retaliate against the judiciary as a whole. The government

suggests that such retaliation could take the form of "passing legislation to overrule certain

decisions or increase congressional oversight, stripping jurisdiction, or, in extreme cases,

impeaching judicial officers." Def. Mot. for Summ. J. 37.

As with the Intra-branch Interest, the government fails to meet its burden under the customary NTEU standard because it has offered no evidence demonstrating that "the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." NTEU, 513 U.S. at 475. Indeed, the record evidence shows the opposite. According to the government's own declarants, during their time in government— when AO employees could freely engage in the political process—legislative staffers nonetheless believed that "the AO consistently and reliably presented views that were solely in the best interest of the courts, without allowance for political considerations." Cooney Decl. ¶ 10; see also Weich Decl. ¶ 12 ("In my experience as a congressional staffer, the AO and its employees were uniformly perceived as non-partisan actors advocating on behalf of the federal Judiciary."). Nothing in the record before the Court suggests that congressional staffers' perception of the AO is any different today.

Assessing the government's justification under the relaxed Guffey I burden would present a more difficult question. The government predicts that if the Code does not take effect, it would "only be a matter of time" before partisan activity by AO employees will negatively affect the judiciary in its dealings with the Congress. Def. Reply 18. It points again to social media and partisan politics. It asserts that "the role played by social media in partisan politics is far greater today than it was even ten years ago." Supp. Duff Decl. ¶ 3. As a result, the government posits, political operatives intent on harming the judiciary can more readily ascertain and exploit information about the partisan preferences of AO employees. The government maintains further that the hyper-partisanship of today's political culture increases the likelihood that members of Congress and their staffs will (unfairly) malign the integrity and objectivity of AO staff based on their party affiliation or off-duty political activities. To illustrate these

concerns, the government offers examples from recent headlines where politicians have impugned the integrity of career government employees based simply on their party affiliations.[16]

Perhaps the government is correct.  The Court does not operate in a societal vacuum.  The nation's political discourse *is* fractious and hyper-partisan.  And there may well be some who would seek to exploit those divisions—though social media or other means—to advance their position on a policy issue or legislative proposal affecting the judicial branch.  The AO's pursuit of measures to counter these potential effects is therefore commendable and nothing in the Court's ruling should be taken to suggest it should not continue.  But allowing the challenged restrictions to stand because someone might twist routine civic expression to their political advantage strikes the Court as akin to endorsing the proverbial heckler's veto: muffling the speaker in anticipation of a hostile overreaction by the listener.  For if the government's declarants are correct that members of Congress and their staffs would be likely to retaliate against the entire federal judiciary if they knew that an AO employee supported the opposite party, then the problem would lie with Congress (and indeed the country), not the AO.  In this Court's view at least, the First Amendment freedoms of fair and dedicated professionals should not be sacrificed at the altar of partisan myopia.

In any case, the Court need not decide if the enjoined Code provisions would survive the relaxed Guffey I standard.  Again, without precedent supporting the government's position that it

---

[16] For one, the government notes that after the media identified the party affiliations of members of the Special Counsel Robert Mueller's office, members of the House Judiciary Committee accused the Special Counsel of allowing partisan bias to affect his investigation. Supp. Duff Decl. ¶ 6.

should be able to prevail on its Intra- and Inter-branch Interests simply by identifying realistic hypotheticals, the Court declines to extend the more deferential <u>Guffey I</u> burden any further.

    B.  <u>Irreparable Injury, Balance of Hardships, and the Public Interest</u>

    Having decided that enforcement of seven of the nine challenged prohibitions would violate Plaintiffs' First Amendment rights, the remaining three permanent injunction factors all favor Plaintiffs.  Because "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury,'" Plaintiffs would suffer irreparable injury if subjected to the seven identified restrictions.  <u>Mills v. District of Columbia</u>, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976)).  Further, because "[t]he government cannot suffer harm from an injunction that merely ends an unlawful practice," the balance of hardships tips in Plaintiffs' direction.  <u>R.I.L-R v. Johnson</u>, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (internal quotation marks omitted).  Lastly, it is always in the public interest to prevent the enforcement of unlawful speech restrictions.  <u>See</u> <u>Lamprecht v. FCC</u>, 958 F.2d 382, 390 (D.C. Cir. 1992) ("[A] policy that is unconstitutional would inherently conflict with the public interest.").

    C.  <u>Scope of the Remedy</u>

    In its reply brief, the government argues—for the first time in this litigation—that the scope of the Court's injunction should be limited to Plaintiffs Guffey and Smith.  This argument runs headlong into binding precedent.  In <u>Sanjour v. EPA</u>, 56 F.3d 85 (D.C. Cir. 1995), an en banc panel of the D.C. Circuit considered a challenge to an EPA ethics rule that forbade agency employees from receiving expense reimbursement for unofficial speaking or writing engagements concerning their official duties, <u>id.</u> at 87.  The Circuit explained that First Amendment claims are typically categorized as either as-applied challenges, which "ask only

that the reviewing court declare the challenged statute or regulation unconstitutional on the facts

of the particular case," or as facial challenges, which "request that the court go beyond the facts

before it to consider whether, given all of the challenged provision's potential applications, the

legislation creates such a risk of curtailing protected conduct as to be constitutionally

unacceptable 'on its face.'"  Id. at 92 n.10.  But this "distinction is largely irrelevant in the

context of the Pickering/NTEU analysis" because that test requires a reviewing court to

"consider the spectrum of speech suppressed in determining the constitutionality of the

challenged legislation. "  Id. at 91-92, 92 n.10.  Thus, an NTEU claim "blurs" the distinction

between as-applied and facial challenges.  Id. at 92 n.10.  For that reason, "in NTEU itself the

Court did not categorize the employees' challenge as either 'facial' or 'as applied.'"  Id. at 92.

Because an NTEU/Pickering challenge "requires the court to go beyond the facts of the

particular case before it," Sanjour did not limit its invalidation of the challenged restrictions to

the named plaintiffs.  Id. at 92.[17]  Any ambiguity as to Sanjour's remedial scope was resolved on

remand with the district court's statement that the "decision explicitly contemplates an injunction

granting government-wide relief."  Sanjour v. EPA, 7 F. Supp. 2d 14, 16 (D.D.C. 1998).

Accordingly, the district court concluded "that government-wide relief for plaintiffs and all

similarly situated government employees" was appropriate.  Id. at 17.

---

[17] While the Sanjour court enjoined the application of the speech regulation to lower-level agency personnel, it did not "go so far as to include every possible application of the challenged scheme" in the injunction. 56 F.3d at 92.  Specifically, the Circuit did not consider the "interests relevant to senior executive officials," which it acknowledged might "present a different constitutional question."  Id. at 93 (internal quotation marks omitted).  Accordingly, the Court "express[ed] no view on whether the challenged regulations may be applied to senior executive employees."  Id.

Sanjour controls here.  Because the NTEU/Pickering framework explicitly contemplates that the test—and its accordant remedy—must go beyond considering the individual litigants before it, the Court will apply the injunction to all AO employees except the six high-level "designated employees."

## IV.   Conclusion

For the foregoing reasons, the Court will grant in part and deny in part Plaintiffs' Motion for Summary Judgment and grant in part and deny in part Defendant's Motion for Summary Judgment.  A separate Order shall accompany this memorandum opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge


Date:  April 29, 2020